## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ARBEN BAJRA, JOHN BRENNAN, ASHER EINHORN, and MELANIE SUSMAN, individually and on behalf of all others similarly situated,

        Plaintiffs,

    v.

DELTA AIR LINES, INC.

        Defendant.

Case No.

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiffs Arben Bajra, John Brennan, Asher Einhorn, and Melanie Susman (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Delta Air Lines, Inc. ("Defendant" or "Delta"), by and through their attorneys, and allege as follows based on information and belief and the investigation by their attorneys, except as to allegations specifically pertaining to Plaintiffs, which are made upon personal knowledge:

### INTRODUCTION

1.     On the morning of Friday, July 19, 2024, an automatic update to a cybersecurity software developed by CrowdStrike resulted in millions of

computers running Microsoft Windows to crash and display blue screens of death (the "CrowdStrike outage").

2.      The CrowdStrike outage affected CrowdStrike customers who use Microsoft Windows products, including many airports and airlines.

3.      Most airlines rely on Microsoft's Office365 for scheduling, and for getting crew, passengers, and bags where they need to be.

4.      When the CrowdStrike outage crashed these online systems, the affected airlines resorted to manual operations, such as checking passengers in on paper.

5.      The CrowdStrike outage resulted in massive delays throughout the global airline industry. According to flight tracking firm FlightAware, there were more than 4,000 flight cancellations and 35,500 flight delays worldwide by Friday afternoon.[1]

6.      Delta, for example, reportedly canceled more than 4,500 flights between Friday, July 19 and Sunday, July 21, 2024.[2]

---

[1] https://www.wired.com/story/crowdstrike-windows-outage-airport-travel-delays/ (last visited August 5, 2024).
[2] https://www.cnn.com/2024/07/23/business/delta-flight-cancellations/index.html (last visited August 5, 2024).

7.   By the end of the weekend, nearly every airline had managed to recover and resume normal operations. Delta, however, did not resume normal operations.

8.   By the start of the workweek, Delta continued to cancel a staggering number of flights. On Monday, July 22, it was reported that Delta canceled more than 1,250 flights. These cancellations accounted for nearly 70% of all flights within, to, or from the United States that had been canceled on Monday.[3] No other US airline had canceled one-tenth as many flights.[4]

9.   On Tuesday, July 23, Delta continued to cancel flights. By 2pm that day, more than 450 flights had been canceled and more than 1,000 flights had been delayed.[5]

10.   While Delta purports that its "operational reliability" returned to "normal" on Thursday, July 25,[6] passengers reported flight disruptions and cancelations through July 31, 2024, nearly two weeks after the CrowdStrike outage.

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] https://news.delta.com/update/july-2024-operation/delta-starts-thursdays-operation-zero-cancellations (last visited August 5, 2024).

11.    Delta attributed the delay to its disproportionate reliance on Windows software and its inability to fix problems with its crew tracking system, leaving it unable to find the pilots and flight attendants it needed to fly its planes.[7]

12.    The impact on Delta passengers was disastrous. Delta's failure to recover from the CrowdStrike outage left passengers stranded in airports across the country and the world and, in many cases, thousands of miles from home.

13.    When affected passengers requested prompt refunds for their canceled or delayed flights, Delta refused or ignored these requests. In addition, Delta refused to provide all affected passengers with meal, hotel, and ground transportation vouchers, despite its previous commitments, and continues to refuse or ignore requests for reimbursements of these unexpected expenses.

14.    As a result of Delta's failures, affected passengers were forced to spend thousands of dollars in unexpected expenses, including flights from other airlines, hotels, rental cars, ground transportation, and food. Further, Delta separated thousands of passengers from their luggage, leaving many without necessary medication, clothes, and other belongings.

15.    These unfair, unlawful, and unconscionable practices resulted in Delta unjustly enriching itself at the expense of its customers. Accordingly, Plaintiffs

---

[7] https://news.delta.com/update/july-2024-operation/delta-people-working-247-restore-operation-support-customers-get-crews (last visited August 5, 2024).

bring this action in order to secure refunds for each and every similarly situated consumer Delta has wronged by refusing to issue full refunds for flights cancelled or significantly affected as a direct and proximate result of the CrowdStrike outage.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act of 2005, because: (i) there are 100 or more Class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

17.    This Court has personal jurisdiction over Defendant because they are headquartered and/or have conducted substantial business in this judicial district.

18.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant are headquartered in this district, transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

**Plaintiff Arben Bajra**

19.    Plaintiff Arben Bajra is a citizen and resident of Colorado.

20.    Plaintiff purchased two roundtrip tickets to Amsterdam, Netherlands through Delta's website. Plaintiff paid $2,299 for the tickets using a credit card.

21.    On July 20, 2024, Plaintiff and his significant other arrived at the Denver airport and checked his luggage. Delta later informed Plaintiff that his flight was delayed and that he would miss his connecting flight in New York. Plaintiff spoke with a Delta agent to rebook his flight. Delta informed Plaintiff that the only available flight was two days later, on July 22, 2024. Relying upon Delta's representations, Plaintiff accepted the flight for July 22, 2024. Plaintiff then waited another 6 hours to retrieve his luggage.

22.    On July 22, 2024, Plaintiff and his significant other arrived at the Denver airport. Delta informed Plaintiff that the flight was again canceled. Delta informed Plaintiff that there were no available flights for several days. Delta did not provide Plaintiff with any meal or hotel vouchers. Additionally, Delta informed Plaintiff that the ticket price would be automatically refunded, that Plaintiff did not need to do anything to receive the funds, and that another flight was available in the coming days.

23.    Plaintiff booked a flight to Amsterdam that was leaving that day using a different airline. He paid approximately $1,500 for the tickets using a credit card. Plaintiff and his significant other arrived in Amsterdam on July 23, 2024.

24.    On July 30, 2024, Plaintiff was scheduled to fly from Amsterdam back home to Denver. Upon arrival at the airport in Amsterdam, Delta informed Plaintiff that the flight had been canceled and the earliest available flight was scheduled for the next day.

25.    As a result of Delta's cancelation, Plaintiff and his significant other were stranded in Amsterdam for one day.

26.    As a result of Delta's multiple cancelations, Plaintiff was forced to pay for a flight with a different airline, hotel nights which he didn't use because of Delta's cancelation, a hotel room for one night, and alternative transportation. Plaintiff incurred out of pocket expenses in the amount of approximately $1,975.

27.    After waiting approximately 10 days after Delta informed Plaintiff that his ticket price would be automatically refunded, Plaintiff called Delta to check on the status of his refund. Delta then told Plaintiff that refunds were not automatic and that Plaintiff would be forced to submit a request for a refund.

28.    On July 31, 2024, Plaintiff submitted two refund requests: one for the original canceled flight and one for his out of pocket expenses. In response, Delta offered Plaintiff a $100 voucher to use towards a future flight with Delta.

29.    To date, Delta has not provided Plaintiff with a refund or reimbursement for the original ticket price or any of his out of pocket expenses.

**Plaintiff John Brennan**

30.    Plaintiff John Brennan is a citizen and resident of Florida.

31.    Plaintiff purchased two roundtrip tickets for him and his wife to Seattle, Washington to board a cruise to celebrate their anniversary. Plaintiff paid $1,281.12 for the tickets using a credit card through Delta's website. Plaintiff's flights were scheduled for July 21, and 30, 2024.

32.    On July 21, 2024, Plaintiff and his wife were scheduled for a direct flight from Tampa to Seattle. Upon their arrival in Tampa, Delta informed Plaintiff that the flight was canceled. Delta rebooked Plaintiff on a flight to Seattle with a layover in Atlanta. Delta checked Plaintiff's bags and informed Plaintiff that he would be able to retrieve their bags in Seattle. Plaintiff arrived in Atlanta around 6:00 p.m. that evening. However, Delta later informed Plaintiff that the layover flight from Atlanta to Seattle scheduled for that evening was canceled.

