## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ARBEN BAJRA, JOHN BRENNAN, ASHER EINHORN, CAROLINE FELIPAK, AUNALI KHAKU, DAVID KUK, CARMEN MOORMAN, VITTORIO MUZZI, and MELANIE SUSMAN, individually and on behalf of all others similarly situated, | Case No. 1:24-cv-03477 <br><br> Hon. Mark H. Cohen <br><br><br> JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | |
| DELTA AIR LINES, INC. | |
| Defendant. | |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Arben Bajra, John Brennan, Asher Einhorn, Caroline Felipak, Aunali Khaku, David Kuk, Carmen Moorman, Vittorio Muzzi, and Melanie Susman (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, pursuant to the Court's November 4, 2024 Order (Doc. 32), bring this action against Defendant Delta Air Lines, Inc. ("Defendant" or "Delta"), by and through their attorneys, and allege as follows based on information and belief and the investigation by their attorneys, except as to allegations specifically pertaining to Plaintiffs, which are made upon personal knowledge:

## INTRODUCTION

1.     Plaintiffs bring this Consolidated Class Action Complaint against Defendant for Delta's mass cancellations of thousands of flights purchased by consumers and subsequent failure to provide refunds and reimbursements to impacted consumers.

2.     On the morning of Friday, July 19, 2024, an automatic update to a cybersecurity software developed by CrowdStrike resulted in millions of computers running Microsoft Windows to crash and display blue screens of death (the "CrowdStrike outage").[1]

3.     The CrowdStrike outage affected CrowdStrike customers who use Microsoft Windows products, including many airports and airlines.

4.     Airlines rely on Microsoft's Office365 for travel needs, including scheduling and transporting crew members, passengers, and cargos to their appropriate destinations.

5.     However, the CrowdStrike outage inhibited airlines from conducting their day-to-day activities, which resorted to manual operations, such as checking passengers in on paper. This severely crippled airlines, airports, and passengers from attending their scheduled operations accordingly.

---

[1] https://www.cbsnews.com/news/delta-flight-cancellations-wednesday-ed-bastian/ (last visited October 10, 2024).

6.    Moreover, the CrowdStrike outage resulted in massive delays globally. According to FlightAware, a flight tracking firm, there were more than 4,000 flight cancellations and 35,500 flight delays worldwide by Friday afternoon.[2]

7.    Delta specifically canceled more than 4,500 flights between Friday, July 19 and Sunday, July 21, 2024.[3]

8.    By the end of the weekend, nearly every airline had managed to recover and resume normal operations. Delta, however, did not resume normal operations.

9.    By the start of the workweek, Delta continued to cancel a staggering number of flights. On Monday, July 22, it was reported that Delta canceled more than 1,250 flights. These cancellations accounted for nearly 70% of all flights within, to, or from the United States that had been canceled on Monday.[4] No other U.S. airline had canceled one-tenth as many flights.[5]

10.    On Tuesday, July 23, Delta continued to cancel flights. By 2pm that day, more than 450 flights had been canceled and more than 1,000 flights had been delayed.[6]

---

[2] https://www.wired.com/story/crowdstrike-windows-outage-airport-travel-delays/ (last visited October 10, 2024).
[3] https://www.cnn.com/2024/07/23/business/delta-flight-cancellations/index.html (last visited October 10, 2024).
[4] *Id.*
[5] *Id.*
[6] *Id.*

11.    Delta continued to delay and cancel flights for weeks after the CrowdStrike outage, although Delta purports that its "operational reliability" returned to "normal" on Thursday, July 25, 2024.[7]

12.    Delta continues to blame its inability to resume its services on Windows software and its inability to fix problems with its crew tracking system, leaving it unable to find the pilots and flight attendants it needed for planes to fly.[8]

13.    The impact on Delta passengers was disastrous. Delta's failure to recover from the CrowdStrike outage left passengers stranded in airports across the country and the world and, in many cases, thousands of miles from their desired destination.

14.    To add insult to injury, when affected passengers requested prompt refunds for their canceled or delayed flights, Delta refused or ignored these requests. In addition, Delta refused to provide all affected passengers with meal, hotel, and ground transportation vouchers, despite its previous commitments, and continues to refuse or ignore requests for reimbursements of approved expenses.

15.    As a result of Delta's failures, affected passengers were forced to spend thousands of dollars in unexpected expenses, including flights from other airlines, hotels, rental cars, ground transportation, and food. Further, Delta

---

[7] https://news.delta.com/update/july-2024-operation/delta-starts-thursdays-operation-zero-cancellations (last visited October 10, 2024).
[8] https://news.delta.com/update/july-2024-operation/delta-people-working-247-restore-operation-support-customers-get-crews (last visited October 10, 2024).

separated thousands of passengers from their luggage, leaving many without necessary medication, clothes, and other belongings.

16.    These unfair, unlawful, and unconscionable practices resulted in Delta unjustly enriching itself at the expense of its customers. Accordingly, Plaintiffs bring this action in order to retrieve their monies for each and every similarly situated consumer Delta has wronged by refusing to issue full refunds for flights cancelled or significantly affected and refusing to issue the reimbursements it promised to consumers as a direct and proximate result of the CrowdStrike outage.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act of 2005, because: (i) there are 100 or more Class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

18.    This Court has personal jurisdiction over Defendant because they are headquartered and/or have conducted substantial business in this judicial district.

19.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant are headquartered in this district, transact business in this

district, are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

**Plaintiff Arben Bajra**

20.    Plaintiff Arben Bajra ("Plaintiff Bajra") is a citizen and resident of Colorado.

21.    Plaintiff purchased two roundtrip tickets to Amsterdam, Netherlands through Delta's website. Plaintiff paid $2,299 for the tickets using a credit card.

22.    On July 20, 2024, Plaintiff Bajra and his significant other arrived at the Denver airport and checked his luggage. Delta later informed Plaintiff Bajra that his flight was delayed and that he would miss his connecting flight in New York. Plaintiff Bajra spoke with a Delta agent to rebook his flight. Delta informed Plaintiff Bajra that the only available flight was two days later, on July 22, 2024. Relying upon Delta's representations, Plaintiff Bajra accepted the flight for July 22, 2024. Plaintiff Bajra then waited another 6 hours to retrieve his luggage.

23.    On July 22, 2024, Plaintiff Bajra and his significant other arrived at the Denver airport. Delta informed Plaintiff Bajra that the flight was again canceled. Delta informed Plaintiff Bajra that there were no available flights for several days. Delta did not provide Plaintiff Bajra with any meal or hotel vouchers.

Instead, Delta instructed Plaintiff Bajra to incur the costs associated with hotel and represented that Delta would later reimburse the cost. Delta did not put any restrictions on the hotels, such as a price limitation or limitation on companies to which Plaintiff Bajra could book with. Plaintiff Bajra relied on this statement and booked a hotel, with the understanding that the expense would be later reimbursed in full by Delta.

24.    Additionally, Delta informed Plaintiff Bajra that the ticket price for the original Delta flight would be refunded to Plaintiff Bajra without further action by Plaintiff, and that another flight was available in the coming days.

25.    Because Delta was unable to rebook Plaintiff Bajra on another flight for several days, Plaintiff Bajra declined the flight for several days later, requested that Delta cancel his booking, and  Plaintiff Bajra booked a flight to Amsterdam that was leaving that day on a different airline. Plaintiff Bajra paid approximately $1,500 for the tickets using a credit card. Plaintiff Bajra and his significant other arrived in Amsterdam on July 23, 2024.

26.    On July 30, 2024, Plaintiff Bajra was scheduled to fly from Amsterdam back home to Denver. Upon arrival at the airport in Amsterdam, Delta informed Plaintiff Bajra that the flight had been canceled and the earliest available flight was scheduled for the next day.

27.    As a result of Delta's cancelation, Plaintiff Bajra and his significant other were stranded in Amsterdam for one day.

28.    As a result of Delta's multiple cancelations, Plaintiff Bajra was forced to pay for a flight with a different airline, hotel nights which he didn't use because of Delta's cancelation, a hotel room for one night, and alternative transportation. Plaintiff Bajra incurred out of pocket expenses in the amount of approximately $1,975.

29.    Plaintiff Bajra reasonably relied upon Delta's representations that he would be automatically refunded for the cancelled flight. After waiting approximately 10 days after Delta informed Plaintiff Bajra that his ticket price would be automatically refunded, Plaintiff called Delta to check on the status of his refund. Delta then told Plaintiff Bajra that refunds were not automatic and that Plaintiff would be forced to submit a request for a refund for the canceled flight.

30.    Plaintiff Bajra followed Delta's instructions and on July 31, 2024, Plaintiff Bajra submitted two requests: (1) a refund request for the original canceled flight, and (2) a reimbursement request for his out-of-pocket expenses. In response, Delta offered Plaintiff Bajra a $100 voucher to use towards a future flight with Delta.

31.    At no time before, during, or after Plaintiff Bajra's flight cancellation by Delta did Delta disclose that it would not honor its contract with Plaintiff Bajra and only provide a partial refund/reimbursement.

32.    To date, Delta has not provided Plaintiff Bajra with a refund or reimbursement for the original ticket price or any of his out of pocket expenses.

33.    As a result of Delta's material misrepresentations and its violation of the Montreal Convention, and Delta's contract and policies, Plaintiff Bajra has been harmed.

**Plaintiff John Brennan**

34.    Plaintiff John Brennan ("Plaintiff Brennan") is a citizen and resident of Florida.

35.    Plaintiff Brennan purchased two roundtrip tickets for him and his wife to Seattle, Washington to board a cruise to celebrate their anniversary. Plaintiff Brennan paid $1,281.12 for the tickets using a credit card through Delta's website. Plaintiff Brennan's flights were scheduled for July 21, and 30, 2024.

36.    On July 21, 2024, Plaintiff Brennan and his wife were scheduled for a direct flight from Tampa to Seattle. Upon their arrival in Tampa, Delta informed Plaintiff Brennan that the flight was canceled. Delta rebooked Plaintiff Brennan on a flight to Seattle with a layover in Atlanta. Delta checked Plaintiff Brennan's bags and informed Plaintiff Brennan that he would be able to retrieve their bags in

Seattle. Plaintiff Brennan arrived in Atlanta around 6:00 p.m. that evening. However, Delta later informed Plaintiff Brennan that the layover flight from Atlanta to Seattle scheduled for that evening was canceled.

37.    In Atlanta, Plaintiff Brennan waited in line several hours to speak with a Delta customer service agent in an attempt to book another flight. Around 2 a.m. on July 22, 2024, Plaintiff Brennan realized that all the Delta agents had left, and no one was working the customer service desk. An airport representative informed Plaintiff Brennan to return at 6 a.m. to resume waiting in line to be rebooked.

38.    By then, Plaintiff Brennan realized that he and his wife would be unable to get to Seattle in time to board the cruise, so they were forced to return home to Tampa. Plaintiff Brennan requested that Delta cancel his flight so that he and his wife could return home.

39.    Plaintiff began calling all the nearby hotels and was told they were all sold out. Plaintiff Brennan then called all of the rental car companies in Atlanta, to which he was informed they would not rent to him because they did not want to run out of rental vehicles. Delta informed Plaintiff Brennan that alternative transportation would be reimbursed and instructed Plaintiff Brennan to incur the expenses and represented that Delta would fully reimburse him. Plaintiff Brennan purchased tickets to take a Greyhound Bus from Atlanta back home to Tampa.

40.    As a result of Delta's cancelation, Plaintiff Brennan and his wife were stranded in Atlanta without their luggage. More egregious, Plaintiff Brennan and his wife missed the anniversary cruise.

41.    Delta refused to provide Plaintiff Brennan with the meal and hotel vouchers. Delta further refused to automatically provide a refund for the ticket price. Instead, Delta offered a $100 voucher  – less than Plaintiff Brennan is entitled – to use towards a future flight with Delta.

42.    Plaintiff Brennan reasonably relied on Delta's representations that alternative transportation costs would be fully reimbursed. Plaintiff Brennan incurred out of pocket expenses of no less than $800.00. Further, Plaintiff Brennan spent approximately $10,000 on the cruise that he and his wife missed as a direct and proximate result of Delta's cancellation. Plaintiff Brennan submitted a reimbursement request and all necessary and required information using Delta's website for the canceled flight, the out-of-pocket expenses, and the cost of the cruise. In response, Delta emailed Plaintiff Brennan offering $219.45 - less than he is entitled to.

43.    As a result of Delta's  material misrepresentations and its violation of the contract and policies, Plaintiff Brennan has been harmed.

**Plaintiff Asher Einhorn**

44.    Plaintiff Asher Einhorn ("Plaintiff Einhorn") is a citizen and resident of Washington.

45.    Plaintiff Einhorn purchased two roundtrip tickets to Boston, Massachusetts through Delta's website. Plaintiff Einhorn paid $696.20 for the tickets using a credit card.

46.    On July 21, 2024, Plaintiff Einhorn and his partner arrived at the Boston airport to board their return flight home to Washington. Upon their arrival at the airport, Delta informed Plaintiff Einhorn that the flight was canceled. Plaintiff Einhorn attempted to rebook another flight by contacting Delta's customer service phone line and Delta's website, but Delta did not assist.

47.    Delta informed Plaintiff Einhorn that there were no available flights for several days. Plaintiff Einhorn requested that Delta cancel his flight so that he could make arrangements with another airline due to Delta's failure to find an alternative flight for several days.

48.    Delta did not provide Plaintiff Einhorn with any meal or hotel vouchers. Instead, Delta instructed Plaintiff Einhorn to incur the costs associated with hotels and transportation, and represented that Delta would later reimburse these costs. Delta did not put any restrictions on the hotels and transportation costs, such as a limitation on cost or limitation on companies to which Plaintiff Einhorn could book with. Plaintiff Einhorn relied on these statements and booked a hotel

and transportation, with the understanding that these expenses would be later reimbursed in full by Delta.

49.    As a result of Delta's cancelation, Plaintiff Einhorn was forced to pay for a hotel for one night, transportation, and forced to pay for another flight home with a different airline. Plaintiff Einhorn and his partner incurred out of pocket expenses in the amount of approximately $1,500.

50.    On or around July 22, 2024, Plaintiff Einhorn submitted two refund requests: (1) a refund for the original canceled flight, and (2) a reimbursement request for his out-of-pocket expenses. Delta provided Plaintiff Einhorn with a partial refund for the ticket price in the amount of $408.11. In response to Plaintiff's reimbursement request for his out-of-pocket expenses of approximately $1,500, Delta emailed Plaintiff Einhorn informing him that Delta would provide a reimbursement of $100 – less than he is entitled to – in exchange for a release of Plaintiff Einhorn's claims against Delta.

51.    Plaintiff Einhorn contacted Delta to inform Delta that he wanted to accept the reimbursement but did not agree to release his claims. To date, Delta has not responded to Plaintiff Einhorn.

52.    As a direct result of Delta's material misrepresentations and its violation of the contract and policies, Plaintiff Einhorn has been harmed.

