## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **ARBEN BAJRA, JOHN BRENNAN, ASHER EINHORN, CAROLINE FELIPAK, AUNALI KHAKU, DAVID KUK, CARMEN MOORMAN, VITTORIO MUZZI, and MELANIE SUSMAN,** individually and on behalf of all others similarly situated, | |
| **Plaintiffs,** | **CIVIL ACTION FILE** **NO. 1:24-CV-3477-MHC** |
| **v.** | |
| **DELTA AIR LINES, INC.,** | |
| **Defendant.** | |

## <u>ORDER</u>

This putative class action comes before the Court on Defendant Delta Air

Lines, Inc. ("Delta")'s Motion to Dismiss Plaintiffs' Consolidated Class Action

Complaint ("Mot. to Dismiss") [Doc. 44] and Plaintiffs' Motion for Leave to File

Amended Complaint ("Mot. to Am.") [Doc. 53].

## I.    BACKGROUND[1]

### A.    The CrowdStrike Outage and Delta's Response

On Friday, July 19, 2024, at 12:09 A.M. EST, an automatic update to cybersecurity software developed by CrowdStrike caused a major outage that affected millions of computers running Microsoft Windows (the "CrowdStrike Outage" or "Outage").  Consol Compl. ¶¶ 2, 149.  The defective update was fixed by 1:27 A.M. EST on the same date, but CrowdStrike's customers, which include airports and airlines, "continued to experience system crashes and outages throughout the day."  Id. ¶¶ 150-52.  Because of the Outage, over 4,000 flights were cancelled, and 35,500 flights were delayed worldwide within the same day. Id. ¶ 154.

Plaintiffs allege that airlines use Microsoft Office365 "for scheduling and transporting crew, passengers, and cargos to the appropriate destination," and they normally rely on cloud-based technology for these operations.  Id. ¶¶ 151, 153. When the Outage occurred, affected airlines "were forced to resort to manual operations," including checking in their passengers on paper.  Id. ¶ 153.  Even after

---

[1] Because this case is before the Court on Delta's Motion to Dismiss, the facts are presented as alleged in the Plaintiffs' Consolidated Class Action Complaint ("Consol. Compl.") [Doc. 33].  See Silberman v. Miami Dade Transit, 927 F.3d 1123, 1128 (11th Cir. 2019) (citation omitted).

operations were back online, delay propagation resulted in a continuation of cancelled flights throughout the weekend.[2]  Id. ¶ 155.  Plaintiffs allege that Delta cancelled more than 4,500 flights between Friday, July 19, and Sunday, July 21, 2024.  Id. ¶ 156.

Although almost every airline was able to fully recover and resume normal operations by the end of the weekend, Delta "continued to cancel and delay a staggering number of flights – far more than any other airline."  Id. ¶ 157.  On Monday, July 22, 2024, Delta released a statement regarding the ongoing issues it was experiencing, citing to its reliance on Windows Software and "particular troubles with its critical crew-scheduling system, which helps the airline get crews to the right place at the right time."  Id. ¶¶ 162-63.  Despite an announcement made on Thursday, July 25, 2024, that its "'operational reliability' had returned to 'normal,'" Delta continued to cancel flights through July 31, 2024.  Id. ¶ 160.

Plaintiffs allege that Delta attempted to place blame for its inability to resume operations on CrowdStrike and Microsoft.  Id. ¶ 167.  However, Plaintiffs allege that CrowdStrike contacted Delta to offer assistance and resources "within hours of the incident," and that CrowdStrike's CEO even personally reached out to

---

[2] "Delay propagation occurs when a delay at a flight stage causes a ripple effect in the subsequent stages of a flight."  Consol. Compl. ¶ 155.

Delta's CEO to offer onsite assistance, but Delta repeatedly either declined the offers or did not respond.  Id. ¶¶ 169-70.  Plaintiffs also allege that employees from Microsoft asked Delta employees if they needed assistance every day between July 19 and 23, 2024, but Delta repeatedly "turned down" these offers or did not respond.  Id. ¶¶ 175-79.  Plaintiffs allege that Delta "likely refused Microsoft's help because the IT system it was most having trouble restoring—its crew-tracking and scheduling system—was being serviced by other technology providers, such as IBM, because it runs on those providers' systems, and not Microsoft Windows or Azure."  Id. ¶ 180.  Plaintiffs allege that Microsoft's investigations into the CrowdStrike Outage and the various airlines' downtimes have revealed "that Delta, unlike its competitors, apparently has not modernized its IT infrastructure, either for the benefit of its customers or for its pilots and flight attendants."  Id. ¶ 181.  Plaintiffs summarize "[t]he reasons for Delta's failure to resume normal operations" as follows:

> (1) the design and operational resiliency capabilities of Delta's IT infrastructure are weaker than those of other airlines; (2) the decisions Delta made with respect to system upgrades contributed to its inability to quickly recover from the outage; (3) Delta refused free, onsite and virtual assistance offered by Microsoft to help restore Delta's operations; [and] (4) Delta's CEO ignored repeated offers by CrowdStrike to assist in Delta's recovery from the outage.

Id. ¶ 192.

4

## B.    Delta's Contracts of Carriage

Plaintiffs allege that Delta enters into Contracts of Carriage[3] with its customers, drafted by Delta, which include "Conditions of Carriage" that "reflect [Delta's] self-imposed undertakings and obligations voluntarily undertaken by [Delta]."  Id. ¶¶ 248-50; see also Delta Domestic General Rules Tariff ("Domestic COC") (Mar. 12, 2024) [Doc. 44-5]; Delta International General Rules Tariff ("International COC") (June 25, 2024) [Doc. 44-8]; Delta Canadian General Rules Tariff ("Canada COC") (Mar. 5, 2024) [Doc. 44-10].[4]  Plaintiffs also allege that

---

[3] Plaintiffs allege that Delta has separate U.S., Canadian, and International Contracts of Carriage, but that the language of the contracts are "nearly identical." Id. ¶ 204.

[4] Generally, the district court must convert a motion to dismiss into a motion for summary judgment if it considers materials outside the complaint. FED. R. CIV. P. 12(d); Day v. Taylor, 400 F.3d 1272, 1276 (11th Cir. 2005).  However, "[t]he Court may consider a document or exhibit attached to the motion to dismiss without converting the motion into one for summary judgment if (1) the attached document or exhibit is central to the plaintiff's claim and (2) its authenticity is undisputed.  Se. Clinical Nutrition Centers, Inc. v. Mayo Found. for Med. Educ. & Rsch., 135 F. Supp. 3d 1267, 1270 (N.D. Ga. 2013) (citing Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F.3d 1364 (11th Cir. 1997)).  Here, the terms of the Contracts of Carriage are central to Plaintiffs' breach of contract claims. Plaintiffs do not challenge the authenticity of the documents and, indeed, quote portions of the documents in their Consolidated Complaint.  Accordingly, the Court will consider the Contracts of Carriage in resolving Delta's Motion to Dismiss.

Moreover, Delta filed several versions of the Contracts of Carriage.  See Domestic COC (June 22, 2023) [Doc. 44-4]; International COC (Aug. 17, 2022) [Doc. 44-6];

these offers were made "in writing through [] Delta's direct channels (such as Delta's direct-to-consumer sales website, www.delta.com, and the company's mobile applications) and through traditional travel agencies and online travel agencies." Consol. Compl. ¶ 251. As relevant to Plaintiffs' claims, the Conditions of Carriage contain the following rules:

RULE 19: FLIGHT DELAYS/CANCELLATIONS

A. Delta's Liability in the Event of Schedule Changes, Delays and Flight Cancellations

If there is a flight cancellation, diversion, delay of greater than 120 minutes, or that will cause a passenger to miss connections, Delta will (at passenger's request) cancel the remaining ticket and refund the unused portion of the ticket and unused ancillary fees in the original form of payment in accordance with Rule 22.

*** 

RULE 22: REFUNDS

A. Involuntary Refunds

If a refund is required because of Delta's failure to operate on schedule or refusal to transport (except as a result of passenger's failure to comply with the contract of carriage), the following refund will be made directly to you:

  1) If no portion of the ticket has been used, the refund will be an amount equal to the fare paid.

---

International COC (June 13, 2024) [Doc. 44-7]; Canada COC (Mar. 1, 2022) [Doc. 44-9]. The provisions of these Contracts of Carriage pertinent to the issues in this case appear materially identical for each Contract of Carriage.

2) If a portion of the ticket has been used and termination (interruption) occurs:

a) At A Fare Breakpoint – The refund will be an amount equal to the fare paid for the unused transportation from the point of termination (interruption) to the destination or next Stopover point named on the ticket, or to a point at which transportation is to be resumed.  No refund will apply when alternate transportation is provided by Delta and accepted by the passenger.

b) Within A Fare Component – The refund will be an amount equal to the percentage of unflown mileage to fare component total mileage by prorating the fare paid for the fare component, from the point of termination/interruption to the destination, or next Stopover point named on the ticket, or to the point at which transportation is to be resumed.  No refund will apply when alternate transportation is provided by Delta and accepted by the passenger.

Id. ¶¶ 252-54; Domestic COC R. 19(A), 22(A); International COC R. 20(A), 23(A); Canada COC R. 240(B), 260.  As to "additional amenities," the Contracts of Carriage provide:

B. Delta's Liability for Additional Amenities in the Event of Schedule Changes, Delays and Flight Cancellations

Except as provided above, Delta shall have no liability if the flight cancellation, diversion or delay was due to force majeure.  As used in this rule, "force majeure" means actual, threatened or reported:

(1) Weather conditions or acts of God;

(2) Riots, civil unrest, embargoes, war, hostilities, or unsettled international conditions;

(3) Strikes, work stoppages, slowdowns, lockout, or any other labor-related dispute;

(4) Government regulation, demand, directive or requirement;

(5) Shortages of labor, fuel, or facilities; or

(6) Any other condition beyond Delta's control or any fact not reasonably foreseen by Delta.

However, when a passenger's travel is interrupted for more than 4 hours after the scheduled departure time as a result of flight cancellation or delay on the date of travel other than from force majeure, Delta will provide the passenger with the following additional amenities during the delay:

(a) Hotels

If overnight accommodations are available at Delta contracted facilities, Delta will provide the passenger with a voucher for one night's lodging when the delay is during the period of 10:00 pm to 6:00 am. Delta will provide free public ground transportation to the hotel if the hotel does not offer such service. If accommodations are not available, Delta will provide the passenger with a voucher that may be applied to future travel on Delta equal in value to the contracted hotel rate, up to $100 USD.

(b) Ground Transportation

In lieu of lodging or other amenities, Delta will furnish ground transportation to the destination airport if a passenger's flight is diverted to an alternative airport and if the destination on the ticket and the diverted airport destination are within the following city groups:

San Francisco, CA (SFO)/ Oakland, CA (OAK)/ San Jose, CA (SJC) Los Angeles, CA (LAX)/ Long Beach, CA (LGB)/ Ontario, CA (ONT)/ Santa Ana, CA (SNA) Denver, CO (DEN)/ Colorado Springs (COS) O'Hare – Chicago, IL (ORD)/ Midway – Chicago,

IL (MDW) Dallas-Ft. Worth, TX (DFW)/ Dallas, TX Love Field (DAL) Bush Intercontinental – Houston, TX (IAH)/ Hobby – Houston, TX (HOU) Fort Lauderdale, FL (FLL)/ Miami, FL (MIA)/ West Palm Beach, FL (PBI) Baltimore, MD (BWI)/ National – Washington, DC (DCA)/ Dulles – Washington, DC (IAD) Newark, NJ (EWR)/ LaGuardia – New York, NY (LGA)/ John F. Kennedy – New York, NY (JFK) Orlando, FL (MCO)/ Tampa, FL (TPA)/ Daytona Beach, FL (DAB)/ Melbourne, FL (MLB)/Sarasota Bradenton, FL (SRQ)

(c) Additional Amenities

Delta will provide such additional or alternative amenities as are necessary to maintain the safety and/or welfare of customers with special needs such as unaccompanied children and Persons with a Disability.  Such amenities will be furnished consistent with special needs and/or circumstances.

Consol. Compl. ¶ 273; Domestic COC R.19(B); International COC R. 20(B);

Canada COC R. 240(C).