33.    In Atlanta, Plaintiff waited in line several hours to speak with a Delta customer service agent in an attempt to book another flight. Around 2 a.m. on July 22, 2024, Plaintiff realized that all the Delta agents had left, and no one was working the customer service desk. An airport representative informed Plaintiff to return at 6 a.m. to resume waiting in line to be rebooked.

34.     By then, Plaintiff realized that he and his wife would be unable to get to Seattle in time to board the cruise, so they were forced to return home to Tampa. Plaintiff began calling all the nearby hotels and was told they were all sold out. Plaintiff then called all of the rental car companies in Atlanta, to which he was informed they would not rent to him because they did not want to run out of rental vehicles. Plaintiff purchased tickets to take a Greyhound Bus from Atlanta back home to Tampa.

35.     As a result of Delta's cancelation, Plaintiff and his wife were stranded in Atlanta without their luggage. More egregious, Plaintiff and his wife missed the anniversary cruise.

36.     Delta refused to provide Plaintiff with the meal and hotel vouchers. Delta further refused to automatically provide a refund for the ticket price. Instead, Delta offered a $100 voucher  – less than Plaintiff is entitled – to use towards a future flight with Delta.

37.     Plaintiff incurred out of pocket expenses of no less than $800.00. Further, Plaintiff spent approximately $10,000 on the cruise that he and his wife missed as a direct and proximate result of Delta's cancellation. Plaintiff submitted a reimbursement request using Delta's website for the canceled flight, the out-of-pocket expenses, and the cost of the cruise. In response, Delta emailed Plaintiff offering $219.45 - less than he is entitled to.

**Plaintiff Asher Einhorn**

38.    Plaintiff Asher Einhorn is a citizen and resident of Washington.

39.    Plaintiff purchased two roundtrip tickets to Boston, Massachusetts through Delta's website. Plaintiff paid $696.20 for the tickets using a credit card.

40.    On July 21, 2024, Plaintiff and his partner arrived at the Boston airport to board their return flight home to Washington. Upon their arrival at the airport, Delta informed Plaintiff that the flight was canceled. Plaintiff attempted to rebook another flight by contacting Delta's customer service phone line and Delta's website, but Delta did not assist.

41.    Delta informed Plaintiff that there were no available flights for several days. Delta did not provide Plaintiff with any meal or hotel vouchers.

42.    As a result of Delta's cancelation, Plaintiff was forced to pay for a hotel for one night, transportation, and forced to pay for another flight home with a different airline. Plaintiff and his partner incurred out of pocket expenses in the amount of approximately $1,500.

43.    On or around July 22, 2024, Plaintiff submitted two refund requests: one for the original canceled flight and one for his out-of-pocket expenses. Delta provided Plaintiff with a partial refund for the ticket price in the amount of $408.11. In response to Plaintiff's reimbursement request for his out-of-pocket expenses of approximately $1,500, Delta emailed Plaintiff informing him that

Delta would provide a reimbursement of $100 – less than he is entitled to – in exchange for a release of Plaintiff's claims against Delta.

44.    Plaintiff contacted Delta to inform Delta that he wanted to accept the reimbursement but did not agree to release his claims. To date, Delta has not responded to Plaintiff.

**Plaintiff Melanie Susman**

45.    Plaintiff Melanie Susman is a citizen and resident of California.

46.    Plaintiff purchased a roundtrip ticket to New York through Delta's website. Plaintiff paid approximately $600 for the ticket using a credit card. Plaintiff's flights were scheduled for July 20, and July 30, 2024.

47.    On July 20, 2024, Plaintiff's flight was canceled. At the direction of Delta, Plaintiff had no choice but to book a new flight on July 23, 2024. Delta subsequently canceled the new flight, which forced Plaintiff to purchase a new flight with a different airline.

48.    As a result of Delta's cancelation, Delta provided Plaintiff with a meal voucher. However, when Plaintiff attempted to use the meal voucher, it was rejected at the airport.

49.    Plaintiff incurred out-of-pocket expenses of approximately $950 for a new flight, fees, and meals.

50.    Plaintiff submitted multiple reimbursement requests using Delta's website for the ticket price of the canceled flight and for her out of pocket expenses.

51.    On or around July 30, 2024, Delta emailed Plaintiff informing her that Delta would provide a refund of approximately $300, less than what she is entitled to.

52.    Delta has provided Plaintiff with SkyMiles to use towards a future flight. However, to date, Delta has not provided a refund for her ticket price or out of pocket expenses.

**Defendant**

53.    Delta Air Lines, Inc. ("Delta") is a Delaware corporation with its principal place of business at 1030 Delta Boulevard, Atlanta, Georgia 30354.

54.    Delta is one of the top three biggest airline companies, serving more than 200 million travelers annually. It boasts up to 4,000 daily departures to more than 1,000 destinations worldwide.[8]

---

[8] https://www.delta.com/us/en/about-delta/overview (last visited August 5, 2024).

## GENERAL FACTUAL ALLEGATIONS

**CrowdStrike Outage and its Impact on Airline Travel**

55.    At 12:09AM EST on Friday, July 19, 2024, a faulty automatic update to a cybersecurity software developed by CrowdStrike resulted in millions of computers running Microsoft Windows to crash.[9]

56.    The CrowdStrike outage impacted CrowdStrike customers who use Microsoft Windows products, including many airports and airlines.

57.    Most airlines rely on Microsoft's Office365 for scheduling, and for getting crew, passengers, and bags where they need to be.

58.    Though CrowdStrike reverted the defective update by 1:27AM EST on July 19, Windows users continued to experience system crashes and outages throughout the day.[10]

59.    When the CrowdStrike outage crashed these online systems, affected airlines, while normally reliant on cloud-based technology, were forced to resort to manual operations. For example, many airlines had to check in their passengers on paper rather than through their online systems, a process that is significantly slower.

---

[9] https://www.crowdstrike.com/falcon-content-update-remediation-and-guidance-hub/ (last visited August 5, 2024).
[10] *Id.*

60.    As a result, the CrowdStrike outage resulted in massive delays and cancellations throughout the global airline industry. According to flight tracking firm FlightAware, more than 4,000 flight cancellations and 35,500 flight delays worldwide by Friday afternoon.[11]

61.    Even once systems were back online, the phenomenon of "delay propagation" prevented immediate recovery. Delay propagation occurs when a delay at a flight stage causes a ripple effect in the subsequent stages of a flight. Delays propagate into and out of an airport. Arrival delays are tracked at the end of each flight leg traveled by the same aircraft identified by a tail number.[12]

62.    As a result, most airlines continued to cancel and delay flights throughout the weekend. Delta, for example, reportedly canceled more than 4,500 flights between Friday, July 19 to Sunday, July 21, 2024.[13]

**Delta's Failure to Recover from the Outage**

63.    By the end of the weekend, nearly every airline had managed to recover and resume normal operations. Delta, however, continued to cancel and delay a staggering number of flights.

---

[11] https://www.wired.com/story/crowdstrike-windows-outage-airport-travel-delays/ (last visited August 5, 2024).

[12] https://aspm.faa.gov/aspmhelp/index/Delay_Propagation.html (last visited August 5, 2024).

[13] https://www.cnn.com/2024/07/23/business/delta-flight-cancellations/index.html (last visited August 5, 2024).