**Plaintiff Caroline Felipak**

53.    Plaintiff Caroline Felipak ("Plaintiff Felipak") is a citizen and resident of Florida.

54.    Plaintiff Felipak purchased four one-way tickets and two roundtrip tickets to Seattle, Washington through Delta's website. Plaintiff paid $2,200 for the tickets using a credit card.

55.    On July 21, 2024, Plaintiff Felipak and her family arrived at the Boston airport to board their return flight home to Florida. Upon their arrival at the airport, Delta informed Plaintiff Felipak that the flight was canceled.

56.    Delta informed Plaintiff Felipak that there were no available flights for several days. Delta was able to rebook Plaintiff Felipak and her family on a flight departing July 24, 2024 – three days after her originally scheduled flight.

57.    Despite this three day delay due to Delta's unilateral cancellation, Delta did not provide Plaintiff Felipak with any meal or hotel vouchers.

58.    Instead, Delta instructed Plaintiff Felipak to incur the costs associated with hotels, transportation, and meals, and represented that Delta would later reimburse these costs. Delta did not put any restrictions on the hotels and other expenses, such as cost or companies to which Plaintiff Felipak could book with. Plaintiff Felipak relied on these statements and booked a hotel, transportation, and purchased meals, with the understanding that these expenses would be later reimbursed in full by Delta.

59.    As a result of Delta's cancelation, Plaintiff Felipak was forced to pay for a hotel, transportation, and meals for the three days she and her family were stranded in Seattle – more than 3,000 miles from home. Plaintiff Felipak incurred out of pocket expenses in the amount of approximately $3,000.

60.    When Plaintiff Felipak returned home, she submitted a reimbursement request per Delta's previous representations. She submitted all necessary and required information, including receipts for the hotel, transportation, and meals.

61.    On August 14, 2024, Delta emailed Plaintiff Felipak informing her that Delta would reimburse $350 – nearly 10% of what she is entitled to – in exchange for a release of Plaintiff's claims against Delta.

62.    In only offering Plaintiff Felipak a partial reimbursement, Delta gave the following reason for denying the full cost of the hotel expense: "The requested amount exceeds Delta's nightly reimbursement policy for the city of your flight disruption," citing Section 12 of Delta's Customer Commitment. However, nowhere in Section 12 does Delta limit the cost of hotel expenses to a specified rate. Indeed, Section 12 explicitly states that "Delta will reimburse reasonable costs for your hotel room…".

63.    By August 14, 2024, Delta would have been aware that a class action lawsuit was filed against it on August 6, 2024. At no time did Delta inform

Plaintiff Felipak of her legal rights or the existence of this class action lawsuit before, during, or after soliciting a waiver from her.

64.    Plaintiff Felipak received a paper check in the mail for the $350. The back of the check contains a waiver:

ENDORSE HERE

The undersigned by endorsement below acknowledges receipt of this check as full settlement of and hereby releases Delta Airlines, Inc. from any and all claims the undersigned may have against Delta Airlines, Inc. to this date.
X_____

**DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTIONAL USE**

65.    Plaintiff Felipak had no choice but to sign the waiver in order to secure her $350 partial reimbursement.

66.    Plaintiff Felipak reasonably relied on Delta's representations surrounding Delta's commitment to fully reimbursing the full cost of out-of-pocket expenses incurred (i.e., hotel, transportation, and meals) as a result of Delta's cancellation.

67.    Plaintiff Felipak complied with Delta's contract and policies (i.e., submitting all necessary and required information to obtain a full reimbursement).

68.    As a direct result of Delta's material misrepresentations and its violation of the contract and policies, Plaintiff Felipak has been harmed.

**Plaintiff Aunali Khaku**

69.     Plaintiff Aunali Khaku is a citizen and resident of Sanford, Florida.

70.     Plaintiff Khaku purchased four roundtrip tickets for a family trip from Orlando, Florida to Dubai, United Arab Emirates with Delta's website. Plaintiff Khaku paid $5,108 for the tickets using a credit card.

71.     On Monday July 22, 2024, Plaintiff Khaku arrived at John F. Kennedy Airport for a connecting flight back home to Orlando from Dubai. The final leg of their flight home from JFK to Orlando was scheduled for 3:00 p.m. Delta informed Plaintiff Khaku that the flight had been delayed to 6:00 p.m. At 6:00 p.m., Delta informed Plaintiff Khaku that the flight had been delayed to 9:00 p.m. Finally, at 9:00 p.m., Delta informed Plaintiff Khaku that the flight had been cancelled. Delta informed Plaintiff Khaku that there were no available Delta flights until Friday July 26, 2024, which Plaintiff Khaku did not accept as it was four days away. Delta was able to rebook Plaintiff and his family for a flight with United Airlines on July 24, 2024 – two days after their originally scheduled flight.

72.     Delta refused to cover hotel and meal costs for the cancellation after Plaintiff Khaku inquired regarding reimbursement. Delta cited the CrowdStrike outage as the reason for the cancellation and claimed no responsibility. Plaintiff Khaku, with his wife and two children, then rented a car and drove for three hours

to Allentown, PA, where his parents live, to stay with them for two days while they waited for their rebooked flight on United.

73.    Additionally, Delta lost Plaintiff Khaku and his family's luggage. To this day, Plaintiff and his family have not received their luggage. Plaintiff and his family were then forced to purchase basic necessities and lost all their personal items, including those they had bought on their trip.

74.    Plaintiff Khaku reasonably relied upon Delta's representations that he would be automatically refunded for the cancelled flight. When that did not happen, Plaintiff Khaku called and emailed Delta numerous times to request a refund. In response, Delta gave Plaintiff 10,000 SkyMiles and reimbursed him $650 for the rental car and for the basic necessities Plaintiff Khaku needed to purchase for his family.

75.    At no time before, during, or after Plaintiff Khaku's flight cancellation by Delta did Delta disclose that it would not honor its contract with Plaintiff and not provide a refund.

76.    To date, Delta has not provided Plaintiff Khaku with a refund or reimbursement for the original ticket price, nor has Delta compensated his family for their lost luggage.

77.    As a result of Delta's material misrepresentations and its violation of the Montreal Convention and Delta's contract and policies, Plaintiff Khaku and his family have been harmed.

**Plaintiff David Kuk**

78.    Plaintiff David Kuk ("Plaintiff Kuk") is a citizen and resident of Ontario, Canada.

79.    Plaintiff Kuk purchased four roundtrip tickets from Toronto, Canada to Las Vegas, Nevada through Delta's website. Plaintiff paid for the tickets with 70,000 SkyMiles and $400 using a credit card.

80.    On July 18, 2024, Plaintiff Kuk and his family arrived at the Toronto Pearson YYZ airport. Delta delayed the flight several times before canceling it. Delta did not provide Plaintiff Kuk with any meal or hotel vouchers. Delta rebooked the flight for the following day.

81.    The next day, Plaintiff Kuk and his family again arrived at the Toronto Pearson YYZ airport. Once there, Delta informed Plaintiff Kuk that the rebooked flight had also been canceled. Plaintiff Kuk requested that Delta cancel the flight so that he could book an alternative flight with a different airline.

82.    Plaintiff Kuk booked a flight using a different airline. He paid approximately $2,300 using a credit card.

83.    As a result of Delta's multiple cancelations, Plaintiff Kuk was forced to purchase a flight with a different airline, rental vehicle, and paid for an Airbnb which he was unable to use, in the amount of approximately $700.

84.    Plaintiff Kuk requested a refund for the originally cancelled flight as well as for his out of pocket expenses as a result of Delta's cancellation. Delta did not provide a refund for the canceled flights nor did it reimburse Plaintiff Kuk's out-of-pocket expenses as a result of the canceled flight.

85.    On July 26, 2024, Delta informed Plaintiff Kuk via email that – instead of providing an automatic refund for the canceled flights per its Contract– Delta would only give a $100 electronic voucher to be used toward a future flight with Delta.

86.    Plaintiff Kuk's spouse used Delta's online chat function to get more information about the electronic voucher. Delta's customer service agent informed Plaintiff Kuk's spouse that the electronic voucher would expire in one year.

87.    To date, Delta has not provided Plaintiff Kuk with a refund or reimbursement for the original ticket price or any of his out-of-pocket expenses.

88.    As a direct result of Delta's material misrepresentations and its violation of the Montreal Convention and Delta's contract and policies, Plaintiff Kuk has been harmed.

**Plaintiff Carmen Moorman**

89.    Plaintiff Carmen Moorman is a citizen and resident of the state of Ohio.

90.    Plaintiff Moorman purchased four (4) roundtrip international tickets to Puerto Escondido, Mexico from Cincinnati, Ohio through Delta's website at a cost of more than $1,100.00 per ticket.

91.    Plaintiff Moorman return flight from Puerto Escondido, Mexico was scheduled to depart on July 21, 2024.

92.    On July 21, 2024, Plaintiff Moorman and her family arrived at the Puerto Escondido, Mexico airport and checked their luggage. The July 21, 2024 international flight was scheduled to take Plaintiff Moorman and her family home through the following route: Puerto Escondido, Mexico, to Mexico City, Mexico, to Minneapolis, Minnesota, to Cincinnati, Ohio.

93.    The first two legs of Plaintiff Moorman and her family's return flight departed as scheduled; however, the third leg of Plaintiff Moorman and her family's return flight (Minneapolis, Minnesota to Cincinnati, Ohio) was substantially delayed for more than four (4) hours, before ultimately being canceled.

94.    In particular, after Plaintiff Moorman and her family landed in Minneapolis, Minnesota, Plaintiff Moorman and her family went to the gate for

departure home; where it became apparent that her flight to Cincinnati, Ohio, which was supposed to take off on July 21, 2024 at 8:59 p.m., was delayed.

95.    The flight was delayed several more times until Delta finally canceled the flight at approximately 1:50 a.m. on July 22, 2024.

96.    Plaintiff Moorman attempted to speak with a Delta agent to rebook the flight; however, the line was 5 hours long as there was only one Delta Agent available to assist customers.

97.    Plaintiff Moorman and each of her family members searched for available hotel rooms online and called the ones that appeared to be available. Although Plaintiff Moorman was looking to book two (2) hotel rooms, Plaintiff Moorman booked the first hotel that said there was availability of one room. Reserving the room with a credit card, Plaintiff Moorman and her family took a Lyft to the hotel only to learn on arrival that the hotel was overbooked and there were no rooms available.

98.    Because there were no other rooms available within 85 miles, Plaintiff Moorman and her family decided the best course of action would be to take a Lyft back to the airport.

99.    Plaintiff Moorman and her family were starving at this point, and were aware that the airport restaurants all closed at or around 9:00 p.m.

100.    Plaintiff Moorman and her family had the foresight to DoorDash a meal to the lobby of the hotel before returning to the airport.  The hotel was kind enough to let Plaintiff Moorman and her family use the hotel lobby to wait for and then eat their meal.  The cost of the DoorDash meal was in excess of $70.00.

101.    Plaintiff Moorman and her family returned to the airport via Lyft at approximately 3:00 a.m.

102.    The cost of the two Lyft rides totaled more than $50.00.

103.    As a result of Delta's cancelation, Plaintiff Moorman and her family were stranded in Minneapolis, Minnesota throughout the night and early morning.

104.    All Delta provided to the hundreds of people standing in line was water.

105.    During the delays, Plaintiff Moorman and her family made vending machine purchases at the airport totaling approximately $19.00.

106.    As a result of Delta's cancelation, at approximately 6:00 a.m., Plaintiff Moorman rented a rental car from SIXT to drive her and her family home to Cincinnati.

107.    The rental car, for a twelve (12) hour one way rental from Minneapolis, Minnesota to Cincinnati, Ohio cost Plaintiff Moorman more than $1,600.00.

108.   Plaintiff Moorman paid for gasoline for the vehicle totaling approximately $100.00.

109.   Plaintiff Moorman was also assessed an assortment of toll-related fees in the amount of $27.39.

110.   Plaintiff Moorman also paid for additional food from Culver's and, upon information and belief, Fleet Farm Convenience Store in the amount of approximately $26.00.

111.   Plaintiff Moorman and her family's luggage did not arrive back to the Cincinnati, Ohio airport until 2 to 3 days after it was scheduled to arrive.

112.   Once the luggage arrived at the Cincinnati, Ohio airport, Plaintiff Moorman arranged for her husband to drive back to the airport to retrieve it. The distance between Plaintiff's home and the airport is approximately 23 miles. Thus, an additional approximate 46 miles were unnecessarily put on Plaintiff Moorman's vehicle.  The standard rate of reimbursement for mileage in 2024 is 67 cents per mile. [9] Thus, Plaintiff Moorman was subjected to an additional expense of $30.00 to retrieve her luggage. To add insult to injury, while the luggage was being retrieved and the vehicle was parked outside of the baggage claim, Plaintiff Moorman's vehicle was issued a parking ticket.

---

[9] https://www.irs.gov/newsroom/irs-issues-standard-mileage-rates-for-2024-mileage-rate-increases-to-67-cents-a-mile-up-1-point-5-cents-from-2023

113.   As detailed above, as a direct and proximate result of Delta's substantial delay and ultimate cancelation of Plaintiff Moorman's and her family's international return flight, Plaintiff Moorman was forced to pay for alternative transportation, attempted accommodations requiring round trip ground transportation back to the airport, and meals. In total, Plaintiff Moorman incurred out of pocket expenses of approximately $2,000.00.

114.   On or before July 29, 2024, Plaintiff Moorman submitted her documented expenses to Delta using Delta's reimbursement request form on its website; however, Delta only issued Plaintiff Moorman a check in the amount of $250.00 as detailed below.

115.   Plaintiff Moorman is entitled, under the Montreal Convention, to full reimbursement for her damages.

116.   Although Plaintiff Moorman submitted a request for reimbursement of expenses incurred as a result of the significant delay and later cancellation on July 25, 2024, Defendant only agreed to reimburse Plaintiff Moorman for $250.00 – which is equal to about 12.5% of Plaintiff Moorman's total out of pocket expenses incurred.

117.   Although Plaintiff Moorman did not accept Delta's $250.00 offer, Delta issued a partial reimbursement check in the amount of $250.00 to her address.

118.   Plaintiff Moorman was shocked to see that Defendant's $250.00 partial reimbursement check issued on August 16, 2024 and received on or about August 25, 2024, included an attempted hidden release on the back of it.

119.   In particular, the attempted hidden release on the back of the check stated:

120.   ENDORSE HERE

The undersigned by endorsement below acknowledges receipt of this check as full settlement of and hereby releases Delta Airlines, Inc. from any and all claims the undersigned may have against Delta Airlines, Inc. to this date.
X_____

**DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTIONAL USE**

121.   When Plaintiff Moorman received the $250.00 check in the mail, she noticed that it included a release of liability. Thus, by cashing the check, she would be required to release her claims against Delta.

122.   Because Plaintiff Moorman is entitled to more than $250.00 under the Montreal Convention, Plaintiff Moorman has not signed and Plaintiff Moorman has not deposited the $250.00 check.