In addition to the above provisions contained in the Contracts of Carriage, after the Outage, Delta issued a statement on July 22, 2024, offering affected customers (1) travel waivers (allowing customers to make a one-time change to their itinerary for rebooked travel occurring before July 28); (2) the right to a refund upon request (allowing customers the choice between an "eCredit" or the ability to request a refund online); (3) SkyMiles or travel vouchers; (4) coverage of eligible expenses (meal vouchers, hotel accommodations, ground transportation); and (5) reimbursement of eligible expenses.  Consol. Compl. ¶ 208.  And on July

26, 2024, Delta issued a second statement offering the following, additional amenities: (1) flight cancellation (allowing the customer to cancel their travel online and receive an automatic refund of any unused portions); (2) an expansion of eligible expenses for reimbursement, now including flights purchased through other airlines, train and bus tickets, rental cars, and rideshares; (3) automatic refunds for bags and seats; (4) an offer of SkyMiles or an electronic Transportation Credit Voucher; and (5) an extension of the travel waiver (now allowing rebooking for travel that occurs before August 4).  Id. ¶ 209.

### C.    The Effect of the Outage on Delta Customers Generally

Plaintiffs allege that, although Delta offered reimbursement of eligible expenses through their website and app, Delta failed to clarify that the customer would only be receiving a partial reimbursement.  Id. ¶¶ 210-11, 218. Furthermore, Delta did not disclose to its customers that acceptance of the partial reimbursement would release any legal claims the customer may have against Delta until after the customer "click[ed] on the button to accept the partial reimbursement."  Id. ¶¶ 218-221.

Plaintiffs also allege that the United States Department of Transportation ("DOT") requires "automatic refunds to consumers when a U.S. air carrier cancels or makes a significant change to a scheduled flight . . . and the consumer is not

offered or rejects alternative transportation and travel credits, vouchers, or other

compensation." Id. ¶ 213 (alteration accepted).  The DOT also requires the carrier

and its ticket agents to "inform customers of their right to a refund . . . before

making an offer for alternative transportation, travel credits, vouchers, or other

compensation in lieu of refunds." Id. ¶ 216.  Plaintiffs allege that, even when

customers exercised their right to request a refund, "Delta refused or ignored their

requests, or failed to provide real-time assistance from customer service agents."

Id. ¶ 198.  Plaintiffs further allege that those customers who did receive a response

were offered "pennies on the dollar of the total incurred expenses" with "a release

on the backside of the check." Id. ¶ 199.

### D.    The Plaintiffs

#### 1.    Domestic-Travel Plaintiffs

John Brennan ("Brennan"), a resident of Florida, purchased two roundtrip

tickets to Seattle, Washington, for $1,281 through Delta's website using a credit

card. Id. ¶¶ 34-35.  Once in Seattle, Brennan and his wife planned to board a

cruise, for which he had paid approximately $10,000. Id. ¶¶ 35, 42.  Brennan

arrived at the Tampa airport on July 21, 2024, but his flight was cancelled, and he

was booked for a different flight to Seattle with a layover in Atlanta, Georgia. Id.

¶ 36.  His and his wife's bags were checked, and they were informed that they

would be able to retrieve their bags in Seattle.  <u>Id.</u>  When Brennan arrived in

Atlanta, he was informed that his flight to Seattle was cancelled.  <u>Id.</u>  After waiting

to speak with a Delta representative for eight hours, Brennan realized all the agents

had left the airport for the night, and that he would not make it to Seattle in time to

board the cruise.  <u>Id.</u> ¶¶ 37-38.  Brennan requested that the flight to Seattle be

cancelled.  <u>Id.</u> ¶ 38.  Delta informed Brennan that it would reimburse him for

alternate transportation, so Brennan booked tickets for a Greyhound bus from

Atlanta to Tampa.  <u>Id.</u> ¶ 39.  Plaintiffs allege that, although Brennan submitted a

reimbursement request, Delta has only ever offered Brennan a $100 voucher for a

future Delta flight and a reimbursement offer of $219.45.  <u>Id.</u> ¶ 42.

Asher Einhorn ("Einhorn"), a resident of Washington, purchased two tickets

to Boston, Massachusetts, for $696.20 through Delta's website using a credit card.

<u>Id.</u> ¶¶ 44-45.  Einhorn and his partner arrived at the Boston airport for their return

flight home to Washington on July 21, 2024, but he was informed that the flight

was cancelled.  <u>Id.</u> ¶ 46.  Einhorn attempted to rebook another flight through

Delta's customer service phone line and website, but Delta informed him that there

would not be any available flights for several days, so Einhorn cancelled his flight

and made alternative arrangements with another airline.  <u>Id.</u> ¶¶ 46-47.  After Delta

advised him that he would be reimbursed, Einhorn incurred approximately $1,500

in expenses for one night at a hotel, transportation, and meals.  Id. ¶¶ 48-49.

Einhorn submitted one request for a refund of the original ticket price and another

request for a reimbursement of his out-of-pocket expenses.  Id. ¶ 50.  Delta

provided a partial refund of the ticket price in the amount of $408.11 and offered a

reimbursement of $100 in exchange for a release of Einhorn's claims against Delta.

Id.  Einhorn contacted Delta to inform it that he would like to accept the partial

reimbursement without releasing his claims, but Delta has not responded.  Id. ¶ 51.

Caroline Felipak ("Felipak"), a resident of Florida, purchased four one-way

tickets and two roundtrip tickets to Seattle, Washington, through Delta's website

for $2,200 using a credit card.  Id. ¶¶ 53-54.  On July 21, 2024, Felipak and her

family arrived at the Seattle[5] airport to return home, but Delta informed her that the

flight was cancelled and rebooked her and her family on a flight departing on July

24, 2024.  Id. ¶¶ 55-56.  However, Delta did not provide any meal or hotel

vouchers and, instead, advised Felipak to incur the costs for later reimbursement.

Id. ¶ 58.  Plaintiffs allege that "Delta did not put any restrictions on the hotels and

other expenses."  Id.  Plaintiffs allege that she incurred approximately $3,000 in

out-of-pocket expenses, but when she submitted a reimbursement request, Delta

---

[5] The Complaint alleges that Felipak arrived at the Boston airport, but the Court
assumes that this is a typographical error given later allegations that Felipak and
her family were stranded in Seattle.  See Consol. Compl. ¶ 59.

offered to reimburse $350 in exchange for a release of her claims against Delta.  Id. ¶¶ 59-61.  Felipak received the email containing the offer on August 14, 2024.  Id. ¶ 61.  Delta's reason for limiting the reimbursement amount was that the requested amount "exceeds Delta's nightly reimbursement policy for the city of your flight disruption."  Id. ¶ 62.  Felipak received a paper check in the mail for $350.  Id. ¶ 64.  The back of the check contained the following waiver:

> ENDORSE HERE
>
> The undersigned by endorsement below acknowledges receipt of this check as full settlement of and hereby releases Delta Airlines, Inc. from any and all claims the undersigned may have against Delta Airlines, Inc. to this date.
>
> X
>
> **DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE**
> **RESERVED FOR FINANCIAL INSTITUTIONAL USE**

Id.  Felipak signed the waiver to secure her $350 reimbursement.  Id. ¶ 66.

Melanie Susman ("Susman"), a resident of California, purchased a roundtrip ticket to New York through Delta's website for approximately $600 using a credit card.  Id. ¶¶ 138-39.  Her flight scheduled for July 20, 2024, was cancelled, and after Delta booked Susman a new flight for July 23, 2024, that flight also was cancelled.  Id. ¶ 140.  Susman purchased a new ticket for a flight through a different airline and incurred costs of approximately $950 for the new flight, fees,

and meals.  Id. ¶¶ 140, 142.  Although Delta provided Susman with a meal
voucher, the voucher was rejected at the airport.  Id. ¶ 141.  Susman submitted
multiple requests for a refund and reimbursement but, on July 30, 2024, Delta
offered her only $300 as a refund, along with SkyMiles to use toward a future
flight.  Id. ¶¶ 143-45.

### 2.    International-Travel Plaintiffs

Plaintiff Arben Bajra ("Bajra"), a resident of Colorado, purchased two
roundtrip tickets to Amsterdam, Netherlands, through Delta's website for $2,299
using his credit card.  Id. ¶¶ 20-21.  When he arrived at the airport on July 20,
2024, he was advised that his flight was delayed, and that he would miss his
connecting flight in New York.  Id. ¶ 22.  Bajra rebooked a flight for July 22, 2024,
but when he arrived on that date, he was informed that his flight was cancelled.  Id.
¶¶ 22-23.  Delta informed Bajra that he would automatically receive a refund for
the original ticket price.  Id. ¶ 24.  Because Delta was unable to book any flight to
Amsterdam for several days, Bajra purchased tickets through a different airline for
approximately $1,500 and departed that day.  Id. ¶ 25.  Bajra was scheduled to
return to Denver on July 30, 2024, but upon his arrival at the Amsterdam airport,
he was informed that his Delta flight was cancelled, and that the next available
flight would leave the next day.  Id. ¶ 26.  Plaintiffs allege that Bajra incurred

approximately $1,975 from having to "pay for a flight with a different airline, hotel nights which he didn't use because of Delta's cancelation, a hotel room for one night, and alternative transportation." Id. ¶ 28. Furthermore, when Bajra called Delta to follow up on the refund for his original ticket, Delta informed him that he would have to submit a request for the refund. Id. ¶ 29. Bajra submitted a request for both a refund and a reimbursement of the out-of-pocket expenses. Id. ¶ 30. However, as of the date of the Consolidated Complaint, Delta has only ever offered a $100 voucher for use towards a future Delta flight. Id. ¶¶ 30, 32.

Aunali Khaku, a resident of Florida, purchased four roundtrip tickets to Dubai, United Arab Emirates, for $5,108 on Delta's website using a credit card. Id. ¶¶ 69-70. Khaku and his family arrived at John F. Kennedy Airport on July 22, 2024, for the last leg of their trip home to Florida from Dubai. Id. ¶ 71. After the flight was delayed for six hours, Delta informed Khaku that the flight was cancelled, and that the next available flight was not until July 26, 2024. Id. When Khaku refused to wait the four days, Delta booked a flight for Khaku and his family through United Airlines for July 24, 2024. Id. Plaintiffs allege that, when Khaku inquired regarding reimbursement, Delta refused to cover hotels or meals and claimed no responsibility for the flight cancellation. Id. ¶ 72. Khaku rented a car and drove his family three hours to Allentown, Pennsylvania, to stay with

Khaku's parents for the two days.  Id.  Plaintiffs further allege that Delta lost

Khaku and his family's luggage.  Id. ¶ 73.  Although Delta has given Khaku

10,000 SkyMiles and reimbursed him $650 for the rental car and basic necessities,

Delta has not provided Khaku with a refund of the original ticket price or any

reimbursement for the lost luggage.  Id. ¶¶ 74, 76.

David Kuk ("Kuk"), a resident of Ontario, Canada, purchased four roundtrip

tickets to Las Vegas, Nevada, through Delta's website with 70,000 SkyMiles and

$400 using a credit card.  Id. ¶¶ 78-79.  On July 18, and again on July 19, 2024,

Kuk and his family arrived at the Toronto airport but were told that their flights

were cancelled.  Id. ¶¶ 80-81.  Kuk booked a flight using a different airline for

$2,300 using a credit card.  Id. ¶ 82.  Kuk incurred expenses for the alternate flight,

a rental vehicle, and a night at an Airbnb that he did not use, in the amount of

approximately $700.  Id. ¶ 83.  Kuk requested a refund of the original ticket price

and a reimbursement, but Delta only offered a $100 voucher for use on a future

Delta flight within one year.  Id. ¶¶ 84-87.

Carmen Moorman ("Moorman"), a resident of Ohio, purchased four

roundtrip tickets to Puerto Escondido, Mexico, on Delta's website at more than

$1,100 per ticket.  Id. ¶¶ 89-90.  On the return trip from Mexico to Ohio, Moorman

and her family had a layover in Minneapolis, Minnesota, but the flight from

Minneapolis to Ohio was delayed and ultimately cancelled.  Id. ¶¶ 92-93.

Plaintiffs allege that Moorman attempted to speak with an agent to rebook her

flights, but there was only one agent assisting all affected customers.  Id. ¶ 96.

Moorman's family booked a hotel and used Lyft, a rideshare app, to get to the

hotel.  Id. ¶ 97.  However, the hotel was overbooked.  Id.  Moorman's family

ordered food delivery through DoorDash, ate the food in the lobby of the hotel, and

returned to the airport using Lyft.  Id. ¶¶ 98-101.  Moorman rented a car and drove

the twelve hours from Minneapolis to Cincinnati, Ohio.  Id. ¶ 106-07.  Plaintiffs

allege that Moorman incurred a total of $2,000 in expenses and submitted a request

for reimbursement, but Delta only offered $250 to reimburse her.  Id. ¶¶ 113, 116.