64.    On Monday, July 22, however, Delta canceled more than 1,250 flights, about a third of its schedule.[14] These cancellations accounted for nearly 70% of all flights within, to, or from the United States that had been canceled on Monday.[15] No other US airline had canceled one-tenth as many flights.[16]

65.    On Tuesday, July 23, Delta continued to cancel and delay flights. By 2 p.m. that day, more than 450 flights had been cancelled and more than 1,000 flights had been delayed.[17]

66.    On Thursday, July 25, Delta announced that its "operational reliability" had returned to "normal." [18] Yet, passengers continued to report that Delta canceled their flights through July 31, 2024.

67.    Delta reportedly canceled more flights between Friday and Tuesday than it did in 2018 and 2019 *combined*.[19] There were 5,470 flight cancellations for

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] https://www.nytimes.com/2024/07/23/us/pete-buttigieg-delta-outage.html (last visited August 5, 2024).

[18] https://news.delta.com/update/july-2024-operation/delta-starts-thursdays-operation-zero-cancellations (last visited August 5, 2024).

[19] https://www.businessinsider.com/delta-canceled-more-flights-in-5-days-than-2-years-2024-7#:~:text=Delta%20canceled%20more%20flights%20in%205%20days%20after%20the%20CrowdStrike,in%202018%20and%202019%20combined&text=Delta%20canceled%20more%20flights%20in%20less%20than%20a%20week%20due,it%20canceled%20a%20combined%205%2C370 (last visited August 5, 2024).

the airline between Friday and Tuesday, per FlightAware.[20] By contrast, a total of 5,370 flights were canceled by Delta across the whole 2018 and 2019.[21]

68.    On Monday, July 22, Delta released the following statement, attributing its failures to its reliance on Windows software and to its inability to fix problems with its crew tracking system:[22]

> Upward of half of Delta's IT systems worldwide are Windows based. The CrowdStrike error required Delta's IT teams to manually repair and reboot each of the affected systems, with additional time then needed for applications to synchronize and start communicating with each other.
>
> Delta's crews are fully staffed and ready to serve our customers, but one of Delta's most critical systems – which ensures all flights have a full crew in the right place at the right time – is deeply complex and is requiring the most time and manual support to synchronize.

69.    In the days following the CrowdStrike outage, Delta sought to shift the blame to CrowdStrike and Microsoft by retaining a law firm to pursue potential damages against CrowdStrike and Microsoft.[23]

70.    However, CrowdStrike has refuted Delta's allegations, stating that the threat of litigation "has contributed to a misleading narrative that CrowdStrike is responsible for Delta's IT decisions and response to the outage."[24]

---

[20] *Id.*

[21] *Id.*

[22] https://news.delta.com/update/july-2024-operation/delta-people-working-247-restore-operation-support-customers-get-crews (last visited August 5, 2024).

[23] https://www.law360.com/articles/1863550/delta-hires-boies-schiller-to-recoup-outage-related-damages (last visited August 5, 2024).

71.     According to CrowdStrike, Delta rejected repeated offers to help restore Delta's impacted systems. [25] In addition, CrowdStrike stated that its CEO "personally reached out to Delta's CEO to offer onsite assistance, but received no response."[26]

**Traveler Experiences**

72.     The impact on Delta passengers was disastrous. Delta's failure to recover from the CrowdStrike outage left passengers stranded in airports across the country for days, in many cases thousands of miles from home.

73.     When informing passengers that their flights had been canceled, Delta offered e-credits as compensation but made no mention to passengers of their rights under federal law to receive cash refunds.[27]

74.     Upon information and belief, Delta's misrepresentation resulted in thousands of passengers forgoing their right to a refund by accepting the offered e-credits instead.

75.     Even when affected passengers did exercise their rights to request prompt refunds for their cancelled or delayed flights, Delta refused or ignored

---

[24] https://apple.news/AWlK7OnFxRnGwB7FARQAMGg (last visited August 5, 2024).
[25] *Id.*
[26] *Id.*
[27] https://www.washingtonpost.com/transportation/2024/07/26/delta-canceled-flights-investigation-crowdstrike/# (last visited August 5, 2024).

these requests, or failed to provide real-time assistance from customer service agents.

76.     In addition, Delta refused to provide all affected passengers with meal, hotel, and ground transportation vouchers, despite its previous commitments.

77.     As a result, affected passengers were forced to spend thousands of dollars in unexpected expenses, including flights from other airlines, hotels, rental cars, ground transportation, and food.

78.     Further, Delta separated thousands of passengers from their luggage, leaving many without clothes, necessary medication, and other belongings.

79.     As a result, affected passengers were forced to spend hundreds of dollars purchasing replacements.

80.     When affected passengers attempted to seek reimbursement for these expenses, Delta refused or ignored these requests, despite its previous commitments.

81.     Even when agreeing to reimbursements, Delta forced passengers to release their legal claims against the airline.[28]

---

[28] *See infra* ¶¶ 91-94.

**Delta Violates its Policies Related to Flight Disruptions**

82.     According to the U.S. Department of Transportation's Airline Customer Service Dashboard, Delta has made the following commitments to passengers affected by a cancellation within the airline's control:[29]

- Meal or meal cash/voucher when cancellation results in passenger waiting for 3 hours or more for new flight

- Complimentary hotel accommodations for any passenger affected by an overnight cancellation

- Complimentary ground transportation to and from hotel for any passenger affected by an overnight cancellation

83.     In addition, Delta has made the following commitments to passengers affected by a significant delay within the airline's control:[30]

- Meal or meal cash/voucher when flight delay results in passenger waiting for 3 hours or more for new flight

- Complimentary hotel accommodations for any passenger affected by an overnight delay

- Complimentary ground transportation to and from hotel for any passenger affected by an overnight delay

84.     In a statement made by Delta on July 22, Delta recommitted to its promises and pledged to offer affected passengers the following:[31]

---

[29] https://www.transportation.gov/airconsumer/airline-customer-service-dashboard (last visited August 5, 2024).
[30] *Id.*

**Extending a travel waiver**. Delta extended a travel waiver for all customers with travel booked from July 19-23. The waiver offers customers the ability to make a one-time change to their itinerary. The fare difference for customers will be waived when rebooked travel occurs on or before July 28, in the same cabin of service as originally booked. Customers are encouraged to manage changes to their travel via delta.com or the Fly Delta app.

**Right to a Refund Upon Request**. Customers whose travel has been disrupted due to a canceled or significantly delayed flight may choose to cancel their travel and receive an eCredit for the unflown portion of the trip, or may instead request a refund for the unflown portion of the trip at delta.com/refund.

**Issuing SkyMiles Program miles or a travel voucher** in an amount based on the customer's affected travels.

**Covering eligible expenses** resulting from this flight disruption, including providing meal vouchers, hotel accommodations where available and ground transportation.

**Reimbursement of eligible expenses**. Customers who have incurred hotel, meal or ground transportation expenses while in transit during this operational disruption may submit eligible expenses for reimbursement.

85.    On July 26, Delta made further commitments to affected customers:[32]

**Flight Cancellation/Extended Delay Refunds & Trip Cancellation Option**

Customers whose travel was disrupted due to a canceled or significantly delayed flight may choose to cancel their travel via Delta.com or the Fly Delta app and receive an automatic refund for the unflown portion of the trip. Since July 19, of the refunds processed, 70% were completed via Delta.com or the app.

---

[31] https://news.delta.com/update/july-2024-operation/delta-people-working-247-restore-operation-support-customers-get-crews (last visited August 5, 2024).

[32] https://news.delta.com/what-delta-doing-make-things-right-customers-impacted-crowdstrike-disruption (last visited August 5, 2024).

**No Questions Asked Trip Cancellation**

Delta is also permitting customers with travel booked from July 19-28 who chose not to travel to cancel and request a refund of the unflown portion of their trip – regardless of whether their flight was canceled or significantly delayed. Enhanced refund flexibility applies to tickets with Delta-operated flights, purchased on or before July 23.