123.   To date, Delta has not provided Plaintiff Moorman with a full refund or full reimbursement for Plaintiff Moorman's out of pocket expenses and instead issued a partial reimbursement in the amount of $250.00.

124.   Because Plaintiff Moorman is entitled to a full reimbursement of Plaintiff Moorman's out-of-pocket expenses, Plaintiff Moorman has rejected the contingent $250.00 partial reimbursement and will not sign or deposit the check.

125.   As a direct result of Delta's material misrepresentations and its violation of the Montreal Convention contract and policies, Plaintiff Moorman has been harmed.

**Plaintiff Vittorio Muzzi**

126.   Plaintiff Vittorio Muzzi ("Plaintiff Muzzi") is an Italian citizen and resident of Haarlem, The Netherlands.

127.   Plaintiff Muzzi purchased four roundtrip tickets from The Netherlands to Fort Lauderdale, Florida through KLM's website for both Delta and KLM flights. Plaintiff Muzzi paid €3729.96 for the tickets using a debit card.

128.   On July 19, 2024, Plaintiff Muzzi arrived at the Schipol Airport in the Netherlands. After waiting in the airport for six hours, Delta informed Plaintiff Muzzi that the flight AMS to Boston had been canceled. Delta failed to automatically rebook Plaintiff Muzzi on a later flight or offer accommodation or meals vouchers, so Plaintiff Muzzi was forced to manually rebook his flight 3 days later to a different airport using a different airline.

129.   Despite cancelling Plaintiff Muzzi's flight, Delta retained Plaintiff Muzzi's baggage.

130.   Plaintiff Muzzi ultimately was able to book a flight for several days later, July 22, 2024, using a different airline and arrival airport (MCO).

131.   Because Delta had retained Plaintiff Muzzi's baggage, the baggage became lost and was not returned to Plaintiff Muzzi. Ultimately, Plaintiff Muzzi had to rent a car and travel to MCO airport to retrieve his baggage on August 3, 2024.

132.   As a result of Delta's cancellation, Plaintiff Muzzi was forced to book for a flight with a different airline, pay hotel nights which he didn't use because of Delta's cancellation, pay drop off charges for the rented car, cancellation fees, meals, Ubers, and minor clothing expenses since his baggage was lost. Plaintiff Muzzi incurred out of pocket expenses and cancellation/no-show fees in the amount of approximately €5,000.

133.   Plaintiff Muzzi reasonably relied upon Delta's representations that he would be compensated for his out of pockets expenses.

134.    Plaintiff Muzzi followed Delta's instructions and on August 4, 2024. Plaintiff Muzzi submitted a compensation request. In response, Delta offered Plaintiff Muzzi €587.59.

135.   At no time before, during, or after Plaintiff Muzzi's flight cancellation by Delta did Delta disclose that it would not honor its contract with Plaintiff Muzzi and only provide a partial refund/reimbursement.

136.   To date, Delta has not provided Plaintiff Muzzi with a refund or reimbursement for the original ticket price or any of his out of pocket expenses.

137.   As a result of Delta's material misrepresentations and its violation of the Montreal Convention and Delta's contract and policies, Plaintiff Muzzi has been harmed.

**Plaintiff Melanie Susman**

138.   Plaintiff Melanie Susman ("Plaintiff Susman") is a citizen and resident of California.

139.   Plaintiff Susman purchased a roundtrip ticket to New York through Delta's website. Plaintiff Susman paid approximately $600 for the ticket using a credit card. Plaintiff's flights were scheduled for July 20, and July 30, 2024.

140.   On July 20, 2024, Plaintiff Susman's flight was canceled. At the direction of Delta, Plaintiff had no choice but to book a new flight on July 23, 2024. Delta subsequently canceled the new flight, without any options for rebooking. As a result, Plaintiff Susman requested that Delta cancel the flight, which forced Plaintiff Susman to purchase a new flight with a different airline.

141.   As a result of Delta's cancelation, Delta provided Plaintiff Susman with a meal voucher. However, when Plaintiff Susman attempted to use the meal voucher, it was rejected at the airport.

142.   Plaintiff Susman incurred out-of-pocket expenses of approximately $950 for a new flight, fees, and meals.

143.   Plaintiff Susman submitted multiple reimbursement requests using Delta's website for the ticket price of the canceled flight and for her out-of-pocket expenses.

144.   On or around July 30, 2024, Delta emailed Plaintiff Susman informing her that Delta would provide a refund of approximately $300, less than what she is entitled to.

145.   Delta has provided Plaintiff Susman with SkyMiles to use towards a future flight. However, to date, Delta has not provided a refund for her ticket price or out of pocket expenses.

146.   As a result of Delta's violations of its Contract and failure to provide meals and reimbursements under its policies, Plaintiff Susman has been harmed.

**Defendant**

147.   Delta Air Lines, Inc. ("Delta") is a Delaware corporation with its principal place of business at 1030 Delta Boulevard, Atlanta, Georgia 30354.

148.    Delta is one of the top three biggest airline companies, serving more than 200 million travelers annually. It boasts up to 4,000 daily departures to more than 1,000 destinations worldwide.[10]

## GENERAL FACTUAL ALLEGATIONS

### CrowdStrike Outage and its Impact on Airline Travel

149.    At 12:09 a.m. EST on Friday, July 19, 2024, a faulty automatic update to a cybersecurity software developed by CrowdStrike resulted in millions of computers running Microsoft Windows to crash.[11]

150.    The CrowdStrike outage impacted CrowdStrike customers who use Microsoft Windows products, including many airports and airlines.

151.    Airlines use Microsoft's Office365 for scheduling and transporting crew, passengers, and cargos to the appropriate destination.

152.    Although CrowdStrike fixed the defective update by 1:27 a.m. EST on July 19, Windows users continued to experience system crashes and outages throughout the day.[12]

153.    When the CrowdStrike outage crashed these online systems, affected airlines, while normally reliant on cloud-based technology, were forced to resort to manual operations. For example, many airlines had to check in their passengers on

---

[10] https://www.delta.com/us/en/about-delta/overview (last visited October 10, 2024).
[11] https://www.crowdstrike.com/falcon-content-update-remediation-and-guidance-hub/ (last visited October 10, 2024).
[12] *Id.*

paper rather than through their online systems, a process that is significantly slower.

154.    As a result, the CrowdStrike outage resulted in massive delays and cancellations throughout the global airline industry. According to flight tracking firm FlightAware, more than 4,000 flight cancellations and 35,500 flight delays worldwide by Friday afternoon.[13]

155.    Once systems were back online, the phenomenon of "delay propagation" prevented immediate recovery. Delay propagation occurs when a delay at a flight stage causes a ripple effect in the subsequent stages of a flight. Delays propagate into and out of an airport. Arrival delays are tracked at the end of each flight leg traveled by the same aircraft identified by a tail number.[14]

156.    As a result, most airlines continued to cancel and delay flights throughout the weekend. Delta canceled more than 4,500 flights between Friday, July 19 to Sunday, July 21, 2024.[15]

---

[13] https://www.wired.com/story/crowdstrike-windows-outage-airport-travel-delays/ (last visited October 10, 2024).

[14] https://aspm.faa.gov/aspmhelp/index/Delay_Propagation.html (last visited October 10, 2024).

[15] https://www.cnn.com/2024/07/23/business/delta-flight-cancellations/index.html (last visited October 10, 2024).

**Delta's Failure to Recover from the Outage Was Entirely Within Delta's Control**

157.   By the end of the weekend, nearly every airline had managed to recover and resume normal operations. Delta, however, continued to cancel and delay a staggering number of flights – far more than any other airline.

158.   On Monday, July 22, Delta canceled more than 1,250 flights, about a third of its schedule.[16] These cancellations accounted for nearly 70% of all flights within, to, or from the United States that had been canceled on Monday.[17] No other US airline had canceled one-tenth as many flights.[18]

159.   On Tuesday, July 23, Delta continued to cancel and delay flights at staggering numbers. By 2 p.m. that day, more than 450 flights had been cancelled and more than 1,000 flights had been delayed.[19]

160.   On Thursday, July 25, Delta announced that its "operational reliability" had returned to "normal." [20] Yet, passengers continued to report that Delta canceled their flights through July 31, 2024.

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] https://www.nytimes.com/2024/07/23/us/pete-buttigieg-delta-outage.html (last visited October 10, 2024).

[20] https://news.delta.com/update/july-2024-operation/delta-starts-thursdays-operation-zero-cancellations (last visited October 10, 2024).

161. Delta reportedly canceled more flights in five days (between Friday and Tuesday) than it did in the entire years of 2018 and 2019 *combined*.[21] There were 5,470 flight cancellations for the airline between Friday and Tuesday, per FlightAware.[22] By contrast, a total of 5,370 flights were canceled by Delta across years 2018 and 2019.[23]

162. On Monday, July 22, Delta released the following statement, attributing its failures to its reliance on Windows software and to its inability to fix problems with its crew tracking system:[24]

> Upward of half of Delta's IT systems worldwide are Windows based. The CrowdStrike error required Delta's IT teams to manually repair and reboot each of the affected systems, with additional time then needed for applications to synchronize and start communicating with each other.
>
> Delta's crews are fully staffed and ready to serve our customers, but one of Delta's most critical systems – which ensures all flights have a full crew in the right place at the right time – is deeply complex and is requiring the most time and manual support to synchronize.

163. Delta cited particular troubles with its critical crew-scheduling

---

[21] https://www.businessinsider.com/delta-canceled-more-flights-in-5-days-than-2-years-2024-7#:~:text=Delta%20canceled%20more%20flights%20in%205%20days%20after%20the%20CrowdStrike,in%202018%20and%202019%20combined&text=Delta%20canceled%20more%20flights%20in%20less%20than%20a%20week%20due,it%20canceled%20a%20combined%205%2C370. (last visited October 10, 2024).

[22] *Id.*

[23] *Id.*

[24] https://news.delta.com/update/july-2024-operation-delta-people-working-247-restore-operation-support-customers-get-crews (last visited October 10, 2024).

system, which helps the airline get crews to the right place at the right time.[25]

164.   "It's critical because you have to get the aircraft, the cabin crew, the flight crew, all at the right place at the right time in order for you to operate your schedule," explained Michael McCormick, a longtime Federal Aviation Administration veteran.[26] "When the system goes down ... you have to resort to manually trying to plan it," he explained. "That's requiring emails, texts, phone calls, all around the system in order to try to do that."[27]

165.   In the eyes of McCormick, who now serves on the faculty at Embry-Riddle Aeronautical University, this recent outage — and the subsequent meltdown it triggered — should serve as a wakeup call for airlines:

> "I think this highlights the need to have better firewalls, so, that's cybersecurity, but in addition to that, redundancy and backup systems," McCormick said. "[Airlines] have grown extraordinarily dependent upon automation, and as we saw — and continue to see — they cannot operate their flight schedules without that automation."[28]

166.   Software that helps airlines schedule and track their pilots and flight attendants can become an Achilles' heel for companies trying to recover from major disruptions to their operations.[29]

---

[25] https://thepointsguy.com/news/dot-investigates-delta-meltdown/
[26] https://thepointsguy.com/news/dot-investigates-delta-meltdown/
[27] https://thepointsguy.com/news/dot-investigates-delta-meltdown/
[28] https://thepointsguy.com/news/dot-investigates-delta-meltdown/
[29] https://www.nytimes.com/2024/07/22/business/delta-global-tech-outage-pete-buttigieg.html

167.   In the days following the CrowdStrike outage, Delta sought to shift the blame to CrowdStrike and Microsoft by retaining a law firm to pursue potential damages against CrowdStrike and Microsoft.[30]

168.   However, CrowdStrike has refuted Delta's allegations, stating that the threat of litigation "has contributed to a misleading narrative that CrowdStrike is responsible for Delta's IT decisions and response to the outage."[31]

169.   According to CrowdStrike, CrowdStrike reached out to Delta to offer assistance "within hours of the incident," but Delta rejected repeated offers to help restore Delta's impacted systems.[32] Indeed, CrowdStrike stated that its CEO "personally reached out to Delta's CEO to offer onsite assistance, but received no response."[33]

170.   Moreover, CrowdStrike avers that it further offered free on-site services and resources to Delta within hours of the outage, but Delta refused the assistance and resources.[34]

171.   Similarly, Microsoft on Tuesday, August 6, 2024, blamed Delta Air Lines for its weeklong bout of cancelations, claiming its aging technology caused the airline to recover far slower from the global tech outage than its rivals.

---

[30] https://www.law360.com/articles/1863550/delta-hires-boies-schiller-to-recoup-outage-related-damages (last visited October 10, 2024).
[31] https://apple.news/AWlK7OnFxRnGwB7FARQAMGg (last October 10, 2024).
[32] *Id.*
[33] *Id.*
[34] *Id.*

172.   Plaintiffs and Class members' damages were caused or contributed to being caused by Delta's outdated software. Furthermore, Delta did not have backup scheduling programs or backup plans in the event of scheduling software problems, as well as other actions that Delta could have taken to prevent the delays and/or cancellations. Such is evidenced by the fact that Delta was the slowest to recover in comparison to other airlines. Furthermore, as detailed more fully below, Delta rejected assistance from CrowdStrike and Microsoft. It is for these reasons that other airlines like United and American bounced back more quickly from the CrowdStrike update.

173.   "Our preliminary review suggests that Delta, unlike its competitors, apparently has not modernized its IT infrastructure," Mark Cheffo, an attorney representing Microsoft, wrote in an August 6, 2024 letter to Delta.