Moorman did not accept the offer but received a check on August 25, 2024, that

included a waiver identical to the one received by Felipak.  Id. ¶¶ 118-19.

Moorman has not signed or deposited the check, and she has not received any other

refund or reimbursement.  Id.

　　Vittorio Muzzi ("Muzzi"), a resident of Haarlem, Netherlands, purchased

four roundtrip tickets to Fort Lauderdale, Florida, "through KLM's website for

both Delta and KLM flights," for €3,729.96 using a debit card.  Id. ¶¶ 126-27.

Muzzi arrived at the Schiphol Airport in the Netherlands on July 19, 2024, but was

informed that the flight was cancelled.  Id. ¶ 128.  Delta did not offer to rebook his

flight or offer any accommodations, so Muzzi booked a flight through a different airline for a different date.  Id.  However, Delta retained Muzzi's luggage, and he was not able to retrieve it until August 3, 2024.  Id. ¶¶ 129, 131.  Plaintiffs allege that Muzzi incurred expenses totaling approximately €5,000 for the alternate flight, unused nights at the hotel, cancellation fees, rental car fees, meals, and clothing. Id. ¶ 132.  When Muzzi submitted a request for reimbursement/refund, Delta offered to pay €587.59.  Id. ¶ 134.

### E.    Procedural History

Based on the foregoing, Plaintiffs Bajra, Brennan, Einhorn, and Susman initiated the instant class action on August 6, 2024, and Khaku initiated a separate lawsuit in this Court on August 14, 2024.  See Class Action Compl. [Doc. 1]; Class Action Compl., Khaku v. Delta Air Lines, Inc., No. 1:24-CV-3594-MHC (N.D. Ga. Aug. 14, 2024), ECF No. 1.  An amended complaint was filed in this case on October 21, 2024, adding Felipak, Kuk, Moorman, and Muzzi as Plaintiffs.  See Am. Class Action Compl. [Doc. 27].  On November 4, 2024, this Court granted the parties' motion to consolidate the two cases [Doc. 32].  Plaintiffs subsequently filed the Consolidated Complaint on November 12, 2024.  The table below lists the causes of action asserted in the Consolidated Complaint and the Plaintiffs asserting them:

| Claim | Plaintiff(s) |
|---|---|
| Breach of contract for failure to refund fare (Count I) | All Plaintiffs |
| Breach of contract for failure to cover additional amenities (Count II) | All Plaintiffs |
| Breach of implied/oral contract (Count III) | All Plaintiffs |
| Common law fraud (Count IV) | All Plaintiffs |
| Unjust enrichment (Count V) | All Plaintiffs |
| Violation of the California Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200 et seq. (Count VI) | Susman and the California Subclass |
| Violation of the California Consumers Legal Remedies Act, CAL. CIV. CODE §§ 1750-1785 (Count VII) | Susman and the California Subclass |
| Violation of California False Advertising Law, CAL. BUS. & PROF. CODE § 17500 et seq. (Count VIII) | Susman and the California Subclass |
| Violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), FLA. STAT. ANN. § 501.201 et seq. (Count IX) | Brennan, Felipak, Khaku, and the Florida Subclass |
| Violations of the Washington Consumer Protection Act, WASH REV. CODE § 19.86 et seq. (Count X) | Einhorn and the Washington Subclass |
| Violations of the Ohio Consumer Sales Practices Act, OHIO REV. CODE § 1345.01 et seq. (Count XI) | Moorman and the Ohio Subclass |
| Violations of the Montreal Convention[6] for the delay in carriage of passengers and baggage (Count XII) | Bajra, Khaku, Kuk, Moorman, Muzzi, and the Montreal Convention Class |
| Violations of European Union Air Passenger Rights, Regulation 261/2004 ("EU 261")[7] (Count XIII) | Bajra, Muzzi, and the EU Class |

Consol. Compl. ¶¶ 245-415.

---

[6] The Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, T.I.A.S. NO. 13038 (2000) (the "Montreal Convention" or "Convention").

[7] Regulation (EC) No. 261/2004 of the European Parliament and of the Council, 2004 O.J. (L 46) 1.

## II.    DELTA'S MOTION TO DISMISS

### A.    Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Under Federal Rule of Civil Procedure 12(b)(6), a complaint will be dismissed for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 548 (2007).  The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation omitted).  Thus, a claim will survive a motion to dismiss only if the factual allegations in the pleading are "enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.

At the motion to dismiss stage, the court accepts all the well-pleaded facts in the plaintiff's complaint as true, as well as all reasonable inferences drawn from those facts.  McGinley v. Houston, 361 F.3d 1328, 1330 (11th Cir. 2004); Lotierzo

v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). Not

only must the court accept the well-pleaded allegations as true, but it must also

construe the allegations in the light most favorable to the pleader. Powell v.

Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011). Documents attached to the

complaint are considered part of the complaint. FED. R. CIV. P. 10(c). But the

court need not accept legal conclusions, nor must it accept as true legal conclusions

couched as factual allegations. Iqbal, 556 U.S. at 678. Thus, evaluation of a

motion to dismiss requires the Court to assume the truth of well-pleaded factual

allegations and "determine whether they plausibly give rise to an entitlement to

relief." Id. at 679.

**B.    Analysis**[8]

Delta seeks dismissal of all claims asserted by the International-Travel

Plaintiffs, with the exception of Count XII (violation of the Montreal Convention),

arguing that the Montreal Convention preempts those claims asserted under state

---

[8] Although styled as a motion to dismiss the Consolidated Complaint, Delta does
not seek dismissal of the claim for violation of the Montreal Convention asserted
by Bajra, Khaku, Kuk, Moorman, and Muzzi (Count XII) or of Brennan's breach
of contract claim based on failure to refund fare (Count I). Delta also moves to
dismiss Bajra's and Kuk's state law claims on the ground that they are preempted
by the Montreal Convention but does not argue that Bajra or Kuk fail to state a
claim for relief under Count I. See Mem. of Law in Supp. of Def.'s Mot. to
Dismiss ("Def.'s Br.") [Doc. 44-1] at 23 n.16; see also App. A, Summ. of Pls.'
Claims in Consol. Compl. and Grounds for Dismissal [Doc. 44-2].

law, and that EU 261 is not enforceable in the United States.  Def.'s Br. at 8-11.

Delta also argues that all state law claims asserted by all Plaintiffs—with the

exception of Count I (breach of contract based on failure to refund fare) asserted

by Bajra, Brennan, and Kuk—are preempted by the Airline Deregulation Act of

1978 ("ADA").  Id. at 11-20.  Furthermore, Delta argues that Plaintiffs fail to state

a claim for relief under Count I as asserted by Einhorn, Felipak, Susman, Khaku,

Moorman, and Muzzi.  Finally, Delta argues that Plaintiffs fail to state a claim for

relief under Count II (breach of contract based on failure to cover additional

amenities) and Count III (breach of implied/oral contract) as asserted by all

Plaintiffs.  Id. at 23-27.

> ### 1.    Whether the Montreal Convention Preempts the International-Travel Plaintiffs' State Law Claims

The Montreal Convention is a multilateral treaty, of which the United States

is a signatory.  Like its predecessor,[9]  the "cardinal purpose" of the Montreal

---

[9] The Montreal Convention succeeded the Convention for the Unification of
Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49
Stat. 3000 (1934) (the "Warsaw Convention").  The Montreal Convention "unifies
and replaces the system of liability that derives from the Warsaw Convention,
explicitly recognizing the importance of ensuring protection of the interests of
consumers in international carriage by air and the need for equitable compensation
based on the principle of restitution."  Bassam v. Am. Airlines, 287 F. App'x 309,
312 (5th Cir. 2008) (quoting Sompo Japan Ins., Inc. v. Nippon Cargo Airlines Co.,
522 F.3d 776, 780 (7th Cir. 2008)).  Thus, "[a]lthough the Warsaw Convention no
longer applies to claims arising after November 2003," when the Montreal

Convention is to "achieve uniformity of rules governing claims arising from international air transportation." El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 169 (1999) (quoting E. Airlines, Inc. v. Floyd, 499 U.S. 530, 552 (1991)) (alteration accepted). "As a treaty of the United States, the Convention is considered . . . the supreme law of the land." Benjamin, 32 F. Supp. 3d at 1315 (quoting Best v. BWIA W. Indies Airways Ltd., 581 F. Supp. 2d 359, 362 (E.D.N.Y. 2008)); see also U.S. CONST. art. VI, cl. 2 ("[A]ll Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land."). Preemption under the Montreal Convention is governed by Article 29, which provides as follows:

> In the carriage of passengers, baggage, and cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights. In any such action, punitive, exemplary or any other non-compensatory damages shall not be recoverable.

Montreal Convention, art. 29.

---

Convention came into force, "the caselaw developed under it is regarded as applicable in the interpretation of the Montreal Convention's equivalent language." Benjamin v. Am. Airlines, Inc., 32 F. Supp. 3d 1309, 1315 (N.D. Ga. 2014).

The Montreal Convention "applies to all international carriage of persons, baggage, or cargo performed by aircraft for reward." Id. art. 1(1). The Convention defines "international travel" as follows:

> [A]ny carriage in which, according to the agreement between the parties, the place of departure and the place of destination, whether or not there be a break in the carriage . . . , are situated either within the territories of two State Parties, or within the territory of a single State Party if there is an agreed stopping place within the territory of another State, even if that State is not a State Party.

Id. art. 1(2). Plaintiffs allege that the flights of Bajra, Khaku, Kuk, Moorman, and Muzzi involved "international carriage" as defined by the Montreal Convention. See Consol. Compl. ¶¶ 21, 70, 79, 90, 127. Thus, the specific issue before the Court is whether the various state law claims asserted by these Plaintiffs fall within the preemptive scope of the Montreal Convention.

Delta argues that, because the International-Travel Plaintiffs assert a claim under Article 19 of the Montreal Convention, any claim they also assert under state law is preempted. Def.'s Br. at 10. Specifically, Delta argues that Plaintiffs' state law claims all arise out of circumstances that constitute a delay in carriage; thus, the claims fail because "none of the international-travel Plaintiffs alleges that Delta refused to fly them to their destinations." Id. The Court disagrees with Delta.

Article 19 of the Montreal Convention provides for liability against a carrier "for damage occasioned by delay in the carriage by air of passengers, baggage or

cargo."  Montreal Convention art. 19.  However, "[w]hat constitutes a 'delay' under the Montreal Convention is not always clear."  Bombin v. Sw. Airlines, Co., 529 F. Supp. 3d 411, 422 & n.4 (E.D. Pa. 2021) (citing Jae Woon Lee & Joseph Charles Wheeler, *Air Carrier Liability for Delay: A Plea to Return to International Uniformity*, 77 J. Air L. & Com. 43, 60 (2012)) (noting that "flight cancellations are 'not expressly addressed' by the Montreal Convention").  The majority of courts addressing the contours of Article 19 and its preemptive effect have "distinguish[ed] claims sounding in 'delay' (which are preempted by the Montreal Convention) from claims sounding in 'nonperformance' (which are *not* preempted by the Montreal Convention)."  Id.; see also Atia v. Delta Airlines, Inc., 692 F. Supp. 2d 693, 699 (E.D. Ky. 2010) (opting to follow "the majority of federal courts" and holding that, "because [the] Plaintiff's breach of contract claim is based on Delta Airlines' failure to either transport her to her destination or to offer her a refund for the unused portion of her ticket, her breach of contract claim is not preempted by the Montreal Convention"); Ahmed v. Air France-KLM, 165 F. Supp. 3d 1302, 1312 (N.D. Ga. 2016) (finding that the plaintiffs' claims "do not fall under Article 19's provision for delay" because the defendant "failed to fulfill its obligation to transport [the plaintiffs] under their respective first contracts for carriage" or "offer an alternative means of travel without additional

consideration"); <u>Benjamin</u>, 32 F. Supp. 3d 1309 (finding no preemption where the defendant "refused to honor" the plaintiff's ticket, even though the plaintiff eventually arrived at her destination).