**Out-of-Pocket Expense Reimbursement**

We know many customers who experienced a significant delay or flight cancellation incurred unplanned, out-of-pocket expenses during the disruption period, between July 19 and July 28. Delta has expanded the list of eligible expenses that may be covered for this disruption, including flight tickets purchased on other airlines in the same cabin of service or lower, train and bus tickets, rental cars and ride shares.

As part of our Delta Customer Commitment, we will continue to cover reasonable costs for additional categories of expenses.

…

**Automatic Refunds for Bag and Seat Fees**

As an added gesture, Delta is automatically refunding all paid checked bag fees for customers who were charged for checking a bag since July 19 (when the disruption started). Delta is continuing to waive bag fees for up to three checked bags for customers traveling through 11:59 p.m. local time July 28.

Additionally, Delta is automatically refunding seat purchases including paid upgrade and preferred seats for customers who were not able to take advantage of those purchases. For example, if a customer paid for a Delta Comfort+ upgrade post purchase and did not travel in that upgraded seat, Delta is automatically refunding the fee.

No action is needed to receive either the baggage or upgrade fee refund; they are being processed automatically over the coming days.

For all ticket or fee refunds, customers will receive the refund back to their original form of payment. Customers may see multiple refund transactions in their credit card or bank statement as fee refunds are processed separately from flight refunds. Customers eligible for out-of-pocket expense reimbursement will receive an email with instructions on how to receive the reimbursement.

**Customer Apology Gesture**

Customers impacted by a cancellation or significant delay during the disruption period also received an email offering SkyMiles or an electronic Transportation Credit Voucher (ETCV).

**Extending a travel waiver**

Delta extended a  travel waiver  for all customers with travel booked from July 19-28. The waiver offers customers the ability to make a one-time change to their itinerary. The fare difference for customers will be waived when rebooked travel occurs on or before Aug. 4, in the same cabin of service as originally booked. Customers are encouraged to manage changes to their travel via  delta.com  or the Fly Delta app.

86.    In addition, on July 25, U.S. Secretary of Transportation Pete Buttigieg made clear in a statement on his X (formerly Twitter) account: "If you've racked up out-of-pocket expenses on hotels, meals, alternative flights, etc. Delta is required to reimburse passengers."[33]

**Delta Violates Department of Transportation Regulations**

87.    The Department of Transportation "require[es] automatic refunds to consumers when a U.S. air carrier… cancels or makes a significant change to a

---

[33] https://x.com/SecretaryPete/status/1816550304533369165 (last visited August 5, 2024).

scheduled flight to, from, or within the United States and the consumer is not offered or rejects alternative transportation and travel credits, vouchers, or other compensation."[34]

88.    Automatic refunds must be provided "promptly," which is defined as "within 7 business days for credit card payments and within 20 calendar days for other forms of payment."[35]

89.    The Department of Transportation also "require[es] refunds to consumers for fees for ancillary services that passengers paid for but did not receive and for checked baggage fees if the bag is significantly delayed."[36]

90.    To ensure passengers know that they are entitled to a refund, the Department of Transportation further "require[es] carriers and ticket agents to inform consumers of their right to a refund if that is the case *before* making an offer for alternative transportation, travel credits, vouchers, or other compensation in lieu of refunds."[37]

91.    Delta's failures further violate Department of Transportation Regulations because it conditions its offer of reimbursements to passengers on a waiver releasing Delta of all legal claims passengers have against Delta.

---

[34] https://www.govinfo.gov/content/pkg/FR-2024-04-26/pdf/2024-07177.pdf (last visited August 5, 2024).
[35] *Id.*
[36] *Id.*
[37] *Id.* (emphasis added).

92.    Delta's waiver is reproduced in full below:

> By accepting payment, you acknowledge this payment as full settlement of and hereby releases Delta Air Lines, Inc. from any and all claims the undersigned may have against Delta Air Lines, Inc. to this date.

93.    Delta's waiver is unconscionable and unenforceable because it fails to inform consumers of their legal rights, namely their "right to a refund if that is the case *before* making an offer for alternative transportation, travel credits, vouchers, or other compensation in lieu of refunds."[38]

94.    Additionally, Delta's offer of reimbursements is only a fraction of what passengers are entitled to.

**Delta's Failures Prompt Federal Scrutiny**

95.    On July 23, Secretary Buttigieg released a statement that the Department of Transportation had opened an investigation into Delta "to ensure the airline is following the law and taking care of its passengers during continued widespread disruptions."[39] By that time, the Department of Transportation had received more than 3,000 complaints against Delta.[40]

96.    In a news conference later that day, Secretary Buttigieg stated:

---

[38] https://www.govinfo.gov/content/pkg/FR-2024-04-26/pdf/2024-07177.pdf (last visited August 5, 2024).

[39] https://www.npr.org/2024/07/23/nx-s1-5049792/deltas-airlines-delays-and-cancelations-prompt-dot-investigation (last visited August 5, 2024).

[40] https://www.washingtonpost.com/transportation/2024/07/26/delta-canceled-flights-investigation-crowdstrike/# (last visited August 5, 2024).

There's a lot of things I'm very concerned about, including people being on hold for hours and hours, trying to get a new flight, people having to sleep on airport floors, even accounts of unaccompanied minors being stranded in airports, unable to get on a flight.

97.     On July 24, Secretary Buttigieg posted to his X (formerly Twitter) account the following: "On hold for hours, sleeping on airport floors, unaccompanied minors stranded—these are the stories we are hearing from Delta passengers."[41]

98.     According to *The Washington Post*, the Department of Transportation's investigation is examining text messages sent by Delta to passengers "that regulators say did not spell out their rights to a refund."[42]

99.     In addition to the Department of Transportation's investigation, on July 23, U.S. Senator Maria Cantwell (D-Wash.), Chair of the Senate Committee on Commerce, Science and Transportation, sent a letter to Delta Air Lines CEO Ed Bastian regarding the airline's operational and customer communications problems in the wake of the CrowdStrike outage.[43]

---

[41] https://x.com/SecretaryPete/status/1816147652288913674 (last visited August 5, 2024).
[42] https://www.washingtonpost.com/transportation/2024/07/26/delta-canceled-flights-investigation-crowdstrike/# (last visited August 5, 2024).
[43] https://www.commerce.senate.gov/services/files/374240F2-C0B2-4B38-8B64-37678CDF9D28 (last visited August 5, 2024).

100.   In the letter, Senator Cantwell expressed concern "that Delta is failing to meet the moment and adequately protect the needs of passengers."[44]

101.   In particular, Senator Cantwell expressed concern that Delta was violating Section 503 the Federal Aviation Administration Reauthorization Act of 2024, which codified the right to a refund for airline passengers whose flights are canceled, significantly delayed, or significantly changed.[45]

102.   Senator Cantwell stated that "Delta's public website does not accurately and transparently reflect a passenger's legal right to a refund."[46]

103.   Similarly, Section 505 of the FAA law provides that "customers should be able to access real-time assistance from customer service agents of air carriers without an excessive wait time, particularly during times of mass disruptions."[47] In her letter, Senator Cantwell noted reports of Delta's failure to connect passengers with its customer service representatives.[48]

104.   Senator Cantwell demanded Delta to "make clear to all its customers subjected to cancellations and significant delays and changes, including as a result of the technology outage, that they are entitled to refunds as a matter of law" and

---

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id*.