174.   In a letter to Delta, Microsoft made the following statements:

175.   Even though Microsoft's software had not caused the CrowdStrike incident, Microsoft immediately jumped in and offered to assist Delta at no charge following the July 19 outage." Microsoft employees asked Delta if they needed assistance every day from July 19 to 23, the letter said.[35]

176.   Each day that followed from July 19 through July 23, Microsoft employees repeated their offers to help Delta. Each time, Delta turned down

---

[35] https://onemileatatime.com/news/microsoft-discredits-delta-blistering-letter/

Microsoft's offers to help, even though Microsoft would not have charged Delta for this assistance.[36]

177.   On the morning of July 22, a Microsoft employee, aware that Delta was having more difficulty recovering than any other airline, messaged a Delta employee to say, "just checking in and no pressure to reply, but if you can think of anything your Microsoft team can be helping with today, just say the word." The Delta employee replied, saying "all good. Cool will let you know and thank you."[37]

178.   Despite this assessment that things were "all good," public reports indicate that Delta canceled more than 1,100 flights on July 22 and more than 500 flights on July 23.[38]

179.   More senior Microsoft executives also repeatedly reached out to help their counterparts at Delta, again with similar results. Among others, on Wednesday, July 24, Microsoft CEO Satya Nadella emailed Delta CEO Ed Bastian, who has never replied.[39]

180.   In fact, it is rapidly becoming apparent that Delta likely refused Microsoft's help because the IT system it was most having trouble restoring—its crew-tracking and scheduling system—was being serviced by other technology

---

[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*

providers, such as IBM, because it runs on those providers' systems, and not Microsoft Windows or Azure.[40]

181.  Microsoft continues to investigate the circumstances surrounding the CrowdStrike incident to understand why other airlines were able to fully restore business operations so much faster than Delta, including American Airlines and United Airlines. Our preliminary review suggests that Delta, unlike its competitors, apparently has not modernized its IT infrastructure, either for the benefit of its customers or for its pilots and flight attendants.[41]

182.  Given all this, my client was surprised to see your letter. This is particularly so given that CrowdStrike has acknowledged responsibility for the content update that caused the July 19 incident.[42]

183.  But meanwhile, the computer problems at Delta knocked its crucial crew tracking system offline for the better part of a week, making it impossible for the company to find the pilots and flight attendants it needed to fly its aircraft.[43] While other airlines were quick to resume normal operations after the CrowdStrike outage, Delta was forced to cancel about 30% of its schedule over those five days,

---

[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] https://edition.cnn.com/2024/08/06/business/microsoft-crowdstrike-outage-delta/index.html

leaving an estimated half-million passengers stranded.[44] It took many days after that to re-book affected passengers on other flights and return their checked bags.[45]

184.   On July 24, Microsoft CEO Satya Nadella emailed Bastian as well, according to the letter. [46]

185.   "In fact, it is rapidly becoming apparent that Delta likely refused Microsoft's help because the IT system it was most having trouble restoring—its crew-tracking and scheduling system—was being serviced by other technology providers, such as IBM, because it runs on those providers' systems, and not Microsoft Windows or Azure," the letter said.[47]

186.   It is reported that American Airline had largely recovered its operation by the evening of July 19th and had only 51 mainline flight cancellations the following day.   Delta, meanwhile, captured unwanted national headlines as network restoration dragged on over five miserable days in which the carrier canceled approximately 7,000 mainline and regional flights.[48] It said those cancellations disrupted the travel of 1.3 million customers and cost the carrier approximately $500 million. [49]

---

[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] https://www.travelweekly.com/Travel-News/Airline-News/Why-CrowdStrike-crash-hit-Delta-harder
[49] *Id.*

187.    American CEO Robert Isom said during an earnings call last month: "One of the things we've learned is that, in terms of any disruption, you've got to keep track of your aircraft, certainly, but also your crews, in terms of where they are. And you probably ought to take action as quickly as possible to make sure you don't lose the ability for the purpose of recovery" […] "We've built technology, and we've done the right thing to make sure that we take early caution, early steps."[50]

188.    Those comments teased at what Delta has said was its biggest sticking point over its protracted recovery from the outage.[51] The airline said 60% of its mission-critical applications, including redundant backup systems, rely on Windows, and that during its recovery it had to physically reset 40,000 servers -- a bigger lift than any other airline.[52]

189.    During its long recovery process, CEO Ed Bastian also explained that what slowed Delta the most was the loss of a key crew-tracking tool, which left the airline without visibility on the whereabouts of its flight crews.[53] Absent that knowledge, Delta was unable to reset its operation.[54]

---

[50] See, https://www.phocuswire.com/why-the-crowdstrike-crash-hit-delta-harder.
[51] https://www.phocuswire.com/why-the-crowdstrike-crash-hit-delta-harder
[52] Id.
[53] Id.
[54] Id.

190.   As discussed above, while the initial outage on July 19, 2024 impacted millions of customers and computers using Microsoft's Office365, all other airlines except for Delta recovered quickly. In other words, Delta is the only airline that failed to resume normal operations for several weeks following the outage.

191.   Delta's operations protocol, technology, software, and policies and procedures related to operations is entirely within Delta's control.

192.   The reasons for Delta's failures to resume normal operations are apparent: (1) the design and operational resiliency capabilities of Delta's IT infrastructure are weaker than those of other airlines; (2) the decisions Delta made with respect to system upgrades contributed to its inability to quickly recover from the outage; (3) Delta refused free, onsite and virtual assistance offered by Microsoft to help restore Delta's operations; (4) Delta's CEO ignored repeated offers by CrowdStrike to assist in Delta's recovery from the outage.

193.   Delta's actions and inactions directly and proximately caused its own operational fiasco, lasting weeks following the outage.

**Traveler Experiences**

194.   The impact on Delta passengers was disastrous. Delta's failure to recover from the CrowdStrike outage left passengers stranded in airports across the

country and the world for days at a time, in many cases thousands of miles from home.

195.   As a result, affected passengers were forced to spend thousands of dollars in unexpected expenses, including flights from other airlines, hotels, rental cars, ground transportation, and food.

196.   To add insult to injury, Delta provided some customer with e-credits to use towards future flights as compensation, but made no effort to provide consumers cash refunds as required by federal law.55

197.   Upon information and belief, Delta's misrepresentations resulted in thousands of passengers forgoing their right to a refund by accepting the offered e-credits or partial refunds instead.

198.   Even when affected passengers did exercise their rights to request prompt refunds for their cancelled or delayed flights, Delta refused or ignored their requests, or failed to provide real-time assistance from customer service agents.

199.   For those passengers who did receive a response from Delta, Delta offered pennies on the dollar of the total incurred expenses and added a release on the backside of the check.

---

55 https://www.washingtonpost.com/transportation/2024/07/26/delta-canceled-flights-investigation-crowdstrike/# (last visited October 10, 2024).

200.   In addition, Delta refused to provide all affected passengers with meal, hotel, and ground transportation vouchers, despite its previous commitments.

201.   Further, Delta separated thousands of passengers from their luggage, leaving many without clothes, necessary medication, and other belongings.

202.   As a result, affected passengers were forced to spend hundreds of dollars purchasing replacements. Furthermore, many affected passengers had to pay out of pocket expenses to retrieve their delayed luggage that would not have been incurred but for the delay.

203.   When affected passengers attempted to seek reimbursement for these expenses, Delta refused to issue full reimbursement of the incurred expenses or ignored their requests, despite Delta's previous commitments to provide said reimbursements.

**Delta Violates its Contracts and Policies Related to Flight Disruptions**

204.   Delta has contracts with consumers, titled Contract of Carriage. There is a U.S. contract for U.S. customers, a Canada contract for Canadian customers, and an International contract for international customers (collectively, the "Contract"). All three contracts are nearly identical and as such will be referred to herein as the Contract.

205.   Consumers who purchased international flights, including Plaintiffs Bajra, Kuk, Moorman, and Muzzi, have additional claims pursuant to the

International Contract of Carriage, the Montreal Convention, and/or the EU Air Passenger Rights. Specifically, Plaintiffs Kuk, Bajra, Muzzi, and Moorman's claims are governed by the Convention for the Unification of Certain Rules for International Carriage by Air done at Montreal on May 28, 1999 (hereinafter referred to as "the Montreal Convention"), a treaty ratified by the United States of American and which entered into force in November 2003, because they purchased flights to/from a Member State to the Montreal Convention. In addition, Plaintiffs Bajra and Muzzi's claims are also governed by the EU Air Passenger Rights because they purchased flights to/from an EU Member State.

206. According to the U.S. Department of Transportation's Airline Customer Service Dashboard, Delta has made the following commitments to passengers affected by a cancellation within the airline's control:[56]

- Meal or meal cash/voucher when cancellation results in passenger waiting for 3 hours or more for new flight

- Complimentary hotel accommodations for any passenger affected by an overnight cancellation

- Complimentary ground transportation to and from hotel for any passenger affected by an overnight cancellation

---

[56] https://www.transportation.gov/airconsumer/airline-customer-service-dashboard (last visited October 10, 2024). See also, https://www.delta.com/us/en/legal/customer-commitment. (last visited October 21, 2024).

207.    In addition, Delta has made the following commitments to passengers affected by a significant delay within the airline's control:[57]

- Meal or meal cash/voucher when flight delay results in passenger waiting for 3 hours or more for new flight

- Complimentary hotel accommodations for any passenger affected by an overnight delay

- Complimentary ground transportation to and from hotel for any passenger affected by an overnight delay

208.    In a statement made by Delta on July 22, Delta recommitted to its promises and pledged to offer affected passengers the following:[58]

**Extending a travel waiver**. Delta extended a travel waiver for all customers with travel booked from July 19-23. The waiver offers customers the ability to make a one-time change to their itinerary. The fare difference for customers will be waived when rebooked travel occurs on or before July 28, in the same cabin of service as originally booked. Customers are encouraged to manage changes to their travel via delta.com or the Fly Delta app.

**Right to a Refund Upon Request**. Customers whose travel has been disrupted due to a canceled or significantly delayed flight may choose to cancel their travel and receive an eCredit for the unflown portion of the trip, or may instead request a refund for the unflown portion of the trip at delta.com/refund.

**Issuing SkyMiles Program miles or a travel voucher** in an amount based on the customer's affected travels.

---

[57] https://www.transportation.gov/airconsumer/airline-customer-service-dashboard (last visited October 10, 2024).  See also, https://www.delta.com/us/en/legal/customer-commitment. (last visited October 21, 2024).
[58] https://news.delta.com/update/july-2024-operation-delta-people-working-247-restore-operation-support-customers-get-crews (last visited October 10, 2024).

**Covering eligible expenses** resulting from this flight disruption, including providing meal vouchers, hotel accommodations where available and ground transportation.

**Reimbursement of eligible expenses**. Customers who have incurred hotel, meal or ground transportation expenses while in transit during this operational disruption may submit eligible expenses for reimbursement.

209.   On July 26, Delta made further commitments to affected customers:[59]

**Flight Cancellation/Extended Delay Refunds & Trip Cancellation Option**

Customers whose travel was disrupted due to a canceled or significantly delayed flight may choose to cancel their travel via Delta.com or the Fly Delta app and receive an automatic refund for the unflown portion of the trip. Since July 19, of the refunds processed, 70% were completed via Delta.com or the app.

**No Questions Asked Trip Cancellation**

Delta is also permitting customers with travel booked from July 19-28 who chose not to travel to cancel and request a refund of the unflown portion of their trip – regardless of whether their flight was canceled or significantly delayed. Enhanced refund flexibility applies to tickets with Delta-operated flights, purchased on or before July 23.

**Out-of-Pocket Expense Reimbursement**

We know many customers who experienced a significant delay or flight cancellation incurred unplanned, out-of-pocket expenses during the disruption period, between July 19 and July 28. Delta has expanded the list of eligible expenses that may be covered for this disruption, including flight tickets purchased on other airlines in the same cabin of service or lower, train and bus tickets, rental cars and ride shares.

---

[59] https://news.delta.com/what-delta-doing-make-things-right-customers-impacted-crowdstrike-disruption (last visited October 10, 2024).

As part of our Delta Customer Commitment, we will continue to cover reasonable costs for additional categories of expenses.

…

**Automatic Refunds for Bag and Seat Fees**

As an added gesture, Delta is automatically refunding all paid checked bag fees for customers who were charged for checking a bag since July 19 (when the disruption started). Delta is continuing to waive bag fees for up to three checked bags for customers traveling through 11:59 p.m. local time July 28.

Additionally, Delta is automatically refunding seat purchases including paid upgrade and preferred seats for customers who were not able to take advantage of those purchases. For example, if a customer paid for a Delta Comfort+ upgrade post purchase and did not travel in that upgraded seat, Delta is automatically refunding the fee.

No action is needed to receive either the baggage or upgrade fee refund; they are being processed automatically over the coming days.

For all ticket or fee refunds, customers will receive the refund back to their original form of payment. Customers may see multiple refund transactions in their credit card or bank statement as fee refunds are processed separately from flight refunds. Customers eligible for out-of-pocket expense reimbursement will receive an email with instructions on how to receive the reimbursement.

**Customer Apology Gesture**

Customers impacted by a cancellation or significant delay during the disruption period also received an email offering SkyMiles or an electronic Transportation Credit Voucher (ETCV).

**Extending a travel waiver**

Delta extended a travel waiver  for all customers with travel booked from July 19-28. The waiver offers customers the ability to make a one-time change to their itinerary. The fare difference for customers will be waived when rebooked travel occurs on or before Aug. 4, in the same cabin of

service as originally booked. Customers are encouraged to manage changes to their travel via delta.com or the Fly Delta app.

210. Delta further implemented a "Temporary Reimbursement Waiver" which Delta touted as offering expanded coverage of reimbursable expenses:[60]

> For travel between July 19-28, customers experiencing a flight cancellation or significant delay (>3 hours) may request reimbursement for the following expenses incurred due to their trip disruption, above and beyond our standard policy:
>
> - The fare paid to purchase another airline ticket in the same class of service, after subtracting the value of the unused Delta ticket.
>
> - Alternative transportation methods such as rental cars, rideshares, trains or buses that a customer used to reach their destination, after subtracting the value of the unused Delta ticket.

211. To obtain reimbursement under the Temporary Reimbursement Waiver, Delta instructs consumers to complete a reimbursement request form.[61]

212. In addition, on July 25, U.S. Secretary of Transportation Pete Buttigieg made clear in a statement on his X (formerly Twitter) account: "If you've racked up out-of-pocket expenses on hotels, meals, alternative flights, etc. Delta is required to reimburse passengers."[62]

**Delta Violates Department of Transportation Regulations**

---

[60] https://www.delta.com/us/en/advisories/other-alerts/july-2024-travel-disruption#reimbursementwaiver (last visited October 16, 2024).

[61] See https://www.delta.com/reimbursement/ (last visited October 16, 2024).

[62] https://x.com/SecretaryPete/status/1816550304533369165 (last visited October 16, 2024).

213.  The Department of Transportation "require[es] automatic refunds to consumers when a U.S. air carrier… cancels or makes a significant change to a scheduled flight to, from, or within the United States and the consumer is not offered or rejects alternative transportation and travel credits, vouchers, or other compensation."[63]

214.  Automatic refunds must be provided "promptly," which is defined as "within 7 business days for credit card payments and within 20 calendar days for other forms of payment."[64]

215.  The Department of Transportation also "require[es] refunds to consumers for fees for ancillary services that passengers paid for but did not receive and for checked baggage fees if the bag is significantly delayed."[65]

216.  To ensure passengers know that they are entitled to a refund, the Department of Transportation further "require[es] carriers and ticket agents to inform consumers of their right to a refund if that is the case before making an offer for alternative transportation, travel credits, vouchers, or other compensation in lieu of refunds."[66]

---

[63] https://www.govinfo.gov/content/pkg/FR-2024-04-26/pdf/2024-07177.pdf (last visited October 16, 2024).
[64] *Id.*
[65] *Id.*
[66] *Id.*

217. Delta's failures further violate Department of Transportation Regulations because it conditions its offer of reimbursements to passengers on a waiver releasing Delta of all legal claims passengers have against Delta.

**Delta Forces Consumers to Accept Partial Reimbursements in Exchange for a Waiver of Legal Claims**

218. Nowhere on Delta's websites nor on the reimbursement request form does it state that Delta will provide partial reimbursements. Further, nowhere on these sites does Delta disclose that accepting a partial reimbursement requires consumers to release their legal claims against Delta.