Here, Plaintiffs' breach of contract claims are based on failure to refund fares and failure to cover additional amenities. Plaintiffs allege that Delta entered into Contracts of Carriage with each Plaintiff by virtue of Plaintiffs' ticket purchases, and that Delta's Contracts of Carriage provide for refunds and reimbursement of expenses incurred as a result of cancellations or delays. Consol. Compl. ¶¶ 246-64, 267-284. Plaintiffs allege that Delta breached its Contracts of Carriage with Plaintiffs when it refused to refund fares and refused to reimburse expenses as outlined in Delta's Contract. <u>Id.</u>

> [Plaintiffs'] breach of contract claim, as well as [their] claims for unfair trade practice and unjust enrichment, stem directly from "the failure of American Airlines to refund the reservation charge." Applying the Convention to these claims would require a tortured reading of its provisions. Simply put, [Plaintiffs'] claims do not seek recovery of damages occasioned by delay in the carriage by air of passengers or goods, which is the crux of Article 19. That is because delay is not what gave rise to [Plaintiffs'] damages. Rather, it was the refusal of American Airlines, after the fact, to refund the group in full that has aggrieved Plaintiffs. Thus, finding the contractual issue of reimbursement in this case to be independent from that of transportation, the Court concludes that [Plaintiffs'] claims do not fall under Article 19 and the preemptive scope of the Montreal Convention.

Hebert v. Am. Airlines, Inc., No. CV 16-345, 2016 WL 3517795, at *3 (E.D. La. June 27, 2016). Likewise, here, Plaintiffs do not assert claims for damages sustained as a result of delays. They seek refunds and reimbursements that were specifically promised to them when they purchased their airline tickets from Delta. See Consol. Compl. ¶¶ 25-54, 273. Delta offers no specific or non-conclusory argument as to any other state law claim asserted by Plaintiffs. Accordingly, the Court finds that the International-Travel Plaintiffs' claims are not preempted by the Montreal Convention, and Delta's Motion to Dismiss is **DENIED** on this ground.

### 2. Whether EU 261 is Judicially Enforceable in the United States

The EU adopted Regulation 261 in an effort to create a more effective compensation system for passengers who are denied boarding or experience cancellations or long delays, and to establish minimum rights for passengers under such circumstances. EU 261 preamble ¶¶ 2-3, art. 1(1).

> More specifically, EU 261 applies to passengers "departing from an airport located in the territory of a Member State," EU 261 art. 3(1)(a), and establishes a fixed compensation schedule entitling inconvenienced passengers to a minimum of €250 and a maximum of €600 (depending on flight distance), id. art. 7(1), for cancellations that occur on short notice and without an offer of a rerouted flight within a specified time frame, id. art. 5(1).

Voladarskiy v. Delta Airlines, Inc., 784 F.3d 349, 350 (7th Cir. 2015).

Delta argues that Plaintiffs Bajra and Muzzi cannot assert a claim directly under EU 261 because that regulation was promulgated by the European Parliament, "is not judicially enforceable outside the courts of EU Member states," and is not incorporated into the Contracts of Carriage. Def.'s Br. at 11 (quoting Voladarskiy, 784 F.3d at 350, 357). In response, Plaintiffs only raise the irrelevant argument that the Montreal Convention does not preempt claims arising under EU 261. Pls.' Resp. in Opp'n to Def.'s Mot. to Dismiss ("Pls.' Resp.") [Doc. 52] at 10.

This precise issue—whether EU 261 is judicially enforceable in the United States, which is not a member state of the EU—appears to be one of first impression in this Circuit. However, a review of the jurisprudence from other circuits indicates that courts only allow claims alleging violations of EU 261 when the applicable Contract of Carriage specifically incorporates EU 261 by reference. See, e.g., Leerar v. WOW Air EHF, No. 16-CV-06011-EDL, 2017 WL 11493651, at *9 (N.D. Cal. Sept. 5, 2017) (rejecting the defendant air carrier's argument that its contract of carriage did not incorporate EU 261 by reference and considering the merits of the plaintiffs' breach of contract claim based on the defendant's failure to comply with EU 261); Dochak v. Polskie Linie Lotnicze LOT S.A., 189 F. Supp. 3d 798, 806 (N.D. Ill. 2016) (dismissing the plaintiffs' breach of contract

claims (which asserted that the defendant had incorporated EU 261 into its contract of carriage and breached the contract by failing to comply with EU 261) after finding that the defendant had, in fact, not incorporated EU 261 into its conditions of carriage).

The only federal appellate court to consider whether plaintiffs may bring direct claims under EU 261 in the United States is the United States Court of Appeals for the Seventh Circuit. See generally Volodarskiy, 784 F.3d 349. Volodarskiy was a class action brought by travelers who had experienced significant delays or cancellations for flights between the United States and various European countries. Id. at 349-50. The plaintiffs asserted a single direct claim under EU 261,[10] but the district court dismissed the claim, holding that "EU 261 does not provide a private right of action that can be enforced in courts outside the EU." Id. at 352. The issue on appeal was "whether the regulation may be judicially enforced outside the courts of EU Member States." Id. The Seventh Circuit found that the lack of clear language empowering "tribunals in nonmember countries to enforce the compensation system," coupled with the text of the

---

[10] The plaintiffs first asserted a claim for breach of contract, contending that EU 261 was incorporated into Delta's Contract of Carriage. Id. at 351-52. The district court dismissed the claim, finding the Contract of Carriage did not incorporate EU 261, but it allowed the plaintiffs to replead. Id. at 352.

30

regulation's enforcement provision, necessitated a finding that EU 261 "is not judicially enforceable outside the courts of EU Member States." Id. at 353-57. Specifically, the court held that Article 16 of EU 261 provides only two fora in which passengers may enforce their rights under the regulation: "(1) an administrative entity in a Member State designated as the 'body responsible for the enforcement of this Regulation' (the [National Enforcement Bodies]); and (2) 'any other competent body *designated by a Member State*.'" Id. at 355 (quoting EU 261 art. 16). And because no party argued that U.S. courts has been "designated" by an EU Member state as a "'competent body' for the enforcement of EU 261 claims," there was no basis for finding a cognizable direct claim under EU 261 in U.S. courts. Id.

As noted above, Plaintiffs offer no response to Delta's argument that EU 261 is not enforceable in the U.S. and, instead, only assert that private enforcement actions are permitted under European law. Pl.'s Resp. at 11 (citing cases in the European Court of Justice). Moreover, Plaintiffs do not allege that EU 261 has been incorporated into Delta's International Contract of Carriage. See generally Consol. Compl. In the absence of any authority to the contrary, the Court agrees with the well-reasoned analysis of the Seventh Circuit and finds that Plaintiffs

Bajra's and Muzzi's direct claims under EU 261 fail as a matter of law. Delta's

Motion to Dismiss is **GRANTED** as to Count XIII of the Consolidated Complaint.

### 3.    Whether the ADA Preempts Plaintiffs' State Law Claims

The ADA, which "largely deregulated domestic air transport," was enacted

in 1978. Koutsouradis v. Delta Air Lines, Inc., 427 F.3d 1339, 1343 (11th Cir.

2005). In enacting the ADA, Congress determined that "'maximum reliance on

competitive market forces' would best further 'efficiency, innovation, and low

prices' as well as 'variety [and] quality . . . of air transportation services.'"

Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378 (1992) (quoting 49

U.S.C. §§ 40101(a)(6), (12)). Thus, Congress included a preemption clause in the

ADA "[t]o ensure that the States would not undo federal deregulation with

regulation of their own." Koutsouradis, 427 F.3d at 1343 (quoting Morales, 504

U.S. at 378). The preemption clause provides, "[A] State . . . may not enact or

enforce a law, regulation, or other provision having the force and effect of law

related to a price, route, or service of an air carrier that may provide air

transportation . . . ." 49 U.S.C. § 41713(b). Although the ADA does not specify

when a state regulation or law "relat[es] to a price, route, or service of an[] air

carrier," the Supreme Court has construed the phrase to mean "having a connection

with, or reference to, airline 'rates, routes, or services.'" Morales, 504 U.S. at 384;

see also Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1254 (11th Cir. 2003)

("[S]o long as the state law action has a connection with airline prices, routes or

services, pre-emption under § 41713 is mandated.").

> **a.** **Plaintiffs' claims brought pursuant to state consumer protection laws and common law (Counts IV through XI) are preempted.**

Delta contends that Plaintiffs' non-contractual claims are preempted by the

ADA because both the common law and state consumer protection laws impose

the states' "own substantive standards with respect to 'rates, routes, or services' in

a way the ADA expressly prohibits." Def.'s Br. at 14-15. In response, Plaintiffs

argue that the consumer protection claims do not relate to a "service" as defined in

the Eleventh Circuit. Pls.' Resp. at 13-14 (citing Amerijet Int'l, Inc. v. Miami-

Dade Cnty., 627 F. App'x 744, 748-49 (11th Cir. 2015); and Dolan v. Jet Blue

Airways Corp., 385 F. Supp. 3d 1338, 1345 (S.D. Fla. 2019)). Plaintiffs further

argue that whether a plaintiff's claims "have an impermissible effect on [the

defendant's] prices or services is an inherently factual question" such that

dismissing Plaintiffs' claims at this stage would be improper. Id. at 14-15 (citing,

inter alia, Zamber v. Am. Airlines Inc., 282 F. Supp. 3d 1289, 130 (S.D. Fla.

2018)).

Each of Plaintiffs' non-contract-based claims are premised on allegations that (1) Delta made certain representations or omissions to Plaintiffs regarding refunds for cancelled or delayed flights and regarding reimbursements for travel expenses incurred as a result of the cancelled or delayed flights, Consol. Compl. ¶¶ 293, 307, 323; (2) Delta's advertisements regarding "the operability of flights, refunds, and reimbursements" were false and misleading, id. ¶¶ 340; and/or (3) Delta knew of Plaintiffs' right to refund and reimbursement but refused to refund fares and reimburse expenses without requiring a waiver, id. ¶¶ 348-50, 360-62, 371-73.  Plaintiffs confine their argument to the "services" prong of the ADA's preemptive scope.  However, they fail to respond to Delta's specific argument (and cases cited supporting the argument) that claims related to refunds, reimbursements, and billing practices are preempted by the ADA.  Def.'s Br. at 14-15 & n.9 (collecting cases).  Although the United States Court of Appeals for the Eleventh Circuit has not yet explicitly decided whether consumer protection and common law claims arising out of an airline's failure to refund ticket prices or reimburse travel costs "relat[es] to a price, route, or service," several other courts considering this and similar issues have ruled in favor of preemption.  For example, in Levey v. Concesionaria Vuela Compania de Aviacion, S.A.P.I. de C.V., 529 F. Supp. 3d 856 (N.D. Ill. 2021), the plaintiff alleged that the airline

34

cancelled the plaintiff's ticket due to the COVID-19 pandemic, and when she

sought a refund for the purchase price of the ticket, the airline refused, "offering

instead to provide a credit toward future travel in the next thirty days." Levey, 529

F. Supp. 3d at 861. The plaintiff, on behalf of a putative class, asserted claims for

breach of contract, unjust enrichment, unconscionability, and violations of the

Illinois Consumer Fraud and Deceptive Practices Act. Id. at 860. The court found

that each of the plaintiff's claims, aside from her breach of contract claim, was

preempted by the ADA. Id. at 864. The court held that "'it is obvious that

canceled ticket refunds relate to rates,' and thus, that the ADA preempts state-law

claims challenging an airline's ticket refund practices." Id. (quoting Statland v.

Am. Airlines, Inc., 998 F.2d 539, 542 (7th Cir. 1993)); see also Statland, 998 F.2d

at 542 ("Under Morales and [the ADA], states cannot regulate [an airline's] ticket

refund practices either by common law or by statute."); Buck v. Am. Airlines, Inc.,

476 F.3d 29, 36 (1st Cir. 2007) (noting that "most courts to have considered suits

for refunds of government fees associated with air travel have found those suits

preempted" and holding the same).

Furthermore, at least one court in this Circuit has held that non-contractual

claims that "arise from [an airline's] failure to inform customers of their right to

reimbursement . . . for lost, damaged or delayed baggage" constitute claims

35

regarding "services" provided by the airline.  Miller v. Delta Air Lines, Inc., No.