[48] *Id.*

that Delta "should invest significant resources into its customer service operations to ensure that customers are made whole in short order."[49]

## CLASS ALLEGATIONS

105.   Plaintiffs bring this action, individually, and on behalf of a nationwide class, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons in the United States who purchased airline tickets through Delta, or for flights on Delta, to, from or within the States, and sought to cancel their flights, or had their flights cancelled, between July 19, 2024 and July 31, 2024.[50]

106.   In the alternative, Plaintiffs brings this class action on behalf of the following State Subclasses:

> **California Class**:
>
> All persons in California who purchased airline tickets through Delta, or for flights on Delta, to, from or within the States, and sought to cancel their flights, or had their flights cancelled, between July 19, 2024 and July 31, 2024.

> **Colorado Class**:
> All persons in Colorado who purchased airline tickets through Delta, or for flights on Delta, to, from or within the States, and sought to cancel their flights, or had their flights cancelled, between July 19, 2024 and July 31, 2024.

---

[49] *Id.*

[50] Plaintiffs reserve the right to amend or add to the timeframe included in the definition of the Class after conducting discovery.

**Florida Class**:

All persons in Florida who purchased airline tickets through Delta, or for flights on Delta, to, from or within the States, and sought to cancel their flights, or had their flights cancelled, between July 19, 2024 and July 31, 2024.

**Washington Class**:

All persons in Washington who purchased airline tickets through Delta, or for flights on Delta, to, from or within the States, and sought to cancel their flights, or had their flights cancelled, between July 19, 2024 and July 31, 2024.

107.   Excluded from the Class(es) are: (a) Defendant; (b) Defendant's affiliates, agents, employees, officers and directors; and (c) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

108.   **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Class are unknown at this time, such information being in the sole possession of Delta and obtainable by Plaintiffs only through the discovery process. Plaintiffs believe, and on that basis allege, that the Class consists of tens of thousands of people. The number of Class members can be determined based on Delta's records.

109.  **Commonality**: Common questions of law and fact exist as to all members of each Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

    a.    Whether federal regulations require Delta to provide passengers a refund when Delta cancels the passenger's flight;

    b.    Whether Delta committed common law fraud;

    c.    Whether Delta was unjustly enriched by its conduct; and

    d.    Whether Delta violated the Florida Deceptive and Unfair Trade Practices Act.

    e.    Whether Delta violated the California Unfair Competition Law, California Consumers Legal Remedies Act, and False Advertising Law; and

    f.    Whether Delta violated the Washington Consumer Protection Act.

110.  **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs' and Class members' claims all arise out Delta's uniform conduct, statements, and unlawful, unfair, and deceptive acts and practices.

111.  **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class, and is committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

112.   **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Delta's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly-situated individuals.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

113.   Delta has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## COUNT I
## BREACH OF CONTRACT
## FAILURE TO REFUND FARE

114.   Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

115.   Defendant made offers to Plaintiffs and the Class Members to enter into a contract for Defendant to provide transportation services to Plaintiffs and the Class Members through passenger tickets for air travel between specific locations, on specific flight numbers, on specific dates and times, at specific prices.

116.   Defendant's offer to provide transportation services to Plaintiffs and the Class Members also included Defendant's offer that it would refund Plaintiffs and the Class Members for all cancellations and/or significantly changed flights.

117.   At all times relevant, such offers and terms were specifically identified in Defendant's Conditions or Carriage entered into between Plaintiffs and the Class Members on one hand, and Defendant on the other, at the time of ticket purchases.

118.   The Conditions of Carriage reflect Defendant's self-imposed undertakings and obligations voluntarily undertaken by Defendant.

119.   Moreover, Plaintiffs and the Class Members did not draft the terms of the Conditions of Carriage, rather, on information and belief, Defendant (and/or Defendant's agents at Defendant's direction) drafted all terms therein.

120.   Defendant made such offers in writing through the Delta's direct channels (such as Delta's direct-to-consumer sales website, www.delta.com, and the company's mobile applications) and through traditional travel agencies and online travel agencies.

121.   Numerous sections of the Conditions of Carriage applicable at the time Plaintiffs and the Class Members purchased their tickets confirm passengers' contractual rights to refunds where a flight has been cancelled and/or significantly changed, regardless of the reason for a cancellation or delay.

122.   For example, Rule 19 Delta's Conditions of Carriage (attached as Exhibit A) provides as follows:

RULE 19: FLIGHT DELAYS/CANCELLATIONS

A. Delta's Liability in the Event of Schedule Changes, Delays and Flight Cancellations

If there is a flight cancellation, diversion, delay of greater than 120 minutes, or that will cause a passenger to miss connections, Delta will (at passenger's request) cancel the remaining ticket and refund the unused portion of the ticket and unused ancillary fees in the original form of payment in accordance with Rule 22.

123.   Rule 22 of Delta's Conditions of Carriage provides as follows:

RULE 22: REFUNDS

A. Involuntary Refunds

If a refund is required because of Delta's failure to operate on schedule or refusal to transport (except as a result of passenger's failure to comply with the contract of carriage), the following refund will be made directly to you:

1) If no portion of the ticket has been used, the refund will be an amount equal to the fare paid.

2) If a portion of the ticket has been used and termination (interruption) occurs:

a) At A Fare Breakpoint - The refund will be an amount equal to the fare paid for the unused transportation from the point of termination (interruption) to the destination or next Stopover point named on the ticket, or to a point at which transportation is to be resumed. No refund will apply when alternate transportation is provided by Delta and accepted by the passenger.

b) Within A Fare Component - The refund will be an amount equal to the percentage of unflown mileage to fare component total mileage by prorating the fare paid for the fare component, from the point of termination/interruption to the destination, or next Stopover point named on the ticket, or to the point at which transportation is to be resumed. No refund will apply when alternate transportation is provided by Delta and accepted by the passenger.

124.   The terms of Defendant's offer to provide transportation services contained a definite promise by Defendant and gave Plaintiffs and the Class Members the power to agree to the terms of Defendant's offer to provide

transportation services, including but not limited to, through the act of purchasing a ticket or accepting transportation on Defendant's aircraft.

125.  Plaintiffs and the Class Members accepted Defendant's offer to provide transportation services, agreeing to the material terms contained in Defendant's offer.

126.  Plaintiffs and the Class Members communicated their acceptance of Defendant's offer to Defendant by purchasing one or more tickets, booking transportation services with Defendant.

127.  The agreement between Plaintiffs, the Class Members, and Defendant included an exchange of promises or value, i.e., consideration. Here, Plaintiffs and the Class Members provided Defendant with consideration in the form of amounts equal to the monetary value of the fare and all charges and taxes paid.

128.  Plaintiffs and the Class Members performed all obligations and conditions required and expected of them and/or had a valid excuse for not performing any such obligations.

129.   Defendant cancelled and/or significantly changed Plaintiffs' and the Class Members' flights.

130.  Defendant has failed to provide and/or has outright refused to provide refunds to Plaintiffs and the Class Members for such cancelled and/or significantly changed flights.

131.   Defendant did so even though Defendant was contractually obligated to provide refunds to Plaintiffs and the Class Members in such circumstances.

132.   As a result, Defendant has failed to perform and/or has materially breached its contracts with Plaintiffs and the Class Members.

133.   Because of Defendant's failure to perform under the contract, Plaintiffs and the Class Members have been damaged and/or did not receive the refunds, benefits, payment, and/or performance to which they were entitled.

134.   As a result, Plaintiffs and the Class Members are entitled to fair compensation in the form of complete refunds for all fares, charges, and taxes paid.

**COUNT II**
**BREACH OF CONTRACT**
**FAILURE TO COVER ADDITIONAL AMENITIES**

135.   Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

136.   Defendant made offers to Plaintiffs and the Class Members to enter into a contract for Defendant to provide transportation services to Plaintiffs and the Class Members through passenger tickets for air travel between specific locations, on specific flight numbers, on specific dates and times, at specific prices.