219. To add insult to injury, when consumers receive email notifications about a partial reimbursement offered by Delta, nowhere in those email notifications contain the legal waiver.

220. Only after consumers click on the button to accept the partial reimbursement does Delta disclose – for the first time – that acceptance of the partial reimbursement releases consumers' legal claims against Delta.

221. Delta's waiver is reproduced in full below:

By accepting payment, you acknowledge this payment as full settlement of and hereby releases Delta Air Lines, Inc. from any and all claims the undersigned may have against Delta Air Lines, Inc. to this date.

222. Delta's waiver is unconscionable and unenforceable because it fails to inform consumers of their legal rights, namely their "right to a refund if that is the

case before making an offer for alternative transportation, travel credits, vouchers, or other compensation in lieu of refunds."[67]

223.  Additionally, Delta's offer of reimbursements is only a fraction of what passengers are entitled to.

224.  Plaintiffs filed a class action lawsuit against Delta on August 6, 2024. Since then, Delta has continued to communicate with putative class members, but fails to disclose the existence of this class action lawsuit against Delta.

225.  Delta continues to conceal the fact that it is subject to a class action lawsuit and instead continues to force consumers to accept partial reimbursements in exchange for a release of legal claims without informing consumers of the legal claims that are the subject of this lawsuit.

**Delta's Failures Prompt Federal Scrutiny**

226.  On July 23, Secretary Buttigieg released a statement that the Department of Transportation had opened an investigation into Delta "to ensure the airline is following the law and taking care of its passengers during continued

---

[67] https://www.govinfo.gov/content/pkg/FR-2024-04-26/pdf/2024-07177.pdf (last visited October 16, 2024).

widespread disruptions."[68] By that time, the Department of Transportation had received more than 3,000 complaints against Delta.[69]

227.   In a news conference later that day, Secretary Buttigieg stated:

There's a lot of things I'm very concerned about, including people being on hold for hours and hours, trying to get a new flight, people having to sleep on airport floors, even accounts of unaccompanied minors being stranded in airports, unable to get on a flight.

228.   On July 24, Secretary Buttigieg posted to his X (formerly Twitter) account the following: "On hold for hours, sleeping on airport floors, unaccompanied minors stranded—these are the stories we are hearing from Delta passengers."[70]

229.   According to The Washington Post, the Department of Transportation's investigation is examining text messages sent by Delta to passengers "that regulators say did not spell out their rights to a refund."[71]

230.   In addition to the Department of Transportation's investigation, on July 23, U.S. Senator Maria Cantwell (D-Wash.), Chair of the Senate Committee on Commerce, Science and Transportation, sent a letter to Delta Air Lines CEO Ed

---

[68] https://www.npr.org/2024/07/23/nx-s1-5049792/deltas-airlines-delays-and-cancelations-prompt-dot-investigation (last visited October 16, 2024).
[69] https://www.washingtonpost.com/transportation/2024/07/26/delta-canceled-flights-investigation-crowdstrike/# (last visited October 16, 2024).
[70] https://x.com/SecretaryPete/status/1816147652288913674 (last visited October 16, 2024).
[71] https://www.washingtonpost.com/transportation/2024/07/26/delta-canceled-flights-investigation-crowdstrike/# (last visited October 16, 2024).

Bastian regarding the airline's operational and customer communications problems in the wake of the CrowdStrike outage.[72]

231.   In the letter, Senator Cantwell expressed concern "that Delta is failing to meet the moment and adequately protect the needs of passengers."[73]

232.   In particular, Senator Cantwell expressed concern that Delta was violating Section 503 the Federal Aviation Administration Reauthorization Act of 2024, which codified the right to a refund for airline passengers whose flights are canceled, significantly delayed, or significantly changed.[74]

233.   Senator Cantwell stated that "Delta's public website does not accurately and transparently reflect a passenger's legal right to a refund."[75]

234.   Similarly, Section 505 of the FAA law provides that "customers should be able to access real-time assistance from customer service agents of air carriers without an excessive wait time, particularly during times of mass disruptions."[76] In her letter, Senator Cantwell noted reports of Delta's failure to connect passengers with its customer service representatives.[77]

---

[72] https://www.commerce.senate.gov/services/files/374240F2-C0B2-4B38-8B64-37678CDF9D28 (last visited October 16, 2024).
[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] *Id.*

235.    Senator Cantwell demanded Delta to "make clear to all its customers subjected to cancellations and significant delays and changes, including as a result of the technology outage, that they are entitled to refunds as a matter of law" and that Delta "should invest significant resources into its customer service operations to ensure that customers are made whole in short order."[78]

## CLASS ALLEGATIONS

236.    Plaintiffs bring this action, individually, and on behalf of a nationwide class, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons in the United States who purchased airline tickets through Delta, or for flights on Delta, to, from or within the States, and incurred a significant delay and/or sought to cancel their flights or had their flights cancelled, between July 19, 2024 and July 31, 2024.[79]

237.    Plaintiffs also bring this class action on behalf of the following State and International Subclasses:

STATE SUBCLASSES:

**California Class**:

> All persons in California who purchased airline tickets through Delta, or for flights on Delta, to, from or within the States, and incurred a significant delay and/or sought to cancel their flights

---

[78] *Id.*

[79] Plaintiffs reserve the right to amend or add to the timeframe included in the definition of the Class after conducting discovery.

or had their flights cancelled, between July 19, 2024 and July 31, 2024.

**Colorado Class**:

All persons in Colorado who purchased airline tickets through Delta, or for flights on Delta, to, from or within the States, and incurred a significant delay and/or sought to cancel their flights or had their flights cancelled, between July 19, 2024 and July 31, 2024.

**Florida Class**:

All persons in Florida who purchased airline tickets through Delta, or for flights on Delta, to, from or within the States, and incurred a significant delay and/or sought to cancel their flights or had their flights cancelled, between July 19, 2024 and July 31, 2024.

**Ohio Class**:

All persons in Ohio who purchased airline tickets through Delta, or for flights on Delta, to, from or within the States, and incurred a significant delay and/or sought to cancel their flights or had their flights cancelled, between July 19, 2024 and July 31, 2024.

**Washington Class**:

All persons in Washington who purchased airline tickets through Delta, or for flights on Delta, to, from or within the States, and incurred a significant delay and/or sought to cancel their flights or had their flights cancelled, between July 19, 2024 and July 31, 2024.

## INTERNATIONAL SUBCLASSES:

### Montreal Convention Class:

All persons who purchased airline tickets through Delta, or for flights on Delta, to or from a Member State[80] of the Montreal Convention and incurred a significant delay and/or sought to cancel their flights or had their flights cancelled, between July 19, 2024 and July 31, 2024.

### The EU Class:

All persons who purchased airline tickets through Delta, or for flights on Delta, to, from or within the EU[81] and incurred a significant delay and/or sought to cancel their flights or had their flights cancelled, between July 19, 2024 and July 31, 2024.

238.  Excluded from the Class(es) are: (a) Defendant; (b) Defendant's affiliates, agents, employees, officers and directors; and (c) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

239.  **Numerosity:** Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Class are unknown at this time, such information being in the sole possession of Delta and obtainable by Plaintiffs only through the discovery process. Plaintiffs believe, and on that basis allege, that the Class

---

[80] See fn. 63 for a list of Member States of the Montreal Convention.
[81] See fn. 67 for a list of Member States of the EU.

consists of tens of thousands of people. The number of Class members can be determined based on Delta's records.

240. **Commonality:** Common questions of law and fact exist as to all members of each Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a. Whether federal regulations require Delta to provide passengers a refund when Delta cancels the passenger's flight;

b. Whether Delta committed common law fraud;

c. Whether Delta was unjustly enriched by its conduct; and

d. Whether Delta violated the Florida Deceptive and Unfair Trade Practices Act.

e. Whether Delta violated the California Unfair Competition Law, California Consumers Legal Remedies Act, and False Advertising Law;

f. Whether Delta violated the Ohio Consumer Sales Practices Act;

g. Whether Delta violated the Washington Consumer Protection Act;

h. Whether Delta violated the Montreal Convention;

i. Whether Delta violated the EU Air Passenger Rights; and

j. Whether Delta violated its international contracts with consumers who had international flights.

241. **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs' and Class members' claims all arise out Delta's uniform conduct, statements, and unlawful, unfair, and deceptive acts and practices.

242. **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class, and is committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

243. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Delta's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly-situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

244.   Delta has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

**COUNT I**
**BREACH OF CONTRACT[82]**
**FAILURE TO REFUND FARE**

245.   Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

246.   Defendant made offers to Plaintiffs and the Class Members to enter into a contract for Defendant to provide transportation services to Plaintiffs and the Class Members through passenger tickets for air travel between specific locations, on specific flight numbers, on specific dates and times, at specific prices.

247.   Defendant's offer to provide transportation services to Plaintiffs and the Class Members also included Defendant's offer that it would refund Plaintiffs and the Class Members for all cancellations and/or significantly changed flights.

248.   At all times relevant, such offers and terms were specifically identified in Defendant's Conditions of Carriage entered into between Plaintiffs and the Class Members on one hand, and Defendant on the other, at the time of ticket purchases.

---

[82] References to Delta's Contract refers to Delta's U.S. Contract of Carriage, its Canadian Contract, and its International Contract. Collectively they are referred to herein as the "Contract" and quotes from the Contract refer to language in the U.S. Contract.

249. The Conditions of Carriage reflect Defendant's self-imposed undertakings and obligations voluntarily undertaken by Defendant.

250. Moreover, Plaintiffs and the Class Members did not draft the terms of the Conditions of Carriage, rather, on information and belief, Defendant (and/or Defendant's agents at Defendant's direction) drafted all terms therein.

251. Defendant made such offers in writing through the Delta's direct channels (such as Delta's direct-to-consumer sales website, www.delta.com, and the company's mobile applications) and through traditional travel agencies and online travel agencies.

252. Numerous sections of the Conditions of Carriage applicable at the time Plaintiffs and the Class Members purchased their tickets confirm passengers' contractual rights to refunds where a flight has been cancelled and/or significantly changed, regardless of the reason for a cancellation or delay.

253. For example, Rule 19 Delta's Conditions of Carriage provides as follows:

RULE 19: FLIGHT DELAYS/CANCELLATIONS

A. Delta's Liability in the Event of Schedule Changes, Delays and Flight Cancellations

If there is a flight cancellation, diversion, delay of greater than 120 minutes, or that will cause a passenger to miss connections, Delta will (at

passenger's request) cancel the remaining ticket and refund the unused

portion of the ticket and unused ancillary fees in the original form of

payment in accordance with Rule 22.

254.  Rule 22 of Delta's Conditions of Carriage provides as follows:

RULE 22: REFUNDS

A. Involuntary Refunds

If a refund is required because of Delta's failure to operate on schedule or

refusal to transport (except as a result of passenger's failure to comply with

the contract of carriage), the following refund will be made directly to you:

1) If no portion of the ticket has been used, the refund will be an

amount equal to the fare paid.

2) If a portion of the ticket has been used and termination

(interruption) occurs:

a) At A Fare Breakpoint - The refund will be an amount equal to the

fare paid for the unused transportation from the point of termination

(interruption) to the destination or next Stopover point named on the

ticket, or to a point at which transportation is to be resumed. No

refund will apply when alternate transportation is provided by Delta

and accepted by the passenger.

b) Within A Fare Component - The refund will be an amount equal to the percentage of unflown mileage to fare component total mileage by prorating the fare paid for the fare component, from the point of termination/interruption to the destination, or next Stopover point named on the ticket, or to the point at which transportation is to be resumed. No refund will apply when alternate transportation is provided by Delta and accepted by the passenger.

255.  The terms of Defendant's offer to provide transportation services contained a definite promise by Defendant and gave Plaintiffs and the Class Members the power to agree to the terms of Defendant's offer to provide transportation services, including but not limited to, through the act of purchasing a ticket or accepting transportation on Defendant's aircraft.

256.  Plaintiffs and the Class Members accepted Defendant's offer to provide transportation services, agreeing to the material terms contained in Defendant's offer.

257.  Plaintiffs and the Class Members communicated their acceptance of Defendant's offer to Defendant by purchasing one or more tickets, booking transportation services with Defendant.

258.  The agreement between Plaintiffs, the Class Members, and Defendant included an exchange of promises or value, i.e., consideration. Here, Plaintiffs and

the Class Members provided Defendant with consideration in the form of amounts equal to the monetary value of the fare and all charges and taxes paid.

259.   Plaintiffs and the Class Members performed all obligations and conditions required and expected of them and/or had a valid excuse for not performing any such obligations.

260.   Defendant cancelled and/or significantly changed Plaintiffs' and the Class Members' flights.

261.   Defendant has failed to provide and/or has outright refused to provide refunds to Plaintiffs and the Class Members for such cancelled and/or significantly changed flights.

262.   Defendant did so even though Defendant was contractually obligated to provide refunds to Plaintiffs and the Class Members in such circumstances.

263.   As a result, Defendant has failed to perform and/or has materially breached its contracts with Plaintiffs and the Class Members.

264.   Because of Defendant's failure to perform under the contract, Plaintiffs and the Class Members have been damaged and/or did not receive the refunds, benefits, payment, and/or performance to which they were entitled.

265.   As a result, Plaintiffs and the Class Members are entitled to fair compensation in the form of complete refunds for all fares, charges, and taxes paid.

**COUNT II**
**BREACH OF CONTRACT**

## FAILURE TO COVER ADDITIONAL AMENITIES

266.    Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

267.    Defendant made offers to Plaintiffs and the Class Members to enter into a contract for Defendant to provide transportation services to Plaintiffs and the Class Members through passenger tickets for air travel between specific locations, on specific flight numbers, on specific dates and times, at specific prices.

268.    Defendant's offer to provide transportation services to Plaintiffs and the Class Members also included Defendant's offer that it would provide a passenger with certain additional amenities during a delay of more than four (4) hours.

269.    At all times relevant, such offers and terms were specifically identified in Defendant's Conditions of Carriage entered into between Plaintiffs and the Class Members on one hand, and Defendant on the other, at the time of ticket purchases.

270.    The Conditions of Carriage reflect Defendant's self-imposed undertakings and obligations voluntarily undertaken by Defendant.

271.    Moreover, Plaintiffs and the Class Members did not draft the terms of the Conditions of Carriage, rather, on information and belief, Defendant (and/or Defendant's agents at Defendant's direction) drafted all terms therein.

272.   Defendant made such offers in writing through Delta's direct channels (such as Delta's direct-to-consumer sales website, www.delta.com, and the company's mobile applications) and through traditional travel agencies and online travel agencies.