4:11-CV-10099-JLK, 2012 WL 1155138, at *2 (S.D. Fla. Apr. 5, 2012).  Indeed,

the Eleventh Circuit has adopted a broad definition of the term "services," which

"generally represent a bargained-for or anticipated provision of labor from one

party to another."  Branche, 342 F.3d at 1256 (quoting Hodges v. Delta Air Lines,

Inc., 44 F.3d 334, 336 (5th Cir. 1995)).[11]

In Miller, the plaintiff alleged that her baggage was delayed and that she had

to pay "over $315.00 for replacement toiletries, medication, and other items in her

suitcase, as well as transportation to and from the airport in an attempt to locate

[her baggage]."  Id. at *1.  The plaintiff alleged that, despite the airline's contract

stating that it would reimburse passengers "up to $3,300 for expenses if their bags

are delayed," the plaintiff's claim for reimbursement was "rejected and/or

ignored."  Id.  Based on these allegations, the plaintiff asserted claims for, among

---

[11] Plaintiffs cite to a three-part test used by the Eleventh Circuit in Amerijet
International for determining whether a particular service is a "service" as used in
the ADA.  Pl.'s Resp. at 13-14 (quoting Amerijet Int'l, 627 F. App'x at 748-49).
However, Plaintiffs direct the Court to no subsequent Eleventh Circuit case—
published or not—wherein the court adopted such a rigid test in making this
determination.  To the contrary, subsequent Eleventh Circuit authority indicates
that courts should look to "what the state law claim targeted[] to determine
preemption" and focus broadly on those aspects of airline travel "that are
bargained for by passengers with air carriers."  Mennella v. Am. Airlines, Inc., 824
F. App'x 696, 703-04 (2020) (quoting Branche, 342 F.3d at 1258).

others, violation of state consumer protection laws, including the FDUTPA, for failure to "post clearer and more prominent signs explaining a passenger's right" to reimbursement. Id. at *1-2.

The court in Miller, after noting that "the majority of circuit precedent [has] adopt[ed] a broad definition of 'service' as it is used in the ADA preemption clause," id. at *2 (citing Hodges, 44 F.3d at 336 (defining "services" to include "items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself"); and Branche, 342 F.3d at 1256-57 (adopting Hodge's definition of "services")), found that the plaintiff's claims were preempted by the ADA.

> Plaintiff seeks to pursue claims that go far beyond the obligations stipulated to by Delta in the Contract of Carriage. The Contract of Carriage does not, for example, impose upon Delta any undertaking as to the type or size of signage that must be posted in airports or what information will be provided to a passenger whose baggage in delayed. Plaintiff's claims clearly rest on allegations that "relate to the heart of services that an airline provides." Koutsouradis, 427 F.3d at 1344 n.2. Permitting this claim to move forward as plead[ed] would thus impermissibly sanction regulation of the manner in which the airline advertise[s] their reimbursement services and would interfere with the provision of baggage handling services to their passengers, thereby offending the stated purpose of the Deregulation Act.

Id. at *3; see also Banga v. Gundumolgula, No. 2:13-CV-00667-MCE, 2013 WL 3804046, at *3 (E.D. Cal. July 19, 2013), R&R adopted, No. 2:13-CV-0667-MCD-CKDPS, 2013 WL 11332786 (E.D. Cal. Sept. 12, 2013) (finding that the plaintiff's

claims under the UCL arising out of the airline's refund policy and fee waivers "are part of the reservations and ticketing process," which constitute a "service").

Based on the preceding discussion, the Court finds that Plaintiffs' claims regarding Delta's representations, advertisements, and failure to refund and reimburse are related to Delta's rates or services. Plaintiffs' common law and consumer protection claims center around Delta's representations and/or advertisements regarding refunds of ticket prices (or "rates") and reimbursements and Delta's alleged refusal to proffer those refunds and reimbursements as promised. An airline's advertisements and policies regarding reimbursements in the event of cancellations or delays, likewise, are related to services that airlines provide. These services are "inherent" when an airline experiences delays or cancellations. "If a passenger is unhappy" with the way refunds or reimbursements are handled by an airline, "such individual is free never to fly that airline again." Koutsouradis, 427 F.3d at 1344 n.2. Furthermore, Plaintiffs seek to hold Delta liable, not just pursuant to the "self-imposed obligations" of Delta, but based on the "state-imposed obligations" regarding deceptive trade practices, false advertising, and unfair competition. See Weber v. USAirways, Inc., 11 F. App'x 56, 57-58 (4th Cir. 2001) (finding that the plaintiff's fraud claim was preempted by the ADA where the plaintiff alleged that he volunteered to give up his seat on an overbooked

flight in exchange for a free round-trip ticket, but the airline failed to disclose that the free ticket was limited to "Z-class" seats).

The Court rejects Plaintiffs' argument that the preemption determination should be deferred until summary judgment.[12]  Plaintiffs cite <u>Zamber</u> to support this argument, but the issue there was whether "a claim related to a price or service marketed by an airline <u>but provided and sold by a third party</u> is preempted." <u>Zamber</u>, 282 F. Supp. 3d at 1302.  Because the issue presented was one of first impression, "not just in this circuit, but throughout the entire court system," the <u>Zamber</u> court deferred its ruling until the summary judgment stage, "where the factual record can be more fully developed."  <u>Id.</u> at 1301-02.  Plaintiffs' claims do not relate to services provided and sold by a third party, nor are the issues presented ones of first impression "throughout the entire court system."  <u>Id.</u> at 1302.

---

[12] The Court likewise rejects Plaintiffs' argument that their allegations "do not implicate a service that airlines compete over, since Plaintiffs and class members had already bought their Delta ticket."  Pls.' Resp. at 15.  Plaintiffs point to no legal authority suggesting that bargained-for services under the ADA include only those that are offered before ticket purchase.  The examples of "services" provided by the Eleventh Circuit include ones like "ticketing, boarding procedures, provision of food and drink, and baggage handling," each of which occur after a passenger has purchased his or her ticket.  <u>Branche</u>, 342 F.3d at 1257.

Accordingly, the Court finds that Plaintiffs' claims for common law fraud (Count IV), unjust enrichment (Count V), and violation of various state statutory provisions concerning consumer protection and deceptive trade practices (Counts VI through XI) are preempted by the ADA. Delta's Motion to Dismiss is **GRANTED** as to these claims.

> **b.    Counts I and II are not preempted, and Count III is not preempted to the extent Plaintiffs rely on oral promises made by Delta.**

Conversely, the Court finds that Plaintiffs' breach of express contract claims are not preempted by the ADA. Although preemption under the ADA is broad, "[t]he ADA contains no hint" that "Congress meant to channel into federal courts the business of resolving . . . the range of contract claims relating to airline rates, routes, or services." Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 232 (1995). Thus, "[t]he ADA preemption clause does not shelter airlines from suits which allege no violation of state-imposed obligations, but seek only recovery for the airline's alleged breach of its own, self-imposed undertakings." Koutsouradis, 427 F.3d at 1343 (citing Wolens, 513 U.S. 219, 229 (1995)); see also Cavalieri v. Avior Airlines C.A., 25 F.4th 843, 846 (11th Cir. 2022) (quoting Bailey v. Rocky Mountain Holdings, LLC, 889 F.3d 1259, 1268 (11th Cir. 2018)) ("The ADA does

not . . . preempt a state-law-based court adjudication . . . concerning a contractual obligation voluntarily undertaken by an air carrier.") (internal quotations omitted).

Plaintiffs allege that, by virtue of their purchase of tickets through Delta's website, they each entered into the applicable Contracts of Carriage with Delta. The Contracts of Carriage provide that, "[i]f a refund is required because of Delta's failure to operate on schedule or refusal to transport . . . , the following refund will be made directly to you . . . ." Consol. Compl. ¶ 254. The Contracts of Carriage further provide that Delta will either furnish the passenger with hotel accommodations and ground transportation in the event of a prolonged delay or provide vouchers for future travel with Delta. Id. ¶ 273. Plaintiffs further allege that, in the wake of the CrowdStrike outage, Delta extended travel waivers and promised reimbursements for an expanded list of eligible out-of-pocket expenses, both through the statements released by Delta on July 22 and 26, 2024, and through the oral promises made by its customer service agents. Id. ¶¶ 208-10, 287-88. Finally, Plaintiffs allege that Delta failed to provide refunds and/or reimbursements to Plaintiffs and class members in violation of its own Contracts for Carriage and additional written and oral promises. Id. ¶¶ 261, 280.

Delta urges this Court to find that the breach of contract claims are preempted because Plaintiffs fail to state a claim for relief. Delta appears to argue

that, because Plaintiffs' claims fail on the merits, they are merely thinly veiled attempts to enlarge Delta's obligations beyond the express terms of the Contracts of Carriage and are, thus, preempted. Def.'s Br. at 17-19. However, none of the cases cited by Delta involve discussion of ADA preemption of breach of contract claims based on the express obligations undertaken by the airline. See Dusko v. Delta Air Lines, No. 1:20-CV-01664-ELR, 2022 WL 22927618, at *8 n.10 (N.D. Ga. Mar. 2, 2022) (finding that the plaintiff adequately pleaded a breach of contract claim based on the defendant's refusal to issue a refund of the ticket price to the plaintiff after the plaintiff rejected a re-accommodation and requested a refund, but dismissing the plaintiff's breach of contract claim based on the implied covenant of good faith and fair dealing as attempting to enlarge the airline's obligations under the contract); Neft v. United Cont'l Holdings, Inc., 299 F. Supp. 3d 965, 975 (N.D. Ill. 2018) (finding that the ADA preempted the plaintiff's breach of contract claim, which sought a refund of membership fees paid to the airline, because "[t]he remedy is outside the terms of [the airline's] contract with [the] Plaintiff," i.e., the contract itself contained no provision that the plaintiff would be entitled to a refund of membership fees in the event of misrepresentations made by the airline's agents); Pica v. Delta Air Lines, Inc., No. CV 18-2876-MWF (EX), 2019 WL 1598761, at *5 (C.D. Cal. Feb. 14, 2019), aff'd, 812 F. App'x 591 (9th

Cir. 2020) (finding that the plaintiff's breach of contract claim based on the airline's alleged mishandling of the plaintiff's personal identifying information ("PII") was preempted by the ADA because the Contract of Carriage "contains no self-imposed promise from [the airline] as to *how* it will handle PII" and, thus, the plaintiff was attempting to read additional obligations into the Contract of Carriage).

Unlike the plaintiffs in each of the cases cited by Delta, with the exception of the plaintiff in Dusko,[13] Plaintiffs here seek to recover for Delta's breach of the promises contained in the Contracts of Carriage relating to refunds and reimbursements and subsequent promises made by Delta and its representatives following the CrowdStrike Outage.  Taking Plaintiffs' allegations as true, Plaintiffs have "stated a facially plausible claim that [Delta] breached its own 'self-imposed undertakings'" by failing to provide refunds and reimbursements.  Levey, 529 F. Supp. 3d at 865 (finding that the plaintiff's breach of contract claim "survives ADA preemption" before turning to the defendant's arguments regarding the merits of the plaintiff's claim); see also Bombin, 529 F. Supp. 3d at 421 (finding

---

[13] The court in Dusko did not consider whether the plaintiff's breach of contract claim based on failure to refund was preempted by the ADA and, instead, found that the plaintiff had sufficiently stated a claim for breach of the express terms of the contract.  Dusko, 2022 WL 22927618, at *6-7.

that the plaintiff's breach of contract claims were not preempted by the ADA

where the plaintiffs pointed directly to the terms of the Contract of Carriage to

support their allegations); Abdel-Karim v. EgyptAir Airlines, 116 F. Supp. 3d 389,

404 (S.D.N.Y. 2015), aff'd sub nom. Abdel-Karim v. Egyptair Holding Co., 649 F.

App'x 5 (2d Cir. 2016) (holding that a breach of contract claim is not preempted

where "the plaintiff relies mainly upon the parties' agreed-upon terms in the

Conditions of Carriage").

Thus, the Court finds that Plaintiffs' claims for breach of express contract,

based on the promises Delta made in its Contracts of Carriage, written promises

made by Delta on July 22 and 26, 2024, following the CrowdStrike Outage, and

oral promises made by Delta representatives are not preempted by the ADA.

Delta's Motion to Dismiss is **DENIED** on this ground.

         **c.**     **Count III is preempted by the ADA to the extent Plaintiffs assert a claim for breach of implied contract.**[14]

Delta argues that Plaintiffs' breach of implied contract claim (Count III) is

"an attempt to enhance or enlarge Delta's written Contracts," and so are preempted

---

[14] To clarify, the Court finds that Counts I and II are not preempted by the ADA, and that Count III also is not preempted to the extent that Plaintiffs rely on oral promises made by Delta representatives. The Court discusses whether these claims are adequately pleaded below. However, because Plaintiffs appear also to base Count III for breach of implied contract, in part, on the same written statements

by the ADA. Def.'s Br. at 18-19. Plaintiffs contend that, because Delta's promises to reimburse Plaintiffs for travel expenses "are purely voluntary and contractual . . . and do not involve state-imposed obligations," the claim is not preempted by the ADA. Pls.' Resp. at 18. The Court agrees with Delta.