137.   Defendant's offer to provide transportation services to Plaintiffs and the Class Members also included Defendant's offer that it would provide a

passenger with certain additional amenities during a delay of more than four (4) hours.

138.   At all times relevant, such offers and terms were specifically identified in Defendant's Conditions of Carriage entered into between Plaintiffs and the Class Members on one hand, and Defendant on the other, at the time of ticket purchases.

139.   The Conditions of Carriage reflect Defendant's self-imposed undertakings and obligations voluntarily undertaken by Defendant.

140.   Moreover, Plaintiffs and the Class Members did not draft the terms of the Conditions of Carriage, rather, on information and belief, Defendant (and/or Defendant's agents at Defendant's direction) drafted all terms therein.

141.   Defendant made such offers in writing through Delta's direct channels (such as Delta's direct-to-consumer sales website, www.delta.com, and the company's mobile applications) and through traditional travel agencies and online travel agencies.

142.   For example, Rule 19(B) Delta's Conditions of Carriage provides as follows:

B. Delta's Liability for Additional Amenities in the Event of Schedule Changes, Delays and Flight Cancellations

Except as provided above, Delta shall have no liability if the flight cancellation, diversion or delay was due to force majeure. As used in this rule, "force majeure" means actual, threatened or reported:

(1) Weather conditions or acts of God;

(2) Riots, civil unrest, embargoes, war, hostilities, or unsettled international conditions;

(3) Strikes, work stoppages, slowdowns, lockout, or any other labor-related dispute;

(4) Government regulation, demand, directive or requirement;

(5) Shortages of labor, fuel, or facilities; or

(6) Any other condition beyond Delta's control or any fact not reasonably foreseen by Delta.

However, when a passenger's travel is interrupted for more than 4 hours after the scheduled departure time as a result of flight cancellation or delay on the date of travel other than from force majeure, Delta will provide the passenger with the following additional amenities during the delay:

(a) Hotels

If overnight accommodations are available at Delta contracted facilities, Delta will provide the passenger with a voucher for one night's lodging when the delay is during the period of 10:00 pm to 6:00 am. Delta will

provide free public ground transportation to the hotel if the hotel does not offer such service. If accommodations are not available, Delta will provide the passenger with a voucher that may be applied to future travel on Delta equal in value to the contracted hotel rate, up to $100 USD.

(b) Ground Transportation

In lieu of lodging or other amenities, Delta will furnish ground transportation to the destination airport if a passenger's flight is diverted to an alternative airport and if the destination on the ticket and the diverted airport destination are within the following city groups:

San Francisco, CA (SFO)/ Oakland, CA (OAK)/ San Jose, CA (SJC) Los Angeles, CA (LAX)/ Long Beach, CA (LGB)/ Ontario, CA (ONT)/ Santa Ana, CA (SNA) Denver, CO (DEN)/ Colorado Springs (COS) O'Hare – Chicago, IL (ORD)/ Midway – Chicago, IL (MDW) Dallas-Ft. Worth, TX (DFW)/ Dallas, TX Love Field (DAL) Bush Intercontinental – Houston, TX (IAH)/ Hobby – Houston, TX (HOU) Fort Lauderdale, FL (FLL)/ Miami, FL (MIA)/ West Palm Beach, FL (PBI) Baltimore, MD (BWI)/ National – Washington, DC (DCA)/ Dulles – Washington, DC (IAD) Newark, NJ (EWR)/ LaGuardia – New York, NY (LGA)/ John F. Kennedy – New York, NY (JFK) Orlando, FL (MCO)/ Tampa, FL (TPA)/ Daytona Beach, FL (DAB)/ Melbourne, FL (MLB)/Sarasota Bradenton, FL (SRQ)

(c) Additional Amenities

Delta will provide such additional or alternative amenities as are necessary to maintain the safety and/or welfare of customers with special needs such as unaccompanied children and Persons with a Disability.  Such amenities will be furnished consistent with special needs and/or circumstances.

143.   The terms of Defendant's offer to provide transportation services contained a definite promise by Defendant and gave Plaintiffs and the Class Members the power to agree to the terms of Defendant's offer to provide transportation services, including but not limited to, through the act of purchasing a ticket or accepting transportation on Defendant's aircraft.

144.   Plaintiffs and the Class Members accepted Defendant's offer to provide transportation services, agreeing to the material terms contained in Defendant's offer.

145.   Plaintiffs and the Class Members communicated their acceptance of Defendant's offer to Defendant by purchasing one or more tickets, booking transportation services with Defendant.

146.   The agreement between Plaintiffs, the Class Members, and Defendant included an exchange of promises or value, i.e., consideration. Here, Plaintiffs and the Class Members provided Defendant with consideration in the form of amounts equal to the monetary value of the fare and all charges and taxes paid.

147.   Plaintiffs and the Class Members performed all obligations and conditions required and expected of them and/or had a valid excuse for not performing any such obligations.

148.   Defendant cancelled and/or significantly changed Plaintiffs' and the Class Members' flights.

149.   Defendant has failed to provide and/or has outright refused to cover the hotel, transportation, and additional amenity expenses incurred by Plaintiffs and the Class Members for cancelled and/or significantly changed flights.

150.   Defendant did so even though Defendant was contractually obligated to provide refunds to Plaintiffs and the Class Members in such circumstances.

151.   As a result, Defendant has failed to perform and/or has materially breached its contracts with Plaintiffs and the Class Members.

152.   Because of Defendant's failure to perform under the contract, Plaintiffs and the Class Members have been damaged and/or did not receive the refunds, benefits, payment, and/or performance to which they were entitled.

153.   As a result, Plaintiffs and the Class Members are entitled to fair compensation in the form of complete refunds for all fares, charges, and taxes paid.

## <u>COUNT III</u>
## BREACH OF IMPLIED/ORAL CONTRACT

154.   Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

155.    In addition to the express written contractual terms between Plaintiffs and Delta relating to refunds for flights that have been cancelled and/or significantly delayed, as set forth in paragraphs 84 and 85, *supra*, Delta entered into oral contracts and/or implied contracts with Plaintiffs and the members of the putative classes.

156.    Delta promised those whose travel had been disrupted due to a canceled or significantly delayed flight that they could request refunds and reimbursements for their out of pocket expenses.

157.    Delta also promised to refund the unplanned, out-of-pocket expenses incurred by Plaintiffs and the putative class members during the disruption period.

158.    Delta, Plaintiffs, and the members of the putative classes mutually assented to the terms of these oral/implied contracts.

159.    Delta, Plaintiffs, and the members of the putative classes each gave consideration to support the terms of these oral/implied contracts.

160.    Plaintiffs and the members of the putative classes suffered injuries as a result of Delta's breach of these oral/implied contracts.

## COUNT IV
## COMMON LAW FRAUD

161.    Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

162.  Delta made material misrepresentations and/or omissions concerning the ability of Plaintiffs and class members to receive refunds for cancelled flights. For example, Delta falsely represented that Plaintiffs and the class members were only able to receive travel vouchers Delta did not fully and truthfully disclose to its customers that they were entitled to receive refunds. As a result, Plaintiffs and the other Class members were fraudulently induced to purchase airline tickets and were unable to pursue refunds of amounts paid for tickets.

163.  Delta had a duty to disclose that Plaintiffs and the class members were entitled to refunds when Plaintiffs and the class members contacted Delta seeking refunds.

164.  Delta had a duty to disclose that Plaintiffs and the class members were entitled to reimbursement of out-of-pocket expenditures incurred as a result of Delta's cancellations.

165.  These misrepresentations and omissions were made by Delta with knowledge of their falsity, and with the intent that Plaintiffs and Class members rely upon them.