273.   For example, Rule 19(B) Delta's Conditions of Carriage provides as follows:

B. Delta's Liability for Additional Amenities in the Event of Schedule Changes, Delays and Flight Cancellations

Except as provided above, Delta shall have no liability if the flight cancellation, diversion or delay was due to force majeure. As used in this rule, "force majeure" means actual, threatened or reported:

(1) Weather conditions or acts of God;

(2) Riots, civil unrest, embargoes, war, hostilities, or unsettled international conditions;

(3) Strikes, work stoppages, slowdowns, lockout, or any other labor-related dispute;

(4) Government regulation, demand, directive or requirement;

(5) Shortages of labor, fuel, or facilities; or

(6) Any other condition beyond Delta's control or any fact not reasonably foreseen by Delta.

However, when a passenger's travel is interrupted for more than 4 hours after the scheduled departure time as a result of flight cancellation or delay on the date of travel other than from force majeure, Delta will provide the passenger with the following additional amenities during the delay:

(a) Hotels

If overnight accommodations are available at Delta contracted facilities, Delta will provide the passenger with a voucher for one night's lodging when the delay is during the period of 10:00 pm to 6:00 am. Delta will provide free public ground transportation to the hotel if the hotel does not offer such service. If accommodations are not available, Delta will provide the passenger with a voucher that may be applied to future travel on Delta equal in value to the contracted hotel rate, up to $100 USD.

(b) Ground Transportation

In lieu of lodging or other amenities, Delta will furnish ground transportation to the destination airport if a passenger's flight is diverted to an alternative airport and if the destination on the ticket and the diverted airport destination are within the following city groups:

San Francisco, CA (SFO)/ Oakland, CA (OAK)/ San Jose, CA (SJC) Los Angeles, CA (LAX)/ Long Beach, CA (LGB)/ Ontario, CA (ONT)/ Santa Ana, CA (SNA) Denver, CO (DEN)/ Colorado Springs (COS) O'Hare –

Chicago, IL (ORD)/ Midway – Chicago, IL (MDW) Dallas-Ft. Worth, TX (DFW)/ Dallas, TX Love Field (DAL) Bush Intercontinental – Houston, TX (IAH)/ Hobby – Houston, TX (HOU) Fort Lauderdale, FL (FLL)/ Miami, FL (MIA)/ West Palm Beach, FL (PBI) Baltimore, MD (BWI)/ National – Washington, DC (DCA)/ Dulles – Washington, DC (IAD) Newark, NJ (EWR)/ LaGuardia – New York, NY (LGA)/ John F. Kennedy – New York, NY (JFK) Orlando, FL (MCO)/ Tampa, FL (TPA)/ Daytona Beach, FL (DAB)/ Melbourne, FL (MLB)/Sarasota Bradenton, FL (SRQ)

(c) Additional Amenities

Delta will provide such additional or alternative amenities as are necessary to maintain the safety and/or welfare of customers with special needs such as unaccompanied children and Persons with a Disability. Such amenities will be furnished consistent with special needs and/or circumstances.

274. The terms of Defendant's offer to provide transportation services contained a definite promise by Defendant and gave Plaintiffs and the Class Members the power to agree to the terms of Defendant's offer to provide transportation services, including but not limited to, through the act of purchasing a ticket or accepting transportation on Defendant's aircraft.

275.   Plaintiffs and the Class Members accepted Defendant's offer to provide transportation services, agreeing to the material terms contained in Defendant's offer.

276.   Plaintiffs and the Class Members communicated their acceptance of Defendant's offer to Defendant by purchasing one or more tickets, booking transportation services with Defendant.

277.   The agreement between Plaintiffs, the Class Members, and Defendant included an exchange of promises or value, i.e., consideration. Here, Plaintiffs and the Class Members provided Defendant with consideration in the form of amounts equal to the monetary value of the fare and all charges and taxes paid.

278.   Plaintiffs and the Class Members performed all obligations and conditions required and expected of them and/or had a valid excuse for not performing any such obligations.

279.   Defendant cancelled and/or significantly changed Plaintiffs' and the Class Members' flights.

280.   Defendant has failed to provide and/or has outright refused to cover the hotel, transportation, and additional amenity expenses incurred by Plaintiffs and the Class Members for cancelled and/or significantly changed flights.

281.   Defendant did so even though Defendant was contractually obligated to provide refunds to Plaintiffs and the Class Members in such circumstances.

282.  As a result, Defendant has failed to perform and/or has materially breached its contracts with Plaintiffs and the Class Members.

283.  Because of Defendant's failure to perform under the contract, Plaintiffs and the Class Members have been damaged and/or did not receive the refunds, benefits, payment, and/or performance to which they were entitled.

284.  As a result, Plaintiffs and the Class Members are entitled to fair compensation in the form of complete refunds for all fares, charges, and taxes paid.

<u>COUNT III</u>
**BREACH OF IMPLIED/ORAL CONTRACT**

285.  Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

286.  In addition to the express written contractual terms between Plaintiffs and Delta relating to refunds for flights that have been cancelled and/or significantly delayed, as set forth in paragraphs 80 and 81, supra, Delta entered into oral contracts and/or implied contracts with Plaintiffs and the members of the putative classes.

287.  Delta promised those whose travel had been disrupted due to a canceled or significantly delayed flight that they could request refunds and reimbursements for their out of pocket expenses.

288.  Delta also promised to refund the unplanned, out-of-pocket expenses incurred by Plaintiffs and the putative class members during the disruption period.

289. Delta, Plaintiffs, and the members of the putative classes mutually assented to the terms of these oral/implied contracts.

290. Delta, Plaintiffs, and the members of the putative classes each gave consideration to support the terms of these oral/implied contracts.

291. Plaintiffs and the members of the putative classes suffered injuries as a result of Delta's breach of these oral/implied contracts.

**COUNT IV**
**COMMON LAW FRAUD**

292. Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

293. Delta made material misrepresentations and/or omissions concerning the ability of Plaintiffs and class members to receive refunds for cancelled flights. For example, Delta falsely represented that Plaintiffs and the class members were only able to receive travel vouchers Delta did not fully and truthfully disclose to its customers that they were entitled to receive refunds. As a result, Plaintiffs and the other Class members were fraudulently induced to purchase airline tickets and were unable to pursue refunds of amounts paid for tickets.

294. Delta had a duty to disclose that Plaintiffs and the class members were entitled to refunds when Plaintiffs and the class members contacted Delta seeking refunds.

295.  Delta had a duty to disclose that Plaintiffs and the class members were entitled to reimbursement of out-of-pocket expenditures incurred as a result of Delta's cancellations.

296.  These misrepresentations and omissions were made by Delta with knowledge of their falsity, and with the intent that Plaintiffs and Class members rely upon them.

297.  Plaintiffs and Class members reasonably relied on these omissions, and suffered damages as a result.

## COUNT V
## UNJUST ENRICHMENT

298.  Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

299.  This claim is pled in the alternative to Plaintiffs' contract-based claims.

300.  Plaintiffs and the class conferred a direct benefit on Delta by purchasing airline tickets.

301.  Delta knowingly and willingly accepted and enjoyed the benefits conferred on it by Plaintiffs and the class.

302.  Delta's retention of these benefits is unjust and inequitable due to the conduct described herein.

303.    As a direct and proximate cause of Delta's unjust enrichment, Plaintiffs and the Class are entitled to an accounting, restitution, attorneys' fees, costs and interest.

### COUNT VI
### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (on behalf of the California Class)

304.    Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

305.    To the extent required, this cause of action is pled in the alternative.

306.    Delta's conduct described herein violates the "unfair" and "unlawful" prongs of California's Unfair Competition Law (the "UCL"), codified at California Business and Professions Code §§ 17200, et seq.

307.    By its conduct alleged herein, Delta has violated the "unfair" prong of the UCL, including without limitation by: (a) promising Plaintiff Susman and the California Class refunds for cancelled or severely delayed flights, and then reneging on that promise; (b) promising Plaintiff Susman and the California Class reimbursement of travel expenses incurred as a result of the cancelled or severely delayed flights, and then reneging on that promise; and (c) failing to comply with the refund and reimbursement obligations imposed by the federal government.

308.    Delta's conduct alleged herein is immoral, unethical, oppressive, unscrupulous, unconscionable, and substantially injurious to Plaintiff Susman and

the California Class. By its conduct alleged herein, Delta has already improperly extracted at least several millions of dollars from customers in California and throughout the United States. There is no utility to Delta's conduct, and even if there were any utility, it would be significantly outweighed by the gravity of the harm caused by Delta's conduct alleged herein.

309. Delta's conduct alleged herein also violates California public policy, including as such policy is reflected in Cal. Civ. Code § 1750, et seq., Cal. Civ. Code §§ 1709-1710, and California common law relating to contracts.

310. By its conduct alleged herein, Delta has also violated the "unlawful" prong of the UCL, including by breaching contractual promises and/or violating the implied covenant of good faith and fair dealing, in violation of California common law.

311. By its conduct alleged herein, Delta received money from Plaintiff Susman and the California Class that Delta should not have received, including but not limited to fees paid for airline tickets, meals, hotels, and other valuable benefits as alleged herein.

312. As a direct and proximate result of Delta's unfair and unlawful conduct, Plaintiff Susman and the proposed California Class lost money and have lost other property and benefits in which Plaintiff Susman and the California Class have a vested interest.

313.   Plaintiff Susman and the California Class lack an adequate remedy at law to recover the amounts they have paid Delta for the service: (a) to the extent those amounts (in part or in whole) are deemed not recoverable as damages under their breach of contract claims; and/or (b) to the extent such payments are considered "voluntary" (as that term is used for the "voluntary payment" defense) and rendered not recoverable under legal claims. The UCL gives courts broad equitable power to "make such orders or judgments…as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203.  As alleged, all amounts paid to Delta by Plaintiff Susman and the California Class for airfare were and are amounts that Delta acquired by means of its misconduct in violation of the UCL.  All such amounts may properly be awarded as restitution under the UCL even in the event it is determined recoverable damages under their legal claims are more limited or damages are not available at all.  Moreover, the voluntary payment defense is not applicable to equitable claims under the UCL – see Torliatt v. Ocwen Loan Servicing, LLC 570 F. Supp. 3d 781, 800 (N.D. Cal. 2021); Bautista v. Valero Mktg. & Supply Co., 2018 WL 11356583, at *4 (N.D. Cal. Dec. 4, 2018) – and a party may state a claim and obtain restitution of payments under the UCL in the factual scenario where those payments are made with knowledge of the relevant facts.

314.    Plaintiff Susman and the California Class lack an adequate remedy at law to obtain injunctive relief requiring Delta to stop refusing to offer refunds and reimburse California customers for out-of-pocket expenses, to the extent the specific performance remedy for their breach of contract claims is determined to require anything less than such relief.    The UCL gives courts broad equitable power to "make such orders or judgments…as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition." Cal. Bus. & Prof. Code § 17203.

315.    Plaintiff Susman seeks an order granting restitution to Plaintiff and the California Class in an amount to be proven at trial, including for the amounts they have paid to third parties for expenses that should have been reimbursed by Delta.

316.    Delta's conduct has caused substantial injury to Plaintiff Susman and the California Class. Delta's conduct is ongoing and will continue absent a permanent injunction.    Accordingly, Plaintiff Susman seeks an order enjoining Delta from continuing its misconduct alleged herein, ordering Delta to honor its obligations.

317.    Plaintiff Susman further seeks an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

**<u>COUNT VII</u>**
**VIOLATIONS OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT ("CLRA")**
**CAL. CIV. CODE §§ 1750–1785**

**(on behalf of the California Class)**

318.    Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

319.    Plaintiff Susman and the members of the California Subclass are "consumers" as defined under the CLRA. See Cal. Civ. Code § 1761(d).

320.    Delta is a "person" as defined under the CLRA. See Cal. Civ. Code § 1761(c).

321.    Airline tickets are "goods" as defined under the CLRA. See Cal. Civ. Code § 1761(a).

322.    The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

323.    Delta engaged in unfair and deceptive acts in violation of the CLRA by the practices described above and by (a) promising Plaintiff Susman and the California Class refunds for cancelled or severely delayed flights, and then reneging on that promise; (b) promising Plaintiff Susman and the California Class reimbursement of travel expenses incurred as a result of the cancelled or severely delayed flights, and then reneging on that promise; and (c) failing to comply with

the refund and reimbursement obligations imposed by the federal government. Delta's conduct violates the CLRA in that it:

    a. represented that the airline tickets have characteristics, uses, or benefits that they do not have, which is in violation of section 1770(a)(5);

    b. represented that the airline tickets are of a particular standard, quality, or grade when, in fact, they are not, which is in violation of section 1770(a)(7);

    c. advertises airline tickets with the intent not to sell them as advertised, which is in violation of section 1770(a)(9);

    d. represents that airline tickets have been supplied in accordance with a previous representation when they have not, which is in violation of section 1770(a)(16); and

    e. inserts an unconscionable provision into its reimbursement of out of pocket expenses in violation of section 1770(a)(19).

324.   Delta's unfair or deceptive acts or practices occurred repeatedly in its trade or business and were capable of deceiving a substantial portion of the purchasing public.

325.   Delta knew, should have known, or was reckless in not knowing that it was incapable of providing airline travel and should have disclosed to passengers

of its lack of capabilities and offered to cover the costs of rebooking flights and other associated costs.

326. Delta was under a duty to Plaintiff and the California Subclass members to disclose the facts about the flight cancellations and Delta's promises to refund and reimburse passengers because:

    a. Delta knew of but actively concealed these facts from Plaintiff and the California Subclass;

    b. Delta was in a superior and exclusive position to know the true facts about its operations which affects the ability of Delta to offer flights, and Plaintiff and the Subclass members could not reasonably have been expected to discover that Delta would be unable to offer them flights; and

    c. Delta made partial representations regarding the status of flights, including future flights which Delta booked passengers, and Delta's promises to refund and reimburse passengers of their costs.

327. The facts that Delta misrepresented to and concealed from Plaintiff and the other California Subclass members are material because a reasonable consumer would have considered them to be important in deciding whether to purchase airline tickets from Delta or pay a lesser price for them.

328.   Delta's business operations and its ability to fly passengers to their destinations at the scheduled times are material terms.

329.   In failing to disclose Delta's inability to operate flights, Delta has knowingly and intentionally concealed material facts in breach of its duty to disclose.

330.   Plaintiff and the California Subclass have suffered injury in fact and actual damages resulting from Delta's material misrepresentations and omissions, including by paying an inflated purchase price for airline tickets and incurring additional out-of-pocket expenses to deal with the flight cancelation. Had Plaintiff and the Subclass known about Delta's flight cancelations, they would not have purchased their airline tickets or would have paid less in doing so.

331.   As a direct and proximate result of Delta's unfair and deceptive conduct, therefore, Plaintiff and the California Subclass members have been harmed.

332.   Pursuant to Cal. Civ. Code § 1782(a), Plaintiff Susman sent a letter to Delta notifying it of its CLRA violations and providing them with an opportunity to correct their business practices on August 5, 2024. If Delta does not correct its business practices, Plaintiff will amend (or seek leave to amend) the complaint to add claims for monetary relief, including for actual, restitutionary, and punitive damages under the CLRA.

333.   Pursuant to Cal. Civ. Code § 1780(a), Plaintiff, individually and on behalf of the California Subclass, seeks injunctive relief for Delta's violation of the CLRA.