Under Georgia law, an implied contract "is one not created or evidenced by distinct and explicit language, but inferred by the law as a matter of reason and justice." Classic Restorations, Inc. v. Bean, 155 Ga. App. 694, 699 (1980). "It is only when the parties themselves do not expressly agree, that the law interposes and raises a promise." Id. (quoting Ramsey v. Langley, 86 Ga. App. 544, 549 (1952)). However, other than conclusory allegations that "Delta entered into oral contracts and/or implied contracts with Plaintiffs," Plaintiffs provide no factual basis as to what these implied contracts are. See Consol. Compl. ¶¶ 286-91 (alleging that Delta promised reimbursements and refunds but otherwise alleging no facts regarding any implied contract). To the extent that Plaintiffs seek to hold Delta liable for any contract "inferred by the law as a matter of reason and justice" or interposed and raised by law, such claims are preempted by the ADA. See Dusko, 2022 WL 22927618, at *8 (holding that the plaintiff's claim for an implied

---

issued by Delta, the Court separately determines whether such a claim is preempted by the ADA.

covenant of good faith and fair dealing failed as a matter of law to the extent the plaintiff asserted that the implied covenant was a "gap filler" because the Contract of Carriage specifically disclaimed any implied warranties); Xiaoyun Lucy Lu v. AirTran Airways, Inc., 631 F. App'x 657, 662 (11th Cir. 2015) ("[A]n airline's contract terms may not be altered, enhanced, or enlarged 'based on state laws[.]'"); see also Stout v. Med-Trans Corp., 313 F. Supp. 3d 1289, 1298 (N.D. Fla. 2018) (quoting Schneberger v. Air Evac EMS, Inc., No. CIV-16-843-R, 2017 WL 1026012, at *2 (W.D. Okla. Mar. 15, 2017), aff'd, 749 F. App'x 670 (10th Cir. 2018)) ("[R]equring [the air carrier] to accept less [than the full amount of charges billed] because of a policy-based inquiry . . . necessarily imposes upon them a rate that 'the state dictates' rather than one that 'the [air carrier] itself undertakes."). Here, as in Dusko, the Contracts of Carriage specifically provide that the Contracts cannot be changed absent a writing by a Delta officer, and that "[n]o other covenants, warranties, undertakings or understandings may be implied, in law or in equity."  Domestic COC R. 1(B), 24; International COC R. 1(B), 26; Canada COC R. 1(D).  Plaintiffs cannot attempt to enlarge Delta's obligations based on contracts that are implied by law.

Accordingly, the Court finds that Count III is preempted by the ADA to the extent Plaintiffs seek to hold Delta liable for any implied contract. Delta's Motion to Dismiss is **GRANTED** on this ground.

### 4. Whether Plaintiffs Adequately Plead Count I of the Consolidated Complaint

Under Georgia law, to state a claim for breach of contract, a plaintiff must plead the following elements: "(1) breach and the (2) resultant damages (3) to the party who has the right to complaint about the contract being broken." Norton v. Budget Rent A Car Sys., Inc., 307 Ga. App. 501, 502 (2010) (quoting Kuritzky v. Emory Univ., 294 Ga. App. 370, 371 (2008)).

Delta argues that six of the nine named Plaintiffs fail to state a claim for breach of contract based on Delta's alleged failure to refund ticket fares because Plaintiffs fail to plead the conditions precedent to such claims. Def.'s Br. at 21-23. Specifically, Delta points to a case from this district, Dusko, in which the court held that Delta has no obligation to refund a ticket unless and until a passenger (1) requests cancellation and refund and (2) rejects Delta's offer for a re-accommodation. Def.'s Br. at 21 (citing Dusko, 2022 WL 22927618, at *6). Thus, because Plaintiffs fail to allege that Felipak, Khaku, Moorman, or Muzzi ever requested a cancellation and refund of their tickets, Delta argues that their claims must be dismissed. Id. at 22. Delta further argues that both Felipak and Khaku

accepted re-accommodation offers made by Delta, and that Delta's Contracts of Carriage do not apply to Muzzi because he booked his ticket through another airline.  Id.  Finally, Delta contends that, because Einhorn and Susman received refunds of the unused portions of their tickets, Delta cannot be in breach of the contract based on failure to refund.  Id. at 22-23.[15]  Delta does not seek dismissal on the merits of Brennan's, Bajra's, or Kuk's breach of contract claim based on failure to refund.  Id. at 23 n.16.

In response, Plaintiffs argue that Delta's unilateral cancellation and rebooking of the flights of Felipak, Khaku, Moorman, and Muzzi, coupled with Delta's failure to provide sufficient customer service support, rendered it impossible for these Plaintiffs to request cancellations and refunds of their tickets. Pls.' Resp. at 19-21.  Plaintiffs also argue that the Contracts of Carriage impose no obligation for a Plaintiff to reject offers for re-accommodation in order to receive a refund.  Id. at 21.  Instead, Plaintiffs argue, because the language in the Contracts of Carriage "***require***[] Delta to re-book flights (and not simply ***offer*** flights that passengers can accept or reject)," Plaintiffs are not obligated to reject any offers

---

[15] Plaintiffs state that they "do not oppose the dismissal of Plaintiffs' Einhorn and Susman's breach of contract claim (Count 1), as they received a refund for their flights after this case was filed."  Pls.' Resp. at 25 n.5.  Accordingly, Delta's Motion to Dismiss is **GRANTED** as to Einhorn's and Susman's breach of contract claim based on failure to refund.

for re-accommodation to receive refunds.  Id. at 22.  Plaintiffs argue that "if Rule 19(A) is open to multiple reasonable interpretations, it must be interpreted in Plaintiffs' favor."  Id.

The Court finds that Plaintiffs' argument reads ambiguity into the Contract of Carriage where there is none.

> Ambiguity exists where the words used in the contract leave the intent of the parties in question—i.e., that intent is uncertain, unclear, or is "open to various interpretations." (Punctuation and footnote omitted.) Investment Properties Co. v. Watson, 278 Ga. App. 81, 83(1)(2006). Conversely, no ambiguity exists where, examining the contract as a whole and affording the words used therein their plain and ordinary meaning, the contract is "capable of only one reasonable interpretation." (Punctuation and footnote omitted.) Quality Foods v. Smithberg, 288 Ga. App. 47, 51(1) (2007).

Cap. Color Printing, Inc. v. Ahern, 291 Ga. App. 101, 106 (2008).

The Contracts of Carriage, which are entered into between passengers who "buy a ticket from or travel on Delta," provide that "Delta will exercise reasonable efforts to transport you and your baggage from your origin to your destination with reasonable dispatch."  Domestic COC R. 1(A), 2; Canada COC R. 1(A), 3; International COC R. 1(A), 2.  They also provide that "published schedules," "flight times," or "[t]imes shown in timetables" are not guaranteed, but Delta retains sole discretion to "substitute alternate Carriers or aircraft, change its schedules, [or] delay or cancel flights . . . ."  Domestic COC R. 2; Canada COC R.

3; International COC R. 2.  However, in the event of a cancellation, diversion or prolonged delay,

> Delta will (at passenger's request) cancel the remaining ticket and refund the unused portion of the ticket and unused ancillary fees . . . .  If the passenger does not request cancellation and refund of the remaining portion of the ticket, Delta will transport the passenger to the destination on Delta's next flight on which seats are available in the class of service originally purchased.  At Delta's sole discretion and if acceptable to the passenger, Delta may arrange for the passenger to travel on another Carrier or via ground transportation.  If acceptable to the passenger, Delta may provide transportation in a lower class of service, in which case the passenger may be entitled to a partial refund.
>
> ***
>
> If a refund is required because of Delta's failure to operate on schedule or refusal to transport . . . , the following refund will be made directly to you[] . . . .  No refund will apply when alternate transportation is provided by Delta and accepted by the passenger.

Domestic COC R. 19(A), 22(A); International COC R. 20(A), 23(A); Canada COC R. 240(B), 260(A).

The terms of the Contracts of Carriage are clear.  They require Delta to issue a refund under three circumstances: (1) at the passenger's request to cancel and refund; (2) when Delta fails to operate on schedule; or (3) when Delta refuses to transport.  Where a passenger fails to request a cancellation and refund, Delta's obligation to rebook the passenger's flight takes effect.  And by taking the alternate

form of transportation offered by Delta to one's destination, the passenger triggers the final clause of Rule 22(A) quoted above—Delta's obligation to refund ends.[16]

With respect to Felipak and Khaku, the Consolidated Complaint contains no allegation that Plaintiffs asked Delta to cancel the ticket and issue a refund. The Consolidated Complaint also contains no allegation that Delta refused to transport them to their destinations. Instead, Plaintiffs allege that Delta rebooked their flights, albeit with a delay of three and two days, respectively. Consol. Compl. ¶ 56 ("Delta was able to rebook Plaintiff Felipak and her family on a flight departing July 24, 2024 – three days after her originally scheduled flight."); id. ¶ 71 ("Delta was able to rebook [Khaku] and his family for a flight with United Airlines on July 24, 2024 – two days after their originally scheduled flight."). By the express terms of the applicable Contracts of Carriage, "[n]o refund will apply when alternate transportation is provided by Delta and accepted by the passenger." Domestic COC R. 22(A); International COC R. 23(A). Nothing in the Consolidated Complaint suggests that either Felipak or Khaku did not make use of the alternate transportation provided by Delta.

---

[16] Delta contends that a passenger must actively reject Delta's offer to re-accommodate in order to state a claim for a refund, Def.'s Br. at 21, while Plaintiffs argue that such a rejection is not necessary, Pls.' Opp'n at 22. The Court finds that these arguments present a distinction without a difference in this case.

To the extent Plaintiffs argue that Delta's failure to "perform [its] duties within a reasonable time" constitutes a material breach of the Contracts of Carriage, such an argument has no merit, particularly in light of the plain terms of the Contracts.  Specifically, Plaintiffs contend that Delta "unilaterally cancel[ling] Plaintiffs' flights and re-book[ing] them for several days later, if at all," undermined Plaintiffs' expectations for "timely transportation consistent with their original booking, not days later."  Pls.' Resp. at 23-24.  However, the Contracts of Carriage specifically provide as follows:

> Delta will exercise reasonable efforts to transport you and your baggage from your origin to your destination with reasonable dispatch, but published schedules, flight times, aircraft types, seat assignments, and similar details reflected in the ticket or Delta's published schedules <u>are not guaranteed and form no part of this contract</u>.  Delta may substitute alternate Carriers or aircraft, change its schedules, delay or cancel flights, change seat assignments, and alter or omit stopping places shown on the ticket as required by its operations in Delta's sole discretion.  Delta's sole liability in the event of such changes is set forth in Rule 22.

Domestic COC R. 2 (emphasis added); <u>see also</u> International COC R. 2; Canada COC R. 3.  In contrast to the self-imposed obligations undertaken by Delta to refund fares to those who request them, Delta explicitly disclaims any contractual obligation to adhere to the published schedules or flight times as reflected on passengers' tickets.  To add such an obligation would remove Plaintiffs' claims from the realm of the <u>Wolens</u> exception and into the realm of "enlarg[ing] or

enhanc[ing] [the Contracts] based on state laws or policies external to the agreement," which are barred by ADA preemption principles.  <u>Wolens</u>, 513 U.S. at 233.  Accordingly, Plaintiffs Felipak and Khaku fail to state a claim for breach of contract.

However, the Court finds that Moorman and Muzzi plead plausible claims for breach of contract based on Delta's alleged failure to refund unused ticket fares.  As noted above, the Contracts of Carriage provide that "Delta's sole liability in the event of such changes [in schedule, delays, or cancellations] is set forth in Rule 23."  International COC R. 2.[17]  Rule 23 of the International COC further provides that Delta will issue a refund "because of Delta's failure to operate on schedule <u>or</u> refusal to transport."  <u>Id.</u>, R. 23(A) (emphasis added).  Plaintiffs allege that Delta failed to operate on schedule and failed to provide them with alternate transportation.  Consol. Compl. ¶¶ 94-96, 106 (alleging that Moorman's flight from Minnesota to Ohio was delayed for almost five hours before it was cancelled, that Moorman was unable to speak with a Delta agent to rebook her flight because only one agent was available to assist passengers, and that Moorman ultimately

---

[17] Both Moorman and Muzzi travelled internationally and, thus, the International COC is the Contract governing their claims against Delta.  International COC R. 1(A) (noting that the International COC "applies to travel on any itinerary for International Carriage").

arranged for her own transportation because of Delta's cancellation); id. ¶ 128 (alleging that Muzzi's flight was delayed for six hours before he was informed that the flight was cancelled, that Delta failed to rebook Muzzi's flight, and that Muzzi had to manually rebook his flight with a different airline). These allegations are sufficient to show, at this stage, that Delta failed to operate on schedule, thus triggering the refund provision contained in Rule 23 of the International COC. Furthermore, the Consolidated Complaint contains no allegation that Delta provided alternative transportation to either Muzzi or Moorman; thus, Delta's obligation to refund did not end, as in the case of Felipak and Khaku.