166.  Plaintiffs and Class members reasonably relied on these omissions, and suffered damages as a result.

## COUNT V
## UNJUST ENRICHMENT

167.   Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

168.   This claim is pled in the alternative to Plaintiffs' contract-based claims.

169.   Plaintiffs and the class conferred a direct benefit on Delta by purchasing airline tickets.

170.   Delta knowingly and willingly accepted and enjoyed the benefits conferred on it by Plaintiffs and the class.

171.   Delta's retention of these benefits is unjust and inequitable due to the conduct described herein.

172.   As a direct and proximate cause of Delta's unjust enrichment, Plaintiffs and the Class are entitled to an accounting, restitution, attorneys' fees, costs and interest.

## COUNT VI
## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (on behalf of the California Class)

173.   Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

174.   To the extent required, this cause of action is pled in the alternative.

175.   Delta's conduct described herein violates the "unfair" and "unlawful" prongs of California's Unfair Competition Law (the "UCL"), codified at California Business and Professions Code §§ 17200, *et seq.*

176.   By its conduct alleged herein, Delta has violated the "unfair" prong of the UCL, including without limitation by: (a) promising Plaintiff Susman and the California Class refunds for cancelled or severely delayed flights, and then reneging on that promise; (b) promising Plaintiff Susman and the California Class reimbursement of travel expenses incurred as a result of the cancelled or severely delayed flights, and then reneging on that promise; and (c) failing to comply with the refund and reimbursement obligations imposed by the federal government.

177.   Delta's conduct alleged herein is immoral, unethical, oppressive, unscrupulous, unconscionable, and substantially injurious to Plaintiff Susman and the California Class.  By its conduct alleged herein, Delta has already improperly extracted at least several millions of dollars from customers in California and throughout the United States.  There is no utility to Delta's conduct, and even if there were any utility, it would be significantly outweighed by the gravity of the harm caused by Delta's conduct alleged herein.

178.   Delta's conduct alleged herein also violates California public policy, including as such policy is reflected in Cal. Civ. Code § 1750, *et seq.*, Cal. Civ. Code §§ 1709-1710, and California common law relating to contracts.

179.   By its conduct alleged herein, Delta has also violated the "unlawful" prong of the UCL, including by breaching contractual promises and/or violating the implied covenant of good faith and fair dealing, in violation of California common law.

180.   By its conduct alleged herein, Delta received money from Plaintiff Susman and the California Class that Delta should not have received, including but not limited to fees paid for airline tickets, meals, hotels, and other valuable benefits as alleged herein.

181.   As a direct and proximate result of Delta's unfair and unlawful conduct, Plaintiff Susman and the proposed California Class lost money and have lost other property and benefits in which Plaintiff Susman and the California Class have a vested interest.

182.   Plaintiff Susman and the California Class lack an adequate remedy at law to recover the amounts they have paid Delta for the service: (a) to the extent those amounts (in part or in whole) are deemed not recoverable as damages under their breach of contract claims; and/or (b) to the extent such payments are considered "voluntary" (as that term is used for the "voluntary payment" defense) and rendered not recoverable under legal claims. The UCL gives courts broad equitable power to "make such orders or judgments…as may be necessary to restore to any person in interest any money or property, real or personal, which

may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203.  As alleged, all amounts paid to Delta by Plaintiff Susman and the California Class for airfare were and are amounts that Delta acquired by means of its misconduct in violation of the UCL.  All such amounts may properly be awarded as restitution under the UCL even in the event it is determined recoverable damages under their legal claims are more limited or damages are not available at all.  Moreover, the voluntary payment defense is not applicable to equitable claims under the UCL – *see Torliatt v. Ocwen Loan Servicing, LLC* 570 F. Supp. 3d 781, 800 (N.D. Cal. 2021); *Bautista v. Valero Mktg. & Supply Co.*, 2018 WL 11356583, at *4 (N.D. Cal. Dec. 4, 2018) – and a party may state a claim and obtain restitution of payments under the UCL in the factual scenario where those payments are made with knowledge of the relevant facts.

183.   Plaintiff Susman and the California Class lack an adequate remedy at law to obtain injunctive relief requiring Delta to stop refusing to offer refunds and reimburse California customers for out-of-pocket expenses, to the extent the specific performance remedy for their breach of contract claims is determined to require anything less than such relief.  The UCL gives courts broad equitable power to "make such orders or judgments…as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition." Cal. Bus. & Prof. Code § 17203.

184.   Plaintiff Susman seeks an order granting restitution to Plaintiff and the California Class in an amount to be proven at trial, including for the amounts they have paid to third parties for expenses that should have been reimbursed by Delta.

185.   Delta's conduct has caused substantial injury to Plaintiff Susman and the California Class. Delta's conduct is ongoing and will continue absent a permanent injunction.  Accordingly, Plaintiff Susman seeks an order enjoining Delta from continuing its misconduct alleged herein, ordering Delta to honor its obligations.

186.   Plaintiff Susman further seeks an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

<u>**COUNT VII**</u>
**VIOLATIONS OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT ("CLRA") CAL. CIV. CODE §§ 1750–1785**
**(on behalf of the California Class)**

187.   Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

188.   Plaintiff Susman and the members of the California Subclass are "consumers" as defined under the CLRA. See Cal. Civ. Code § 1761(d).

189.   Delta is a "person" as defined under the CLRA. See Cal. Civ. Code § 1761(c).

190.   Airline tickets are "goods" as defined under the CLRA. See Cal. Civ. Code § 1761(a).

191.   The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

192.   Delta engaged in unfair and deceptive acts in violation of the CLRA by the practices described above and by (a) promising Plaintiff Susman and the California Class refunds for cancelled or severely delayed flights, and then reneging on that promise; (b) promising Plaintiff Susman and the California Class reimbursement of travel expenses incurred as a result of the cancelled or severely delayed flights, and then reneging on that promise; and (c) failing to comply with the refund and reimbursement obligations imposed by the federal government. Delta's conduct violates the CLRA in that it:

    a.  represented that the airline tickets have characteristics, uses, or benefits that they do not have, which is in violation of section 1770(a)(5);

    b.  represented that the airline tickets are of a particular standard, quality, or grade when, in fact, they are not, which is in violation of section 1770(a)(7);

    c.  advertises airline tickets with the intent not to sell them as advertised, which is in violation of section 1770(a)(9);

    d.  represents that airline tickets have been supplied in accordance with a previous representation when they have not, which is in violation of section 1770(a)(16); and

    e.  inserts an unconscionable provision into its reimbursement of out of pocket expenses in violation of section 1770(a)(19).

193.  Delta's unfair or deceptive acts or practices occurred repeatedly in its trade or business and were capable of deceiving a substantial portion of the purchasing public.

194.  Delta knew, should have known, or was reckless in not knowing that it was incapable of providing airline travel and should have disclosed to passengers of its lack of capabilities and offered to cover the costs of rebooking flights and other associated costs.

195.  Delta was under a duty to Plaintiff and the California Subclass members to disclose the facts about the flight cancellations and Delta's promises to refund and reimburse passengers because:

    a.  Delta knew of but actively concealed these facts from Plaintiff and the California Subclass;

    b.  Delta was in a superior and exclusive position to know the true facts about its operations which affects the ability of Delta to offer flights, and Plaintiff and the Subclass members could not reasonably have

been expected to discover that Delta would be unable to offer them
flights; and

c.  Delta made partial representations regarding the status of flights,
including future flights which Delta booked passengers, and Delta's
promises to refund and reimburse passengers of their costs.

196.  The facts that Delta misrepresented to and concealed from Plaintiff
and the other California Subclass members are material because a reasonable
consumer would have considered them to be important in deciding whether to
purchase airline tickets from Delta or pay a lesser price for them.

197.  Delta's business operations and its ability to fly passengers to their
destinations at the scheduled times are material terms.