334.   Additionally, pursuant to Cal. Civ. Code §§ 1780 and 1781, Plaintiff, individually and on behalf of the California Subclass, seeks compensatory and punitive damages under the CLRA and to recover their attorneys' fees and costs.

335.   Plaintiff's CLRA venue declaration in accordance with Cal. Civ. Code § 1780(d) was previously filed at ECF No. 1-1.

## COUNT VIII
## VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW
### (Cal. Bus. & Prof. Code § 17500, et seq.)
### (on behalf of the California Class)

336.   Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

337.   Plaintiff Susman brings this claim on behalf of herself and on behalf of the California Class against Defendant.

338.   California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means

whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

339.    Defendant caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendant, to be untrue and misleading to consumers, including Plaintiff Susman and the other California Class Members.

340.    Defendant has violated section 17500 because the misrepresentations and omissions regarding the operability of flights, refunds, and reimbursements as set forth in this Complaint were material and likely to deceive a reasonable consumer.

341.    Plaintiff Susman and the other California Class Members have suffered an injury in fact, including the loss of money or property, as a result of Defendant's unfair, unlawful, and/or deceptive practices. In purchasing an airline ticket, Plaintiff Susman and the other California Class Members relied on the misrepresentations and/or omissions of Defendant with respect to the ability of Delta to fly the aircraft at the scheduled time. Moreover, Plaintiff Susman and the California class relied on the misrepresentations and/or omissions of Defendant

with respect to the issuance of refunds for canceled flights, reimbursements for out of pocket expenses as a result of Delta's cancelations, and other commitments Delta made with respect to offering additional benefits, including meal and hotel vouchers. Defendant's representations were untrue because Delta canceled Plaintiff Susman's and the California class members' flights and failed to provide the refunds and reimbursements to which they were entitled and Delta failed to provide additional benefits described herein. Had Plaintiff Susman and the other California Class Members known this, they would not have purchased airline tickets from Delta and/or paid as much for them. Accordingly, Plaintiff Susman and the other California Class Members overpaid for their airline tickets and did not receive the benefit of their bargain.

342.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

343.   Plaintiff Susman, individually and on behalf of the other California Class Members, requests that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff Susman and the other California Class Members any money Defendant acquired by unfair competition, including

restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT IX
## VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (on behalf of the Florida Class)

344.   Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

345.   The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, et seq. (FDUTPA), is designed to protect consumers from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

346.   Plaintiffs Brennan and Felipak are "consumers" as defined in the FDUTPA.

347.   Delta engages in "trade or commerce" as defined in the FDUTPA.

348.   In the course of Delta's business, it engaged in conduct that was consumer-oriented and did so in a manner which was materially deceptive and unfair towards customers such as Plaintiffs Brennan and Felipak.

349.   Delta had actual knowledge of a consumer's right to a refund as described herein, but refused to provide refunds to consumers.

350.   Delta had actual knowledge of a consumer's right to have their costs covered as described herein, but refused to reimburse consumers.

84

351.   Delta's unfair and deceptive practices were done to enrich its bottom line to the detriment of Plaintiffs Brennan and Felipak and the Florida Class.

352.   As set forth above, Delta's actions occurred in the conduct of trade or commerce and constitute unfair and/or deceptive trade practices under the FDUTPA.

353.   Plaintiffs Brennan and Felipak and the Florida Class relied upon and were deceived by Delta's unfair and deceptive misrepresentations of material fact in deciding to purchase airline tickets from Delta.

354.   Plaintiffs and Brennan, Felipak and the Florida Class were injured as a result of Delta's conduct, and suffered ascertainable monetary loss. Plaintiff Brennan and the class members conveyed to Delta a thing of value, but did not receive the benefit of their bargain.

355.   Pursuant to the FDUTPA, Plaintiffs Brennan and Felipak and the Florida Class are entitled to an award of reasonable legal fees and costs incurred in connection with this action.

### COUNT X
### VIOLATIONS OF THE WASHINGTON
### CONSUMER PROTECTION ACT
#### (on behalf of the Washington Class)

356.   Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

357.    Defendant Delta Air Lines engaged in unfair or deceptive practices prohibited by the Washington Consumer Protection Act, Wash. Rev. Code § 19.86, et seq. ("WCPA").

358.    Plaintiff Einhorn is a "person" as defined in the WCPA.

359.    Delta engages in "trade" and/or "commerce" as defined in the WCPA.

360.    In the course of Delta's business, it knowingly and intentionally failed to provide refunds to consumers and cover costs incurred by customers, such as Plaintiff Einhorn, when Delta canceled their flights.

361.    Delta had actual knowledge of a consumer's right to a refund as described herein, but refused to provide refunds to consumers.

362.    Delta had actual knowledge of a consumer's right to have their costs covered as described herein, but refused to reimburse consumers.

363.    Delta's unfair and deceptive practices were done to enrich its bottom line to the detriment of Plaintiff Einhorn and the Washington Class.

364.    As set forth above, Delta's actions occurred in the conduct of trade or commerce and constitute unfair and/or deceptive trade practices under the WCPA.

365.    Plaintiff Einhorn and the Washington Class relied upon and were deceived by Delta's unfair and deceptive misrepresentations of material fact in deciding to purchase airline tickets from Delta.

366.   Plaintiff Einhorn and the Washington Class were injured as a result of Delta's conduct, and suffered ascertainable monetary loss. Plaintiff Einhorn and the class members and did not receive the benefit of their bargain.

## COUNT XI
## VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT
### (OHIO REV. CODE §§ 1345.01, *et. seq.*)
### (On Behalf of the Ohio Class)

367.   Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

368.   Plaintiff Moorman brings this claim on behalf of the Ohio Class.

369.   Plaintiff Moorman and the other Ohio Class members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 ("OCSPA").

370.   Defendant is a "supplier" as defined by the OCSPA. Plaintiff Moorman's and the other Ohio Class members' purchases of airline tickets were "consumer transactions" as defined by the OCSPA.

371.   The OCSPA prohibits the following unconscionable acts of practices in connection with a consumer transaction, whether it occurs before, during or after the transaction:

(3) Delta knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;

(5) Delta required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;

(6) Delta knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment; and

(7) Delta has, without justification, refused to make a refund in cash or by check for a returned item that was purchased with cash or by check, unless the supplier had conspicuously posted in the establishment at the time of the sale a sign stating the supplier's refund policy.

372.   Delta engaged in unconscionable acts and practices when it refused to issue refunds and reimbursements pursuant to Delta's Contract of Carriage and its policies pursuant to the Global IT Outage. Delta further violated the OCSPA by failing for provide full refunds and reimbursements and instead offering only partial refunds and reimbursements. Delta further engaged in unconscionable acts and practices when it solicited waivers from Plaintiff Moorman and the Ohio Class members in exchange for accepting those partial refunds and/or reimbursements.

373.   Delta further violated the OCSPA by soliciting waivers of legal claims from Plaintiff Moorman and the Ohio Class members without fully informing them of their legal rights, including the existence of this class action lawsuit against Delta.

374.   Plaintiff Moorman and the Ohio Class members relied upon Delta's material misrepresentations – including but not limited to the amount of which they are entitled to receive through refunds and reimbursements and the

requirement of signing a waiver in order to receive said refunds and reimbursements – which were likely to, and did, in fact, deceive reasonable consumers, including Plaintiff Moorman and the Ohio Class members.

375.   As a result of its violations of the OCSPA detailed above, Delta caused actual damage to Plaintiff Moorman and the Ohio Class and, if not stopped, will continue to harm Plaintiff Moorman and the Ohio Class. As discussed, Delta continues to solicit waivers of legal claims from consumers and putative class members without informing them of their legal rights or the existence of this class action lawsuit.

376.   Plaintiff Moorman and the Ohio Class sustained damages as a result of Delta's unlawful acts and are, therefore, entitled to damages and other relief as provided under the OCSPA.

377.   Plaintiff Moorman also seeks court costs and attorneys' fees as a result of Defendant's violation of the OCSPA as provided in Ohio Rev. Code § 1345.09.

## COUNT XII
## VIOLATION OF THE MONTREAL CONVENTION
### (DELAY IN CARRIAGE OF PASSENGERS AND BAGGAGE)
### (On behalf of Plaintiffs Kuk, Moorman, Bajra, Muzzi, Khaku, and the Montreal Convention Class)

378.  Plaintiffs Kuk, Moorman, Bajra, Muzzi, and Khaku restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

379.  The Montreal Convention applies to all "international carriage" of persons, baggage, or cargo performed by aircraft for reward. It applies equally to gratuitous carriage by aircraft performed by an air transport undertaking.

380.  For the purposes of the Montreal Convention, the expression "international carriage" means any carriage in which, according to the agreement between the parties, the place of departure and the place of destination, whether or not there be a break in the carriage or a transshipment, are situated either within the territories of two State Parties, or within the territory of a single State Party if there is an agreed stopping place within the territory of another State, even if that State is not a State Party. Carriage between two points within the territory of a State Party without an agreed stopping place within the territory of another State is not international carriage for the purposes of this Convention.

381.  Article 19 of the Montreal Convention sets forth the private cause of action for money damages caused by delay or cancellation of international airfare transportation against airlines: "[t]he carrier is liable for damage occasioned by delay in the carriage by air of passengers, baggage or cargo."

382.    The United States is a signatory to Montreal Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999 (entered into force on Nov. 4, 2003) reprinted in S. Treaty Doc. No. 106-45, since 05-28-1999.

383.    The United States of America and Mexico, the Netherlands, and Canada, as well as 135 other member countries,[83] are signatories to the Montreal Convention of 1999.

384.    Article 33(1) of the Montreal Convention provides that: "An action for damages must be brought, at the option of the plaintiff, in the territory of one of the States Parties, either before the court of the domicile of the carrier or of its principal place of business, or where it has a place of business through which the contract has been made or before the court at the place of destination."

---

[83] *i.e.*, Albania; Fiji; North Macedonia; Argentina; Finland; Norway; Armenia; France; Oman; Australia; Gabon; Pakistan; Austria; Gambia; Panama; Azerbaijan; Georgia; Paraguay; Bahamas; Germany; Peru; Bahrain; Ghana; Philippines; Bangladesh; Greece; Poland; Barbados; Guatemala; Portugal; Belgium; Guyana; Qatar; Belize; Honduras; Republic of Korea; Benin; Hungary; Republic of Moldova; Bolivia; Iceland; Romania; Bosnia and Herzegovina; India; Russian Federation; Botswana; Indonesia; Rwanda; Brazil; Ireland; Saint Vincent and the Grenadines; Brunei Darussalam; Israel; Saudi Arabia; Bulgaria; Italy; Senegal; Burkina; Faso; Jamaica; Serbia; Cabo Verde; Japan; Seychelles; Cambodia; Jordan; Sierra Leone; Cameroon; Kazakhstan; Singapore; Canada; Kenya; Slovakia; Central African Republic; Kuwait; Slovenia; Chad; Latvia; South Africa; Chile; Lebanon; Spain; China; Lithuania; Sri Lanka; Colombia; Luxembourg; Sudan; Congo; Madagascar; Sweden; Cook Islands; Malaysia; Switzerland; Costa Rica; Maldives; Syrian; Arab Republic; Côte d'Ivoire; Mali; Thailand; Croatia; Malta; Togo; Cuba; Mauritius; Tonga; Cyprus; Tunisia; Czech Republic; Monaco; Turkey; Democratic Republic of the Congo; Mongolia; Uganda; Denmark; Montenegro; Ukraine; Dominican Republic; Morocco; United Arab Emirates; Ecuador; Mozambique; United Kingdom; Egypt; Namibia; United Republic of Tanzania; El Salvador; Nepal; Equatorial Guinea; Netherlands; Uruguay; Estonia; New Zealand; Vantuatu; Eswatini; Niger; Viet Nam; Ethiopia; Nigeria; Zambia.

385.   Plaintiffs Kuk, Moorman, Bajra, Muzzi, Khaku, and the Class entered into binding legal agreements for international airfare transportation (a) from a specific airport in the United States of America to a specific airport in a Member Country; and/or (b) from a specific airport in a Member Country[84] to a specific airport in the United States of America. For example, Plaintiff Moorman entered into a binding legal agreement for four (4) (a) international airfare transportation tickets from an airport in Cincinnati, Ohio to an airport in Puerto Escondido, Mexico; and four (4)  (b) international airfare transportation from Puerto Escondido, Mexico to a specific airport in the United States of America, namely an airport in Cincinnati, Ohio.

386.   Similarly, Plaintiff Kuk entered into a binding legal agreement for roundtrip international airfare transportation from an airport in Ontario, Canada to Las Vegas, Nevada; Plaintiff Bajra entered into a binding legal agreement for two (2) roundtrip international airfare tickets from an airport in Colorado to The Netherlands; Plaintiff Muzzi entered into a binding legal agreement for four (4) international airfare tickets from The Netherlands to Fort Lauderdale, Florida; and Plaintiff Khaku entered into a binding legal agreement for four (4) international airfare tickets from Florida to Dubai, United Arab Emirates.

---

[84] *See id.*, listing the Montreal Convention Member Countries.

387.   Any and all terms, conditions, covenants and liabilities arising from said contract are governed by the Montreal Convention.

388.   On Plaintiff Moorman and her family's return flight from Puerto Escondido, Mexico to Cincinnati, Ohio, Plaintiff's connecting flight was significantly delayed and was subsequently canceled by Delta. Similarly, one or more of the flights of Plaintiffs Kuk, Bajra, Muzzi, and Khaku were similarly significantly delayed and subsequently canceled by Delta.

389.   The flight delays and/or cancellations were not caused by "extraordinary circumstances" within the meaning of the Montreal Convention, which could not have been avoided in due exercise of due diligence or another pertinent legal standard of care by the Delta.

390.   As discussed, Delta's outdated tech systems are fully within Delta's control, and Delta's unwillingness to accept assistance from Microsoft caused the delays in Delta's operations to return to a state of normalcy.

391.   Delta did not pursue all meaningful actions required to avoid or mitigate impact of extraordinary circumstances.[85]

---

[85] Cf., *Ronald Huzar v. Jet2.com* Limited, [2014] EWCA Civ. 791, Case No: B2/2013/3277/CCRTF (Royal Courts of Justice, London, England, 11 June 2014) (holding that technical problems, which may be unforeseeable, but are ultimately caused by an event inherent in the running of an aircraft, and cannot therefore be considered to be an extraordinary circumstance). *See* https://www.bottomline.co.uk /wp-content/uploads/2013/10/179933236-Jet2-appeal.pdf

392. "Extraordinary circumstances" is limited and applies only in certain circumstances where the airline can prove the cancellation or delay was caused by *political instability, meteorological conditions incompatible with the operation of the flight concerned, security risks, unexpected flight safety shortcomings and strikes* that affect the operation of an operating aircraft. (emphasis added). Moreover, even the listed events do not "themselves constitute extraordinary circumstances, but only . . . may produce such circumstances." *Wallentin-Hermann v. Alitalia*, European Court of Justice, Case No C-549/07, Judgment of December 22, 2008, ¶ 22.