Finally, the Court rejects Delta's argument that the International COC does not apply to Muzzi's ticket because "he booked his tickets through another airline, KLM." Def.'s Br. at 22 (citing Consol. Compl. ¶ 127). Delta argues that, "[i]n situations where flight segments are operated by airlines other than Delta, 'codeshare arrangements,' the terms in Delta's Contracts only apply if Delta was the 'Marketing Carrier,' i.e., 'the Carrier that sells flights under its code.' That was not the case here." Id. at 22 (citing International COC R. 1(A), 2, 18(H)). Delta raises a factual dispute here, which Plaintiffs dispute in response. See Pls.' Resp. at 25 (arguing that "Muzzi's claim arises from Delta's unilateral cancelation of Delta flight: DL243"). Determining whether Delta was the "Marketing Carrier"

such that the Contract of Carriage applies to Muzzi's ticket is not appropriate at this stage.

> The International COC provides as follows:
>
> Some flight segments in your itinerary may be operated by airlines other than Delta pursuant to contractual codeshare arrangements with Delta that allow Delta to sell tickets for travel on flights operated by these Carriers ("Delta Codeshare Partners"). If you purchase a Delta ticket where Delta is the Marketing Carrier (your flight has a Delta flight number), your Contract of Carriage is with Delta regardless of the Operating Carrier.

International COC R. 18(H). The Complaint contains no allegations regarding this codeshare agreement between Delta and KLM, but it does allege that Muzzi purchased his airlines through KLM's website "for both Delta and KLM flights." Consol. Compl. ¶ 127. From this allegation, the Court could reasonably infer that either Delta or KLM was the Marketing Carrier. Delta asks the Court to take Delta's bare statement—that it "was not the case here" that Delta was the Marketing Carrier—and make this inference in Delta's favor without providing Plaintiffs with the benefit of discovery to determine which airline was, in fact, the Marketing Carrier. The Court declines. As the Court must do at this stage, the Court makes the reasonable inference in Plaintiffs' favor. Discovery may reveal otherwise, but dismissal of Muzzi's claim on the ground that the International COC does not apply to him would be inappropriate.

In sum, the Court finds that Plaintiffs plausibly plead claims for relief under Count I as to Moorman and Muzzi, but not as to Felipak and Khaku (and Plaintiffs do not oppose dismissal of Count I as to Einhorn and Susman). Accordingly, Delta's Motion to Dismiss Count I is **GRANTED** as to Felipak, Khaku, Einhorn, and Susman, and **DENIED** as to Moorman and Muzzi.

### 5. Whether Plaintiffs Adequately Plead Count II of the Consolidated Complaint

Delta seeks dismissal of all Plaintiffs' claims for breach of contract based on failure to reimburse travel expenses. Def.'s Br. at 23-27. Delta first argues that the CrowdStrike Outage was a "force majeure" as defined in the Contracts of Carriage and, thus, Delta was not required to provide "additional amenities." Id. at 23-24. Delta points to Rule 19(B) of the Domestic COC and Rule 20(B) of the International COC, which are materially identical, and which provide, in relevant part, as follows: "Delta shall have no liability if the flight cancellation, diversion or delay was due to force majeure. As used in this rule, 'force majeure' means . . . [a]ny other condition beyond Delta's control or any fact not reasonably foreseen by Delta." Domestic COC R. 19(B); International COC R. 20(B).

However, taking Plaintiffs' allegations as true, as the Court must do on Delta's Motion to Dismiss, and drawing all reasonable inferences in Plaintiffs' favor, the Court rejects Delta's force majeure defense at this stage in the litigation.

Delta focuses on the Outage itself and argues that it could not reasonably have

foreseen the Outage.  Def.'s Br. at 23-24.  But Plaintiffs allege that Delta's

prolonged failure to recover was due to factors that were entirely within Delta's

control.  Specifically, Plaintiffs allege that, while other airlines recovered and

resumed normal operations by the end of the weekend following the CrowdStrike

Outage, see, e.g., Consol. Compl. ¶ 186 (alleging that American Airlines recovered

operations "by the evening of July 19th and had only 51 mainline flight

cancellations the following day"), Delta continued to delay and cancel flights

through July 31, 2024, totaling approximately 7,000 cancelled flights.  Id.

¶¶ 157-60, 186.  Plaintiffs allege that the reason Delta was unable to recover was

not because of the CrowdStrike Outage itself or the CrowdStrike Outage's effects

on systems running Microsoft, but because: (1) Delta failed to back up its

scheduling programs or plans in the event of scheduling software problems;

(2) Delta failed to update or modernize its IT structures; and (3) Delta rejected or

ignored offers of help from both CrowdStrike and Microsoft that were extended

within hours of the Outage and through the next week.  Id. ¶¶ 170, 172-73, 175-79,

181, 192.  These allegations, taken as true, are sufficient to show that CrowdStrike

Outage and Delta's response do not constitute force majeure so as to preclude

Plaintiffs' claims for breach of contract based on failure to reimburse.  See Elavon,

<u>Inc. v. Wachovia Bank, Nat. Ass'n</u>, 841 F. Supp. 2d 1298, 1307-08 (N.D. Ga. 2011) (holding that the "economic downturn in 2008 and subsequent events that followed do not constitute a force majeure which excused [the] Defendants' performance of their obligation," and noting that "[w]hile the economic perils that faced the banking industry during 2008 may have been 'reasonably beyond the control' of Wachovia, the decision to extend the Wells Fargo-First Data contract was well within [the] Defendants' control"); <u>see also</u> <u>Rudolph v. United Airlines Holdings, Inc.</u>, 519 F. Supp. 3d 438, 450 (N.D. Ill. 2021) (rejecting the defendant's argument that the COVID-19 pandemic constituted a force majeure event excusing the defendant's cancellation of one plaintiff's flight where the plaintiff alleged that the flight was cancelled, not because of COVID-19, but because of the defendant's "desire to save on operating expenses").

Next, Delta argues that it performed under the terms of Rule 19(B) of the Domestic COC with regard to hotel accommodations and ground transportation, and that it was not required to reimburse Plaintiffs for any additional expenses above those delineated in the Contracts of Carriage.  Def.'s Br. at 24-25.  In response, Plaintiffs contend that the statements released by Delta on July 22 and 26, 2024, constituted "binding modifications to the Contract, creating additional

obligations to reimburse Plaintiffs for reasonable expenses incurred during the disruption."  Pls.' Resp. at 29-30.

The Court finds that Plaintiffs fail to state a claim for breach of contract based on Delta's alleged failure to reimburse them for any expenses to the extent that Plaintiffs seek to hold Delta liable for any representations made outside of the Contracts of Carriage.  The Contracts of Carriage lay out the specific instances in which Delta will reimburse passengers in the event of a significant delay or cancellation within Delta's control: (1) accommodations at a Delta contracted hotel and free ground transportation to and from the hotel; (2) a voucher for future travel in the amount of $100 if there is no availability at a Delta contracted hotel; and (3) ground transportation to the passenger's "destination airport if a passenger's flight is diverted to an alternative airport."  Domestic COC R. 19(B); International COC R. 20(B); Canada COC R. 240(C).  Plaintiffs allege that Delta placed additional obligations on itself and made additional promises to passengers after the CrowdStrike Outage left many passengers who had already paid for their Delta flight tickets stranded.  However, Plaintiffs' Consolidated Complaint is devoid of any allegation that additional consideration was given for Delta's additional promises.

"Generally speaking, '[t]he terms of a written contract may be modified or changed by a subsequent parol agreement between the parties, where such agreement is founded on sufficient consideration.'" Hanham v. Access Mgmt. Grp. L.P., 305 Ga. 414, 417 (2019) (quoting Vasche v. Habersham Marina, 209 Ga. App. 263, 265 (1993)); see also 280 Partners, LLC v. Bank of N. Georgia, 352 Ga. App. 605, 609 (2019) ("The parties to a contract . . . may mutually depart from its terms and form a 'quasi-new agreement.'  But there must be some consideration for that new agreement.") (internal citation omitted).  Plaintiffs rely on USF Corporation v. Securitas Security Services USA, Inc., 305 Ga. App. 404, 406-07 (2010), to argue that consideration was not necessary to modify the Contracts of Carriage because "Delta's subsequent commitments are based on the same subject matter between the same parties and do not require new consideration."  Pls.' Resp. at 30-31.  However, the court in USF Corporation was not determining whether consideration is required to modify an already existing contract.  Instead, the court considered whether the parties had entered into a novation, which extinguished the original contract and governed the parties' claims.  USF Corp., 305 Ga. App. at 404-05, 407 n.8.  Specifically, USF Corporation entered into a contract with Securitas Security Services in February 2005, pursuant to which Securitas would provide security services on USF's premises.  Id. at 404-05.  After

USF was acquired by YRC Regional Transportation, YRC and Securitas entered into a new contract in October 2005.  Id. at 405.  The trial court held that the February 2005 contract governed the parties' claims, but the Georgia Court of Appeals reversed and held that the October 2005 agreement controlled.  Id. at 407. In reaching this holding, the Georgia Court of Appeals cited O.C.G.A. § 13-4-5 (titled "Novation"), which provides, "A simple contract regarding the same matter and based on no new consideration does not destroy another simple contract between the same parties; but, if new parties are introduced so as to change the person to whom the obligation is due, the original contract is at an end."

Plaintiffs take the first clause of O.C.G.A. § 13-4-5 out of context and argue that a contract may be modified without any additional consideration if the "subsequent commitments" are made to the same parties.  Pls.' Resp. at 30-31. But Plaintiffs direct the Court to no case wherein a court has construed the first clause of section 13-4-5 in such a way.[18]  And aside from this novel argument,

---

[18] Plaintiffs also rely on Finlay v. Christiana Tr. as Tr. of ARLP Tr. 3, No. 1:16-CV-1895-SCJ, 2018 WL 11343485 (N.D. Ga. June 25, 2018), but such reliance is misplaced.  The court in Finlay held that the plaintiffs adequately pleaded a claim for breach of contract despite the defendant's argument that the plaintiffs failed to show the existence of a valid loan modification.  Finlay, 2018 WL 11343485, at *7.  Specifically, the court declined to determine whether the documentation and allegations offered by the plaintiffs at the pleading stage "definitively establish a valid loan modification (i.e., adequately demonstrate agreement on material terms, acceptance, and consideration)" and held that such questions were more

Plaintiffs do not provide any explanation for the lack of allegations concerning consideration purportedly given for the modification to the Contracts of Carriage. Accordingly, Plaintiffs' claim for reimbursement of travel expenses fails as a matter of law to the extent that Plaintiffs seek to hold Delta liable for promises made outside of the Contracts of Carriage.

Furthermore, to the extent that Plaintiffs do base their claims for reimbursement on the terms contained in the Contracts of Carriage, Plaintiffs fail to state a claim for relief.  Plaintiffs argue that Rule 19(B) of the Domestic COC provides for a $100 voucher, but the fact that it does not specify whether passengers are to receive $100 per night or $100 total regardless of the length of the delay creates an ambiguity that should be resolved in Plaintiffs' favor.  Pls.' Resp. at 31-32.  However, Plaintiffs' argument raises another distinction without a difference.  Each Plaintiff who allegedly was stranded for longer than one night received an offer for vouchers or reimbursement equivalent to $100 or more per night.  See, e.g., Consol. Compl. ¶¶ 26, 30 (alleging that Bajra had to book a hotel room for one night and received an offer for $100 voucher); id. ¶¶ 36-37, 41

---

appropriate at the summary judgment stage.  Id.  However, Plaintiffs' shortcoming with respect to their reimbursement claim is not that they failed to "adequately demonstrate" any one element of a breach of contract; instead, it is that Plaintiffs' Consolidated Complaint contains no allegation that Delta's additional promises were supported by consideration of any kind.