198.  In failing to disclose Delta's inability to operate flights, Delta has
knowingly and intentionally concealed material facts in breach of its duty to
disclose.

199.  Plaintiff and the California Subclass have suffered injury in fact and
actual damages resulting from Delta's material misrepresentations and omissions,
including by paying an inflated purchase price for airline tickets and incurring
additional out-of-pocket expenses to deal with the flight cancelation. Had Plaintiff
and the Subclass known about Delta's flight cancelations, they would not have
purchased their airline tickets or would have paid less in doing so.

200.   As a direct and proximate result of Delta's unfair and deceptive conduct, therefore, Plaintiff and the California Subclass members have been harmed.

201.   Pursuant to Cal. Civ. Code § 1782(a), Plaintiff Susman sent a letter to Delta notifying it of its CLRA violations and providing them with an opportunity to correct their business practices on August 5, 2024. If Delta does not correct its business practices, Plaintiff will amend (or seek leave to amend) the complaint to add claims for monetary relief, including for actual, restitutionary, and punitive damages under the CLRA.

202.   Pursuant to Cal. Civ. Code § 1780(a), Plaintiff, individually and on behalf of the California Subclass, seeks injunctive relief for Delta's violation of the CLRA.

203.   Additionally, pursuant to Cal. Civ. Code §§ 1780 and 1781, Plaintiff, individually and on behalf of the California Subclass, seeks compensatory and punitive damages under the CLRA and to recover their attorneys' fees and costs.

204.   Plaintiff's CLRA venue declarations are attached as Exhibit "A" to this complaint in accordance with Cal. Civ. Code § 1780(d).

**COUNT VIII**
**VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW**
**(Cal. Bus. & Prof. Code § 17500, et seq.)**
**(on behalf of the California Class)**

205.   Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

206.   Plaintiff Susman brings this claim on behalf of herself and on behalf of the California Class against Defendant.

207.   California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

208.   Defendant caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendant, to be untrue and

misleading to consumers, including Plaintiff Susman and the other California Class Members.

209.   Defendant has violated section 17500 because the misrepresentations and omissions regarding the operability of flights, refunds, and reimbursements as set forth in this Complaint were material and likely to deceive a reasonable consumer.

210.   Plaintiff Susman and the other California Class Members have suffered an injury in fact, including the loss of money or property, as a result of Defendant's unfair, unlawful, and/or deceptive practices. In purchasing an airline ticket, Plaintiff Susman and the other California Class Members relied on the misrepresentations and/or omissions of Defendant with respect to the ability of Delta to fly the aircraft at the scheduled time. Moreover, Plaintiff Susman and the California class relied on the misrepresentations and/or omissions of Defendant with respect to the issuance of refunds for canceled flights, reimbursements for out of pocket expenses as a result of Delta's cancelations, and other commitments Delta made with respect to offering additional benefits, including meal and hotel vouchers. Defendant's representations were untrue because Delta canceled Plaintiff Susman's and the California class members' flights and failed to provide the refunds and reimbursements to which they were entitled and Delta failed to provide additional benefits described herein. Had Plaintiff Susman and the other

California Class Members known this, they would not have purchased airline tickets from Delta and/or paid as much for them. Accordingly, Plaintiff Susman and the other California Class Members overpaid for their airline tickets and did not receive the benefit of their bargain.

211.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

212.   Plaintiff Susman, individually and on behalf of the other California Class Members, requests that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff Susman and the other California Class Members any money Defendant acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT IX
## VIOLATIONS OF THE FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT
### (on behalf of the Florida Class)

213.   Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

214.   The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.* (FDUTPA), is designed to protect consumers from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

215.   Plaintiff Brennan is a "consumer" as defined in the FDUTPA.

216.   Delta engages in "trade or commerce" as defined in the FDUTPA.

217.   In the course of Delta's business, it engaged in conduct that was consumer-oriented and did so in a manner which was materially deceptive and unfair towards customers such as Plaintiff Brennan.

218.   Delta had actual knowledge of a consumer's right to a refund as described herein, but refused to provide refunds to consumers.

219.   Delta had actual knowledge of a consumer's right to have their costs covered as described herein, but refused to reimburse consumers.

220.   Delta's unfair and deceptive practices were done to enrich its bottom line to the detriment of Plaintiff Brennan and the Florida Class.

221.   As set forth above, Delta's actions occurred in the conduct of trade or commerce and constitute unfair and/or deceptive trade practices under the FDUTPA.

222.   Plaintiff Brennan and the Florida Class relied upon and were deceived by Delta's unfair and deceptive misrepresentations of material fact in deciding to purchase airline tickets from Delta.

223.   Plaintiff Brennan and the Florida Class were injured as a result of Delta's conduct, and suffered ascertainable monetary loss. Plaintiff Brennan and the class members conveyed to Delta a thing of value, but did not receive the benefit of their bargain.

224.   Pursuant to the FDUTPA, Plaintiff Brennan and the Florida Class are entitled to an award of reasonable legal fees and costs incurred in connection with this action.

### COUNT X
### VIOLATIONS OF THE WASHINGTON
### CONSUMER PROTECTION ACT
### (on behalf of the Washington Class)

225.   Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

226.   Defendant Delta Air Lines engaged in unfair or deceptive practices prohibited by the Washington Consumer Protection Act, Wash. Rev. Code § 19.86, *et seq*. ("WCPA").

227.   Plaintiff Einhorn is a "person" as defined in the WCPA.

228.   Delta engages in "trade" and/or "commerce" as defined in the WCPA.

229.   In the course of Delta's business, it knowingly and intentionally failed to provide refunds to consumers and cover costs incurred by customers, such as Plaintiff Einhorn, when Delta canceled their flights.

230.   Delta had actual knowledge of a consumer's right to a refund as described herein, but refused to provide refunds to consumers.

231.   Delta had actual knowledge of a consumer's right to have their costs covered as described herein, but refused to reimburse consumers.

232.   Delta's unfair and deceptive practices were done to enrich its bottom line to the detriment of Plaintiff Einhorn and the Washington Class.

233.   As set forth above, Delta's actions occurred in the conduct of trade or commerce and constitute unfair and/or deceptive trade practices under the WCPA.

234.   Plaintiff Einhorn and the Washington Class relied upon and were deceived by Delta's unfair and deceptive misrepresentations of material fact in deciding to purchase airline tickets from Delta.

235.   Plaintiff Einhorn and the Washington Class were injured as a result of Delta's conduct, and suffered ascertainable monetary loss. Plaintiff Einhorn and the class members and did not receive the benefit of their bargain.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that this Court:

A.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class(es) as defined above;

B.    Appoint Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

C.    Award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class members are entitled;

D.    Award pre-judgment and post-judgment interest on such monetary relief;

E.    Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Delta to issue refunds of ticket prices to any member of the class who requests a refund;

F.    Award reasonable attorney's fees and costs; and

G.    Grant such further relief that this Court deems appropriate.

## **JURY DEMAND**

Plaintiffs, individually and on behalf of the putative Class demand a trial by jury on all issues so triable.

Dated: August 6, 2024

Respectfully submitted,

*/s/ G. Franklin Lemond, Jr.*
E. Adam Webb
G. Franklin Lemond, Jr.
**WEBB, KLASE & LEMOND, LLC**
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
Tel: (770) 444-9325
Facsimile: (770) 217-9950
Adam@WebbLLC.com
Franklin@WebbLLC.com

Joseph G. Sauder
Joseph B. Kenney
Juliette T. Mogenson
**SAUDER SCHELKOPF**
1109 Lancaster Avenue
Berwyn, PA 19312
Tel: 888.711.9975
jgs@sstriallawyers.com
jbk@sstriallawyers.com
jtm@sstriallawyers.com

***Attorneys for the Plaintiffs***