393. That "extraordinary circumstances" do not include technical or mechanical problems except in the rare instances where the airline can prove those problems are due to hidden, inherent manufacturing defects or aircraft damage caused by sabotage. *Id.* at ¶ 26 (mechanical problems may constitute extraordinary circumstances only when "it was revealed by the manufacturer of the aircraft compromising the fleet of the air carrier concerned, or by competent authority, that those aircraft, although already in service, are affected by a hidden manufacturing defect which impinges on the flight safety" or where there was "damage to aircraft caused by acts of sabotage); *see also Sturgeon v. Condor Flugdienst GmbH*, European Court of Justice, Case No. C-402/7, Judgment of November 19, 2009

(reiterating that technical problems are not extraordinary circumstances in context of "technical faults on the plane and illness among the crew").

394.   In accordance with Article 19 of the Montreal Convention, Defendant is liable for damages caused by delay and/or cancellation of international carriage of passengers.

395.   As a direct and proximate cause of delay and/or cancellation of the above identified international airfare, Plaintiff Moorman, Kuk, Moorman, Bajra, Muzzi, Khaku and the Class Members were damaged. Plaintiff Moorman incurred out of pocket expenses in the amount of approximately $2,000. Plaintiff Kuk incurred out of pocket expenses in excess of $3,000.00. Plaintiff Bajra incurred out of pocket expenses in the amount of $1,975.  Plaintiff Muzzi incurred out of pocket expenses in the amount of €5,000.  Additionally, Plaintiff Khaku incurred out of pocket expenses for his lost luggage.

396.   At all times material hereto, Defendant refused to compensate Plaintiff Moorman, Kuk, Bajra, Muzzi, Khaku and other members of purported Class, or conditioned compensation on Plaintiff Moorman, Kuk, Bajra, Muzzi, Khaku and class members' waiver of their legal rights.

397.   As a direct and proximate cause of Defendant's significant delay and ultimate cancellation of the international flight, Plaintiff Moorman, Kuk, Bajra,

Muzzi, Khaku and other Class Members incurred out of pocket expenses, such as alternative transportation.

398.  As described more fully above, Plaintiff Moorman's baggage was delayed by 2 – 3 days. Plaintiff Moorman made additional trips to the Cincinatti, Ohio airport she otherwise would not have made but for Delta's delay, which resulted in incurring additional expenses to Plaintiff Moorman as described above. Similarly, Plaintiff Kuk was forced to purchase a flight with a different airline and a rental vehicle he would not have otherwise incurred, as described more fully above. Further, Plaintiff Bajra was forced to purchase a flight with a different airline that he would not have otherwise incurred, as described more fully above. Further, Plaintiff Muzzi's luggage was delayed by 15 days, which resulted in incurring additional expenses Plaintiff Muzzi would not have otherwise incurred, as described more fully above. Additionally, Plaintiff Khaku's luggage was lost and to date has not been returned to Plaintiff Khaku, nor has Delta reimbursed Plaintiff Khaku for the lost luggage.

399.  Plaintiff Moorman submitted an online claim for reimbursement of out of pocket expenses on or about July 25, 2024. Plaintiff Kuk submitted an online claim for reimbursement of out of pocket expenses on or about July 26, 2024.  Plaintiff Bajra submitted an online claim for reimbursement of out of pocket

expenses on or about July 31, 2024. Plaintiff Muzzi submitted an online claim for reimbursement of out of pocket expenses on or about August 4, 2024.

400. Pursuant to Article 19 of Montreal Convention Defendant is statutorily obligated to compensate Plaintiffs Moorman, Kuk, Bajra, Muzzi, Khaku, and the Class for their damages caused by the cancellation of the significant delay and/or cancellation of the flights between July 19, 2024 and July 28, 2024.

## COUNT XIII
## VIOLATIONS OF EU AIR PASSENGER RIGHTS (Regulation 261/2004)
### (On behalf of Plaintiffs Bajra and Muzzi and the EU Subclass)

401. Plaintiffs Bajra and Muzzi restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

402. Regulation 261/2004 ("EU Air Passenger Rights") establishes rules on compensation and assistance to passengers when airlines cancel and/or delay flights.[86] It was enacted pursuant to the authority of the Montreal and Warsaw Conventions. Regulation (EC) No 889/2002 of the European Parliament and of the Council of 13 May 2002 amending Council Regulation (EC) No 2027/97 on air carrier liability in the event of accidents (citing Convention for the Unification of Certain Rules Relating to International Carriage by Air, signed at Montreal on 28

---

[86] See https://eur-lex.europa.eu/legal-content/EN/TXT/?qid=1476179175834&uri=CELEX:32004R0261 (last visited October 17, 2024)

May 1999; Convention for the Unification of Certain Rules Relating to International Carriage by Air, signed at Warsaw on 12 October 1929, or the Warsaw Convention as amended at The Hague on 28 September 1955 and the Convention supplementary to the Warsaw Convention done at Guadalajara on 18 September 1961). The United States is a signatory to the Montreal Convention, thus it is subject to the regulation EU Air Passenger Rights.

403.   The EU consists of 27 Member States.[87]

404.   The EU Air Passenger Rights applies when:[88]

- If your [consumer's] flight is within the EU and is operated either by an EU or a non-EU airline
- If your [consumer's] flight arrives in the EU from outside the EU and is operated by an EU airline
- If your [consumer's] flight departs from the EU to a non-EU country operated by an EU or a non-EU airline
- If you have not already received benefits (compensation, re-routing, assistance from the airline) for flight related problems for this journey under the relevant law of a non-EU country.

405.   Pursuant to Articles 5 and 6 of Regulation 261/2004, for situations other than "extraordinary circumstances," the following applies:

---

[87] Belgium, Bulgaria, Czechia, Denmark, Germany, Estonia, Ireland, Greece, Spain, France, Croatia, Italy, Cyprus, Latvia, Lithuania, Luxembourg, Hungary, Malta, the Netherlands, Austria, Poland, Portugal, Romania, Slovenia, Slovakia, Finland and Sweden. https://eur-lex.europa.eu/EN/legal-content/glossary/member-states.html#:~:text=Now%20there%20are%2027%20Member,%2C%20Slovakia%2C%20Finland%20and%20Sweden (last visited October 17, 2024)

[88] https://europa.eu/youreurope/citizens/travel/passenger-rights/air/index_en.htm (last visited October 17, 2024)

Article 5:

In the case of cancellation of a flight, the passengers concerned shall:

(a) be offered assistance by the operating air carrier in accordance with Article 8; and

(b) be offered assistance by the operating air carrier in accordance with Article 9(1)(a) and 9(2), as well as, in event of re-routing when the reasonably expected time of departure of the new flight is at least the day after the departure as it was planned for the cancelled flight, the assistance specified in Article 9(1)(b) and 9(1)(c); and

(c) *have the right to compensation by the operating air carrier in accordance with Article 7*, unless:

(i) they are informed of the cancellation at least two weeks before the scheduled time of departure; or

(ii) they are informed of the cancellation between two weeks and seven days before the scheduled time of departure and are offered re-routing, allowing them to depart no more than two hours before the scheduled time of departure and to reach their final destination less than four hours after the scheduled time of arrival; or

(iii) they are informed of the cancellation less than seven days before the scheduled time of departure and are offered re-routing, allowing them to depart no more than one hour before the scheduled time of departure and to reach their final destination less than two hours after the scheduled time of arrival.

2. When passengers are informed of the cancellation, an explanation shall be given concerning possible alternative transport.

3. An operating air carrier shall not be obliged to pay compensation in accordance with Article 7, if it can prove that the cancellation is caused by extraordinary circumstances which

could not have been avoided even if all reasonable measures had been taken.

4. The burden of proof concerning the questions as to whether and when the passenger has been informed of the cancellation of the flight shall rest with the operating air carrier.

Article 6:

When an operating air carrier reasonably expects a flight to be delayed beyond its scheduled time of departure:

(a) for two hours or more in the case of flights of 1500 kilometres or less; or

(b) for three hours or more in the case of all intra-Community flights of more than 1500 kilometres and of all other flights between 1500 and 3500 kilometres; or

(c) for four hours or more in the case of all flights not falling under (a) or (b),

passengers shall be offered by the operating air carrier:

(i) the assistance specified in Article 9(1)(a) and 9(2); and

(ii) when the reasonably expected time of departure is at least the day after the time of departure previously announced, the assistance specified in Article 9(1)(b) and 9(1)(c); and

(iii) when the delay is at least five hours, the assistance specified in Article 8(1)(a).

2. In any event, the assistance shall be offered within the time limits set out above with respect to each distance bracket.

406. Pursuant to Regulation 261/2004, "[a]s under the Montreal Convention, obligations on operating air carriers should be limited or excluded in cases where an event has been caused by extraordinary circumstances which could not have been avoided even if all reasonable measures had been taken. Such circumstances may, in particular, occur in cases of ***political instability, meteorological conditions incompatible with the operation of the flight concerned, security risks, unexpected flight safety shortcomings and strikes that affect the operation of an operating air carrier.***" (emphasis added).

407. The CrowdStrike Outage does not constitute an "extraordinary circumstance" under the EU Air Passenger Rights.

408. Under Article 7, passengers are entitled to compensation for cancelled flights:

(a) EUR 250 for all flights of 1500 kilometres or less;

(b) EUR 400 for all intra-Community flights of more than 1500 kilometres, and for all other flights between 1500 and 3500 kilometres;

(c) EUR 600 for all flights not falling under (a) or (b).

In determining the distance, the basis shall be the last destination at which the denial of boarding or cancellation will delay the passenger's arrival after the scheduled time.

2. When passengers are offered re-routing to their final destination on an alternative flight pursuant to Article 8, the arrival time of which does not exceed the scheduled arrival time of the flight originally booked

(a) by two hours, in respect of all flights of 1500 kilometres or less; or

(b) by three hours, in respect of all intra-Community flights of more than 1500 kilometres and for all other flights between 1500 and 3500 kilometres; or

(c) by four hours, in respect of all flights not falling under (a) or (b),

the operating air carrier may reduce the compensation provided for in paragraph 1 by 50 %.

3. The compensation referred to in paragraph 1 shall be paid in cash, by electronic bank transfer, bank orders or bank cheques or, with the signed agreement of the passenger, in travel vouchers and/or other services.

409. Additionally, under Article 8, passengers are entitled to

reimbursement or re-routing:

1. Where reference is made to this Article, passengers shall be offered the choice between:

(a) - reimbursement within seven days, by the means provided for in Article 7(3), of the full cost of the ticket at the price at which it was bought, for the part or parts of the journey not made, and for the part or parts already made if the flight is no longer serving any purpose in relation to the passenger's original travel plan, together with, when relevant,

- a return flight to the first point of departure, at the earliest opportunity;

(b) re-routing, under comparable transport conditions, to their final destination at the earliest opportunity; or

(c) re-routing, under comparable transport conditions, to their final destination at a later date at the passenger's convenience, subject to availability of seats.

2. Paragraph 1(a) shall also apply to passengers whose flights form part of a package, except for the right to reimbursement where such right arises under Directive 90/314/EEC.

3. When, in the case where a town, city or region is served by several airports, an operating air carrier offers a passenger a flight to an airport alternative to that for which the booking was made, the

operating air carrier shall bear the cost of transferring the passenger from that alternative airport either to that for which the booking was made, or to another close-by destination agreed with the passenger.

410.   Article 9 provides accommodations to affected passengers:

(a) meals and refreshments in a reasonable relation to the waiting time;

(b) hotel accommodation in cases

- where a stay of one or more nights becomes necessary, or

- where a stay additional to that intended by the passenger becomes necessary;

(c) transport between the airport and place of accommodation (hotel or other).

411.   Plaintiffs Bajra's and Muzzi's flights were to/from a Member State within the EU.

412.   Delta cancelled Plaintiffs Bajra's and Muzzi's flights due to its failure to recover from the CrowdStrike Outage, which is not an "extraordinary circumstance." As such, Plaintiffs Bajra and Muzzi are entitled to compensation under the EU Air Passenger Rights.

413.   Plaintiffs Bajra and Muzzi and the rest of the EU Class members requested refunds/relief under the EU Air Passenger Rights.

414.   Delta refused to provide relief under the EU Air Passenger Rights.

415.   As a result, Plaintiffs Bajra and Muzzi and the rest of the EU Class members have been harmed.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that this Court:

A.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class(es) as defined above;

B.    Appoint Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

C.    Award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class members are entitled;

D.    Award pre-judgment and post-judgment interest on such monetary relief;

E.    Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Delta to issue refunds of ticket prices to any member of the class who requests a refund;

F.    Award reasonable attorney's fees and costs; and

G.    Grant such further relief that this Court deems appropriate.

## **JURY DEMAND**

Plaintiffs, individually and on behalf of the putative Class demand a trial by jury on all issues so triable.

Dated: November 12, 2024

Respectfully submitted,

*/s/ G. Franklin Lemond, Jr.*
E. Adam Webb

104

G. Franklin Lemond, Jr.
**WEBB, KLASE & LEMOND, LLC**
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
Tel: (770) 444-9325
Facsimile: (770) 217-9950
Adam@WebbLLC.com
Franklin@WebbLLC.com

Joseph G. Sauder
Joseph B. Kenney
Juliette T. Mogenson
**SAUDER SCHELKOPF**
1109 Lancaster Avenue
Berwyn, PA 19312
Tel: 888.711.9975
jgs@sstriallawyers.com
jbk@sstriallawyers.com
jtm@sstriallawyers.com

*Attorneys for Plaintiffs Bajra, Brennan, Einhorn, Felipak, Kuk, Muzzi, and Susman*

Francis J. "Casey" Flynn, Jr.
**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
6057 Metropolitan Plaza
Los Angeles, CA 90036
Tel: (314) 662-2836
casey@lawofficeflynn.com

Tiffany Marko Yiatras
**CONSUMER PROTECTION LEGAL, LLC**
308 Hutchinson Road
Ellisville, Missouri 63011-2029
Tel: (314) 541-0317
tiffany@consumerprotectionlegal.com

*Attorneys for Plaintiff Moorman*

David A. Bain
Georgia Bar No. 032449
**Law Offices of David A. Bain, LLC**
Suite 1050
1230 Peachtree St., N.E.
Atlanta, GA 30309
(404) 724-9990
dbain@bain-law.com

Paul Doolittle
SC Bar No. 6012
(admitted pro hac vice)
Thomas William Sizemore
Georgia Bar No. 823195
**Poulin Willey Anastopoulo, LLC**
32 Ann Street
Charleston, SC 29403
(803) 222-2222
paul.doolittle@poulinwilley.com
teamsizemore@poulinwilley.com

*Attorneys for Plaintiff Khaku*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2024, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which automatically sends email notification of such filing to all attorneys of record.

*/s/ G. Franklin Lemond, Jr.*
G. Franklin Lemond, Jr.