(alleging that the Brennan was stranded overnight in Atlanta before he purchased Greyhound tickets and received an offer for a $100 voucher and a reimbursement of $219.45); id. ¶¶ 56-57, 59 (alleging that Felipak's flight was cancelled for three days and that Delta offered a reimbursement of $350); id. ¶¶ 71, 74 (alleging that Khaku's flight was cancelled for two days and that Delta gave him 10,000 SkyMiles and $650); id. ¶¶ 80-81, 85 (alleging that Kuk's flight was cancelled for one day and that Delta offered a voucher for $100); id. ¶¶ 94-96, 116 (alleging that Moorman's flight was cancelled overnight and that Delta offered $250 as reimbursement); id. ¶¶ 128, 130, 134 (alleging that Muzzi's flight was cancelled, that he rebooked his own ticket for three days later, and that Delta offered €587.59 as reimbursement); id. ¶¶ 140, 144 (alleging that Susman's flight was cancelled by Delta for three days before Susman cancelled and rebooked her own tickets, and that Delta "provided [Susman] with SkyMiles to use towards future flight"). Plaintiffs' own allegations belie their argument that Delta did not comply with the Contracts of Carriage, or that the Contracts are ambiguous with respect to reimbursements.

Finally, Delta argues that Plaintiffs' claims for special or incidental damages arising out of the delays and cancellations are foreclosed by the language contained in the Contracts of Carriage. Id. at 27-27. Plaintiffs do not respond to this

argument, and the Court deems it unopposed.  See Kramer v. Gwinnett Cnty., 306

F. Supp. 2d 1219, 1221 (N.D. Ga. 2004) ("[A] party's failure to respond to any

portion or claim in a motion indicates such portion, claim or defense is

unopposed.").  The Court agrees with Delta.  The Contracts of Carriage

specifically exclude any claims for special, incidental, or special damages.

Domestic COC R. 24; International COC R. 26; Canada COC R. 191(C).  Thus,

Plaintiffs cannot state a claim for breach of contract based on reimbursements to

the extent they seek to recover for the cost of unused hotel reservations or other

incidental damages.  See, e.g., Consol. Compl. ¶¶ 28, 132 (alleging that Bajra and

Muzzi paid for hotel nights they did not use and that Muzzi incurred

"cancellation/no-show fees"); id. ¶¶ 35, 42 (alleging that Brennan paid

approximately $10,000 for a cruise he and his wife missed because of the

cancellation); id. ¶ 83 (alleging that Kuk paid for an Airbnb that he was unable to

use).

 Accordingly, Plaintiffs fail to state a claim for breach of contract based on

reimbursements, and Delta's Motion to Dismiss is **GRANTED** as to Count II of

Plaintiffs' Consolidated Complaint.

### 6.    Whether Plaintiffs Adequately Plead Count III of the Consolidated Complaint

Finally, Delta seeks dismissal of Plaintiff's claim for breach of oral contract.[19]  Def.'s Br. at 27-30.  Delta raises five separate arguments in support of dismissal: (1) the Contracts of Carriage specifically foreclose such a claim; (2) an express and implied contract cannot exist at the same time; (3) Plaintiffs do not allege that any person who made the oral promises had authority to bind Delta; (4) Plaintiffs fail to allege that Delta made any offer that was accepted by Plaintiffs outside of the Contracts of Carriage; and (5) Plaintiffs fail to allege consideration to support any oral contract.  Id.

The Court finds that Plaintiffs' claim for breach of oral contract fails for many of the reasons raised by Delta.  First, the Contracts of Carriage explicitly provide that "[n]o Delta employee or ticketing agent has the authority to modify any provision of the Conditions of Carriage unless authorized in writing by a Delta officer."  Domestic COC R. 1(B); International COC R. 1(B); Canada COC R. 1(D).  Thus, any oral promise made by Delta customer service representatives are not enforceable.  Furthermore, as with Plaintiffs' claim for reimbursement based

---

[19] Because the Court grants Delta's Motion to Dismiss as to the portion of Count III that relies on implied contracts as preempted by the ADA, the Court only considers whether Plaintiffs adequately plead their claim for breach of oral contract.

on the July 22 and 26, 2024, written statements released by Delta, Plaintiffs fail to allege any consideration for the oral modification to the Contracts of Carriage. Plaintiffs argue that "[s]eparate consideration has clearly been alleged," and cite to paragraph 290[20] of the Consolidated Complaint.  Pls.' Resp. at 34-35.  However, paragraph 290 simply states in conclusory fashion that "Plaintiffs and the members of the putative classes each gave consideration to support the terms of these oral/implied contracts."  Consol. Compl. ¶ 290.  Aside from this legal conclusion, Plaintiffs provide no allegation supporting their claim that they gave consideration or what that consideration was.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  Iqbal, 556 U.S. at 679; see also Twombly, 550 U.S. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)) (holding that "a formulaic recitation of the elements of a cause of action will not do," and that courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

Accordingly, Plaintiffs' claim for breach of oral contract fails as a matter of law, and Delta's Motion to Dismiss is **GRANTED** as to Count III of the Consolidated Complaint.

---

[20] Plaintiffs cite to paragraph 281, but that paragraph pertains to Delta's alleged failure refund Plaintiffs in breach of the Contracts of Carriage.  The Court assumes this is a scrivener's error and that Plaintiffs intended to cite to paragraph 290.

## III.    PLAINTIFFS' MOTION TO AMEND

### A.    Legal Standard

Under Federal Rule of Civil Procedure Rule 15(a), a party may amend his or her complaint once as a matter of course within twenty-one days after service of a response by answer or motion.  Otherwise, the party may amend his or her complaint "only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2).  Rule 15(a) further instructs that "[t]he court should freely give leave when justice so requires."  Id.  "[U]nless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial."  Thomas v. Town of Davie, 847 F.2d 771, 773 (11th Cir. 1988) (quoting Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594, 598 (5th Cir. 1981)); see also Spanish Broad. Sys. v. Clear Channel Commc'ns, 376 F.3d 1065, 1077 (11th Cir. 2004) ("The Supreme Court has emphasized that leave to amend must be granted absent a specific, significant reason for denial.") (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

Nevertheless, courts may deny a motion to amend for numerous reasons, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and]

futility of amendment." <u>Foman</u>, 371 U.S. at 182; <u>see also</u> <u>Carruthers v. BSA</u>

<u>Adver., Inc.</u>, 357 F.3d 1213, 1218 (11th Cir. 2004).  In particular, "[a] proposed

amendment may be denied for futility 'when the complaint as amended would still

be properly dismissed.'" <u>Coventry First, LLC v. McCarty</u>, 605 F.3d 865, 870

(11th Cir. 2010) (quoting <u>Cockrell v. Sparks</u>, 510 F.3d 1307, 1310 (11th Cir.

2007)).  "Thus, the same standard of legal sufficiency as applied under a motion to

dismiss for failure to state a claim pursuant to Rule 12(b)(6) is used to determine

futility." <u>Bazemore v. U.S. Bank, N.A.</u>, 167 F. Supp. 3d 1346, 1355 (N.D. Ga.

2016), <u>aff'd</u>, 692 F. App'x 986 (11th Cir. 2017).

### B.    Analysis

Plaintiffs filed a Motion to Amend alongside their response to Delta's

Motion to Dismiss, requesting leave to amend in the event this Court grants any

portion of Delta's Motion.  Mot. to Am. at 1, 3 ("[T]o the extent that the Court is

inclined to dismiss any of Plaintiffs' claims based on insufficient factual

allegations, Plaintiffs respectfully request leave to file a further amended pleading

in order to address any such deficiencies.").  Plaintiffs do not set forth the

substance of their proposed amendments but argue that doing so "is speculative at

this juncture because Plaintiffs do not know how the Court will rule, or if an

amendment will even be necessary." <u>Id.</u> at 3.  Plaintiffs also argue that (1) there is

68

no undue delay because Plaintiffs filed the motion along with their response

opposing Delta's Motion to Dismiss; (2) Plaintiffs do not seek leave to amend in

bad faith but in direct response to Delta's Motion to Dismiss; (3) Plaintiffs have

not repeatedly failed to cure deficiencies in their amendments because "there has

yet to be any finding that Plaintiffs' allegations are deficient"; and (4) there would

be no prejudice to Delta because the case is still in its early stages.  Id. at 3-4.

Delta opposes Plaintiffs' Motion to Amend.  See generally Def.'s Opp'n to

Pls.' Mot. to Am. [Doc. 57].  Delta argues that Plaintiffs already have been given

three opportunities to plead facts sufficient to state claims against Delta, and that a

fourth opportunity should not be given.  Id. at 3-4.  Delta also argues that, if the

Court dismisses any of Plaintiffs' claims on preemption grounds, any amendment

asserting the same theories of liability would be futile.  Id. at 4.

The Eleventh Circuit consistently has held that "[a] plaintiff who moves for

leave to amend a complaint 'must either attach a copy of the proposed amendment

to the motion or set forth the substance thereof.'"  United States ex rel. 84Partners,

LLC v. Nuflo, Inc., 79 F.4th 1353, 1363 (11th Cir. 2023) (quoting Atkins v.

McInteer, 470 F.3d 1350, 1362 (11th Cir. 2006)).

> Plaintiff[s] ha[ve] described the proposed amendment in the vaguest
> terms possible, stating only that [they] intend[] to add "additional
> information" and to assert "viable claims."  While Plaintiff[s] insist[]
> that these "viable claims" are not futile, without a sufficient explanation

of the substance of the proposed amendment, the Court cannot discern whether the claims that Plaintiff[s] seek[] to add would be futile, or whether the proposed amendment would result in undue prejudice to the Defendant[].

Wolfe v. Piedmont Med. Care Corp., No. 1:10-CV-1412-JEC-CCH, 2011 WL 13323743, at *2 (N.D. Ga. Mar. 15, 2011).

Plaintiffs' Motion neither attaches the proposed amended complaint nor sets forth the substance of the proposed amended complaint, but Plaintiffs ask that this Court overlook this deficiency because "Plaintiffs do not know how the Court will rule, or if an amendment will even be necessary." Mot. to Am. at 3. The only information provided by Plaintiffs as to any proposed amendment is that it "will bolster the allegations to address any deficiencies identified by the Court." Id. However, Plaintiffs' "failure to articulate [] viable claim[s]" in their Consolidated Complaint and their "failure to attach a proposed amended complaint to [their motion] show the futility of granting [them] leave to amend [their] complaint again." Gibbs v. United States, 517 F. App'x 664, 670 (11th Cir. 2013); see also My24HourNews.com, Inc. v. AT&T Corp., 791 F. App'x 788, 803 (11th Cir. 2019) (finding no abuse of discretion where the district court denied the plaintiff's request for leave to amend, in part, because the plaintiff "simply requested 'leave to amend to cure any defects'").

Accordingly, Plaintiffs' Motion to Amend is **DENIED**.

## IV.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendant Delta Air Lines, Inc.'s Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint [Doc. 44] is **GRANTED IN PART AND DENIED IN PART**.  The Motion is **GRANTED** as to Counts II through XI and XIII of Plaintiffs' Consolidated Class Action Complaint (breach of contract based on failure to cover additional amenities, breach of implied/oral contract, common law fraud, unjust enrichment, violation of the California Unfair Competition Law, violations of the California Consumers Legal Remedies Act, violation of California False Advertising Law, violations of the Florida Deceptive and Unfair Trade Practices Act, violations of the Washington Consumer Protection Act, violations of the Ohio Consumer Sales Practices Act, and violations of EU Air Passenger Rights (Regulation 261/2004), respectively).  The Motion also is **GRANTED** as to the breach of contract claim based on failure to refund (Count I) asserted by Plaintiffs Asher Einhorn, Caroline Felipak, Aunali Khaku, and Melanie Susman.  As Plaintiffs Asher Einhorn, Caroline Felipak, and Melanie Susman assert no viable claims against Defendant, they are **DISMISSED** from this action.  The Motion is otherwise **DENIED**.

It is further **ORDERED** that Plaintiffs' Motion for Leave to File Amended Complaint [Doc. 53] is **DENIED**.

71

The causes of action remaining in this case are as follows:

- Count I (breach of contract based on failure to refund) asserted by Plaintiffs Arben Bajra, John Brennan, David Kuk, Carmen Moorman, and Vittorio Muzzi; and

- Count XII (violation of the Montreal Convention) as asserted by Plaintiffs Arben Bajra, Aunali Khaku, David Kuk, Carmen Moorman, and Vittorio Muzzi.

Finally, it is hereby **ORDERED** that the parties shall file an Amended Joint Preliminary Report and Discovery Plan within fourteen (14) days of the date of this Order.

**IT IS SO ORDERED** this 6th day of May, 2024.

MARK H. COHEN
United States District Judge