## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ARBEN BAJRA, JOHN BRENNAN, AUNALI KHAKU, DAVID KUK, CARMEN MOORMAN, and VITTORIO MUZZI, individually and on behalf of all others similarly situated, | |
| | Case No. 1:24-cv-03477-MHC |
| Plaintiffs, | Hon. Mark H. Cohen |
| v. | |
| | <u>JURY TRIAL DEMANDED</u> |
| DELTA AIR LINES, INC., | |
| Defendant. | |

## <u>CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT</u>

Plaintiffs Arben Bajra, John Brennan, Aunali Khaku, David Kuk, Carmen Moorman, and Vittorio Muzzi (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, pursuant to the Court's January 23, 2026 Order (Doc. 81), bring this action against Defendant Delta Air Lines, Inc. ("Defendant" or "Delta"), by and through their attorneys, and allege as follows based on information and belief and the investigation by their attorneys, except as to allegations specifically pertaining to Plaintiffs, which are made upon personal knowledge:

## INTRODUCTION

1.     Plaintiffs bring this Third Amended Class Action Complaint against Defendant for Delta's mass significant delays and/or cancellations of thousands of flights purchased by consumers and/or subsequent failure to provide full refunds and/or reimbursements to impacted consumers.

2.     On the morning of Friday, July 19, 2024, an automatic update to cybersecurity software developed by CrowdStrike resulted in millions of computers running Microsoft Windows to crash and display blue "screens of death." This system breakdown will be referred to hereinafter as the "CrowdStrike outage".[1]

3.     The CrowdStrike outage affected CrowdStrike customers who use Microsoft Windows products, including many airports and airlines.

4.     Airlines rely on Microsoft's Office365 for travel needs, including scheduling and transporting crew members, passengers, and baggage and/or other cargo to their appropriate destinations.

5.     However, the CrowdStrike outage inhibited airlines from conducting their day-to-day activities. Instead, airlines resorted to manual operations, such as checking passengers in on paper. This severely crippled airlines, airports, and

---

[1]  https://www.cbsnews.com/news/delta-flight-cancellations-wednesday-ed-bastian/ (last visited February 3, 2026).

passengers from attending to their scheduled operations accordingly.

6.    Moreover, the CrowdStrike outage resulted in massive delays globally. According to FlightAware, a flight tracking firm, there were more than 4,000 flight cancellations and 35,500 flight delays worldwide by the afternoon of July 19, 2024.[2]

7.    Delta specifically canceled more than 4,500 flights between Friday, July 19 and Sunday, July 21, 2024.[3]

8.    By the end of the weekend, nearly every airline had managed to recover and resume normal operations.  Delta, however, did not resume normal operations.

9.    At the start of the workweek, Delta continued to cancel a staggering number of flights.  On Monday, July 22, it was reported that Delta canceled more than 1,250 flights.  These cancellations accounted for nearly 70% of all flights within, to, or from the United States that had been canceled on Monday.[4]  No other U.S. airline had canceled one-tenth as many flights.[5]

10.    On Tuesday, July 23, Delta continued to cancel flights.  By 2pm that

---

[2]   https://www.wired.com/story/crowdstrike-windows-outage-airport-travel-delays/ (last visited February 3, 2026).
[3]    https://www.cnn.com/2024/07/23/business/delta-flight-cancellations/index.html (last visited February 3, 2026).
[4] *Id.*
[5] *Id.*

day, more than 450 flights had been canceled and more than 1,000 flights had been delayed.[6]  The delays were often significant and substantial, exceeding more than four hours.

11.    Delta continued to delay and cancel flights for weeks after the CrowdStrike outage, although Delta purports that its "operational reliability" returned to "normal" on Thursday, July 25, 2024.[7]

12.    During the CrowdStrike outage, for those flights that were ultimately cancelled, Delta either automatically rebooked or offered customers the ability to rebook their flight through Delta at no additional cost and/or offered customers the option to book alternative transportation at the expense of Delta:

**Out-of-Pocket Expense Reimbursement**

We know many customers who experienced a significant delay or flight cancellation incurred unplanned, out-of-pocket expenses during the disruption period, between July 19 and July 28. Delta has expanded the list of eligible expenses that may be covered for this disruption, **including flight tickets purchased on other airlines in the same cabin of service or lower, train and bus tickets, rental cars and ride shares**.[8]

(emphasis added).

13.    Delta continued to blame its temporary inability to resume its services

---

[6] *Id.*

[7]        https://news.delta.com/update/july-2024-operation/delta-starts-thursdays-operation-zero-cancellations (last visited February 3, 2026).

[8] https://news.delta.com/what-delta-doing-make-things-right-customers-impacted-crowdstrike-disruption (last visited February 3, 2026).

on Windows software and its inability to fix problems with its crew tracking system, leaving it unable to find the pilots and flight attendants it needed for planes to fly.[9]

14.    The impact on Delta passengers was disastrous.  Delta's failure to adequately and timely recover from the CrowdStrike outage left passengers stranded in airports across the country and the world and, in many cases, thousands of miles from their desired destination.

15.    As outlined more fully below, Delta's Domestic Contract or Carriage (Exhibit 1 hereto), Delta's Canadian Contract of Carriage (Exhibit 2 hereto), and Delta's International Contract of Carriage (Exhibit 3 hereto) – as of the dates of the purchases of the tickets referenced herein – differed as they related to how passengers whose trips were governed by the Montreal Convention and their respective baggage were to be treated in the event of a significant delay or cancellation.  For example, Delta includes specific provisions in the International Contract of Carriage and the Canadian Contract of Carriage that provide for recovery of additional damages beyond mere fare refund.

16.    The relevant Canadian Contract of Carriage provided as follows with respect to international travel:

---

[9]    https://news.delta.com/update/july-2024-operation/delta-people-working-247-restore-operation-support-customers-get-crews (last visited February 3, 2026).

**RULE 191: LIABILITY OF CARRIERS**

For the purpose of International Carriage governed by the Montreal Convention, the Liability rules set out in the Montreal Convention are fully incorporated herein **and shall supersede and prevail over any provisions of this tariff which may be inconsistent with those rules**. **To the extent that they are not inconsistent with the foregoing, the following provisions shall apply:** . . . .

*See* Rule 191 of Canadian Contract of Carriage, p. 48.

17.    Similarly, Delta's International Contract of Carriage and the Canadian Contract of Carriage provided:

**RULE […]: LIABILITY OF CARRIERS[…]**

**[…]**

B) LAWS AND PROVISIONS APPLICABLE

[…]

3) The Carrier shall be liable for damage occasioned by delay in the carriage of passengers by air, as provided in the following paragraphs: […]
c) Damages occasioned by delay are subject to the terms, limitations and defenses set forth in the Warsaw Convention and the Montreal Convention, whichever may apply. They include foreseeable compensatory damages sustained by a passenger and do not include mental injury damages.

d) The Carrier reserves all defenses and limitations available under the Warsaw Convention or the Montreal Convention, whichever may apply, to claims for damage occasioned by delay, including, but not limited to, the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention. Under the

6

Montreal Convention, the liability of the Carrier for damage caused by delay is limited to 5,346 Special Drawing Rights per passenger.
The limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22(5) of the Montreal Convention, whichever may apply.

*See* Rule 18(B)(3) of International Contract of Carriage, pp. 17-19; *see* Rule 191(B)(3) of Canadian Contract of Carriage. pp. 48-50 (removing Codeshare Rules from heading).

18.    In pertinent part, the International Contract of Carriage and the Delta Canadian Contract of Carriage provided with respect to delayed baggage:

**RULE […]: LIABILITY OF CARRIERS[…]**

**[…]**

B) LAWS AND PROVISIONS APPLICABLE

[…]

4) The Carrier is liable for damages sustained in the case of destruction or loss of, damage to, or delay of checked and unchecked baggage, as provided in the following paragraphs:

a) Except as provided below, the liability of the Carrier is limited to 1,288 Special Drawing Rights for each passenger in the case of destruction, loss, damage, or delay of baggage, whether checked or unchecked, under the Warsaw Convention or the Montreal Convention, whichever may apply. […]
[…]
e) The Carrier reserves all defenses and limitations available under the Warsaw Convention, and the Montreal Convention, whichever may apply to such claims including, but not limited to, the defense of Article 20 of the Warsaw Convention and Article 19 of the Montreal Convention, and the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention, except that the Carrier shall not invoke Article 22(2) and (3) of the Warsaw Convention in a manner inconsistent with paragraph 4(a) hereof. The

limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22(5) of the Montreal Convention, whichever may apply. […].

*See* Rule 18(B)(4) of International Contract of Carriage, pp. 17-19; *see also* Rule 191(B)(4) Canadian Contract of Carriage. pp. 48-50 (substantially similar – removing "," after Warsaw Convention, removing language following the last use of the word "apply" above, and removing Codeshare Rules from heading).

19.    Delta's Domestic Contract of Carriage, Delta's International Contract of Carriage, and Delta's Canadian Contract of Carriage, however, are similar in that they each contain a provision that allows Delta to modify the terms of the respective Contract of Carriage to the extent certain conditions are met – each of which were present during the CrowdStrike outage:

**[…] Amendments to Conditions of Carriage**

**Delta may amend these Conditions of Carriage at any time**, except as provided by law. Your travel is governed by the rules that were in effect on the date you purchased your ticket; provided, however, that **Delta reserves the right to apply rules currently in effect on the date of your travel where reasonably necessary for operational reasons and where the change in rule does not have a material negative impact upon you.** […]

*See* International Contract of Carriage at Rule 1(B), p. 1; *see* Domestic Contract of Carriage at Rule 1(B), p. 2; *see also* Canadian Contract of Carriage at Rule 1(D). p. 2 (substantially similar, replacing the word "is" with the word "will be").

20.    Delta's International Contract of Carriage, Delta's Domestic Contract of Carriage, and Delta's Canadian Contract of Carriage were each modified during the CrowdStrike outage to aid operations.  In particular, Delta issued a Temporary

Reimbursement Waiver significantly increasing the scope of damages passengers subject to the Domestic Contract of Carriage can recover from Delta under the respective Contract of Carriage. The modification was within the right of Delta to make without additional consideration as Delta reserved that right so long as there was no negative impact on the consumer. Delta did not reserve the right to modify the contract to any extent the modification had a negative impact on consumers.

21.    Additionally, to the extent that the Temporary Reimbursement Waiver increased Montreal Convention-covered Canadian and International class members' rights under the respective Contracts of Carriage, the modification was within the right of Delta to modify without additional consideration. To the extent the waiver gave the passengers less rights, it was not within the rights of Delta to modify as it had a negative impact on such passengers.

22.    Said differently, to the extent that the Temporary Reimbursement Waiver reduced a passenger's rights, that portion of the modification is null and void under the terms of the reservation of rights to modify the contract.

23.    To add insult to injury, when affected passengers requested prompt refunds for their canceled or delayed flights, Delta refused or ignored these requests. In addition, Delta refused to provide all affected passengers with meal, hotel, and ground transportation vouchers, despite its previous commitments, and continues to refuse or ignore requests for reimbursements of approved expenses.

24.    As a result of Delta's failures, affected passengers were damaged. Specifically, affected passengers were forced to spend thousands of dollars in unexpected out-of-pocket expenses, including flights from other airlines, hotels, rental cars, ground transportation, and food.  Further, Delta separated thousands of passengers from their baggage, leaving many without necessary medication, clothes, and other belongings.

25.    Accordingly, Plaintiffs bring this action in order to retrieve their monies for each and every similarly situated consumer Delta has wronged by refusing to issue full refunds for flights cancelled or significantly affected and refusing to issue the reimbursements it promised to consumers as a direct and proximate result of the CrowdStrike outage.

26.    All of the out-of-pocket expenses sought herein were (1) damages that were incurred by Delta customers and/or passengers as a direct result of Defendant's substantial delay and/or cancellation of their flight and were (2) in breach of: (a) Defendant's Contracts of Carriage as originally written; and (b) Defendant's Contracts of Carriage as subsequently modified.  To the extent (if at all) the International Contract of Carriage and/or the Canadian Contract of Carriage are determined to provide less rights to passengers than what is provided for under the Montreal Convention, the particular limiting provision should be deemed null and void.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act of 2005, because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

28.     This Court has personal jurisdiction over Defendant because it is headquartered and has conducted substantial business in this judicial district.

29.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant is headquartered in this district, transacts business in this district, is subject to personal jurisdiction in this district, and therefore is deemed to be a citizen of this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

**Plaintiff Arben Bajra**

30.     Plaintiff Arben Bajra ("Plaintiff Bajra") is a citizen and resident of Colorado.

31.     Plaintiff Bajra purchased two roundtrip tickets from Denver, Colorado

to Amsterdam, Netherlands through Delta's website.  Plaintiff paid $2,299 for the tickets using a credit card.

32.    On July 20, 2024, Plaintiff Bajra and his significant other arrived at the Denver airport and checked his baggage.  Delta later informed Plaintiff Bajra that his flight was delayed and that he would miss his connecting flight in New York.  Plaintiff Bajra spoke with a Delta agent to rebook his flight.  Delta informed Plaintiff Bajra that the only available flight was two days later, on July 22, 2024. Relying upon Delta's representations, Plaintiff Bajra accepted the flight for July 22, 2024.  Plaintiff Bajra then waited another 6 hours to retrieve his baggage.

33.    On July 22, 2024, Plaintiff Bajra and his significant other arrived at the Denver airport.   Delta informed Plaintiff Bajra that the flight was again canceled. Delta informed Plaintiff Bajra that there were no available flights for several days.   Delta did not provide Plaintiff Bajra with any meal or hotel vouchers.   Instead, Delta instructed Plaintiff Bajra to incur the costs associated with his hotel and represented that Delta would later reimburse the cost.  Delta did not put any restrictions on the hotel, such as a price limitation or limitation on companies to which Plaintiff Bajra could book with.  Plaintiff Bajra relied on this statement and booked a hotel, with the understanding that the expense would be later reimbursed in full by Delta.

34.    Additionally, Delta informed Plaintiff Bajra that the ticket price for

the original Delta flight would be refunded to Plaintiff Bajra without further action by Plaintiff, and that another flight was available in the coming days.

35.    Because Delta was unable to rebook Plaintiff Bajra on another flight for several days, Plaintiff Bajra declined the flight for several days later, requested that Delta cancel his booking, and Plaintiff Bajra booked a flight to Amsterdam that was leaving that day on a different airline.  Plaintiff Bajra paid approximately $1,500 for the tickets using a credit card.  Plaintiff Bajra and his significant other arrived in Amsterdam on July 23, 2024.

36.    On July 30, 2024, Plaintiff Bajra was scheduled to fly from Amsterdam back home to Denver.  Upon arrival at the airport in Amsterdam, Delta informed Plaintiff Bajra that the flight had been canceled and the earliest available flight was scheduled for the next day.

37.    As a result of Delta's significant delay and cancellation and because the Delta flight on which Plaintiff Bajra was rebooked was not until the next day, Plaintiff Bajra and his significant other incurred additional out-of-pocket expenses in the form of an additional hotel stay, meals, and/or additional ground transportation, causing him damage.

38.    As a result of Delta's significant delays and multiple cancelations and the timing of Delta's re-bookings, Plaintiff Bajra was forced to pay for a flight with a different airline, hotel nights which he did not use because of Delta's cancelation,

a hotel room for one night, food, and alternative transportation. Plaintiff Bajra incurred out-of-pocket expenses in the amount of approximately $1,975.

39.    Plaintiff Bajra reasonably relied upon Delta's representations that he would be automatically refunded for the cancelled flight. After waiting approximately 10 days after Delta informed Plaintiff Bajra that his ticket price would be automatically refunded, Plaintiff called Delta to check on the status of his refund of the outbound flight. Delta then told Plaintiff Bajra that refunds were not automatic and that Plaintiff would be forced to submit a request for a refund for the outbound canceled flight.

40.    Plaintiff Bajra followed Delta's instructions and, on July 31, 2024, Plaintiff Bajra submitted two requests: (1) a refund request for the original canceled flight, and (2) a reimbursement request for his out-of-pocket expenses. In response, Delta offered Plaintiff Bajra a $100 voucher to use towards a future flight with Delta.

41.    At no time before, during, or after Plaintiff Bajra's flight cancellation by Delta did Delta disclose that it would not compensate Plaintiff for his out-of-pocket expenses and/or a refund of his outbound flight.

42.    To date, Delta has not provided Plaintiff Bajra with a refund or reimbursement for the original ticket price or any of his out-of-pocket expenses.

43.    As a result of the significant delays of transportation of passengers

and/or baggage, Plaintiff was financially damaged.

44.    The significant delays of transportation of Plaintiff Bajra and his baggage caused damage to Plaintiff Bajra and violated the Montreal Convention and/or constituted breaches of the applicable terms of governing agreements as set forth below (International Contract of Carriage; and/or International Contract of Carriage as Modified).

**Plaintiff John Brennan**

45.    Plaintiff John Brennan ("Plaintiff Brennan") is a citizen and resident of Florida.

46.    Plaintiff Brennan purchased two roundtrip tickets for him and his wife from Tampa, Florida to Seattle, Washington to board a cruise to celebrate their anniversary.  Plaintiff Brennan paid $1,281.12 for the tickets using a credit card through Delta's website.  Plaintiff Brennan's flights were scheduled for July 21, and 30, 2024.

47.    On July 21, 2024, Plaintiff Brennan and his wife were scheduled for a direct flight from Tampa to Seattle.  Upon their arrival in Tampa, Delta informed Plaintiff Brennan that the flight was canceled.  Delta rebooked Plaintiff Brennan on a flight to Seattle with a layover in Atlanta.  Delta checked Plaintiff Brennan's bags and informed Plaintiff Brennan that he would be able to retrieve their bags in Seattle.  Plaintiff Brennan arrived in Atlanta around 6:00 p.m. that evening.

However, Delta later informed Plaintiff Brennan that the flight from Atlanta to Seattle scheduled for that evening was canceled.

48.    In Atlanta, Plaintiff Brennan waited in line several hours to speak with a Delta customer service agent in an attempt to book another flight.  Around 2 a.m. on July 22, 2024, Plaintiff Brennan realized that all the Delta agents had left, and no one was working the customer service desk.  An airport representative informed Plaintiff Brennan to return at 6 a.m. to resume waiting in line to be rebooked.

49.    By then, Plaintiff Brennan realized that he and his wife would be unable to get to Seattle in time to board the cruise, so they were forced to return home to Tampa.  Plaintiff Brennan requested that Delta cancel his flight so that he and his wife could return home.

50.    Plaintiff began calling all the nearby hotels and was told they were all sold out.  Plaintiff Brennan then called all of the rental car companies in Atlanta and was informed they would not rent to him because they did not want to run out of rental vehicles.  Delta informed Plaintiff Brennan that alternative transportation would be reimbursed and instructed Plaintiff Brennan to incur the expenses and represented that Delta would fully reimburse him.  Plaintiff Brennan purchased tickets to take a Greyhound Bus from Atlanta back home to Tampa.

51.    As a result of Delta's cancelation, Plaintiff Brennan and his wife were stranded in Atlanta without their baggage.  More egregious, Plaintiff Brennan and

16

his wife missed the anniversary cruise.

52.     Delta refused to provide Plaintiff Brennan with the meal and hotel vouchers.  Delta further refused to automatically provide a refund for the ticket price.  Instead, Delta offered a $100 voucher – less than the amount to which Plaintiff Brennan is entitled – to use towards a future flight with Delta.

53.     Plaintiff Brennan reasonably relied on Delta's representations that alternative transportation costs would be fully reimbursed.  Plaintiff Brennan incurred out-of-pocket expenses of no less than $800.00.  Further, Plaintiff Brennan spent approximately $10,000 on the cruise that he and his wife missed as a direct and proximate result of Delta's cancellation.  Plaintiff Brennan submitted a reimbursement request and all necessary and required information using Delta's website for the canceled flight, the out-of-pocket expenses, and the cost of the cruise.  In response, Delta emailed Plaintiff Brennan offering $219.45 – less than he is entitled to under each of the applicable agreements (Domestic Contract of Carriage and/or Domestic Contract of Carriage as Modified).

54.     As a result of the significant delays of transportation of passengers and/or baggage, Plaintiff was financially damaged.

55.     The significant delays of transportation of Plaintiff Brennan, his wife, and his baggage caused damage to Plaintiff Brennan and constituted breaches of the applicable terms of governing agreements as set forth below (Domestic

Contract of Carriage and/or Domestic Contract of Carriage as Modified).

**Plaintiff Aunali Khaku**

56.    Plaintiff Aunali Khaku is a citizen and resident of Sanford, Florida.

57.    Plaintiff Khaku purchased four roundtrip tickets for a family trip from Orlando, Florida to Dubai, United Arab Emirates on Delta's website.  Plaintiff Khaku paid $5,108 for the tickets using a credit card.

58.    On Monday July 22, 2024, Plaintiff Khaku and his family arrived at John F. Kennedy Airport for a connecting flight back home to Orlando from Dubai.  The final leg of their flight home from JFK to Orlando was scheduled for 3:00 p.m.  Delta informed Plaintiff Khaku that the flight had been delayed to 6:00 p.m.  At 6:00 p.m., Delta informed Plaintiff Khaku that the flight had been delayed to 9:00 p.m.  Finally, at 9:00 p.m., Delta informed Plaintiff Khaku that the flight had been cancelled.  Delta informed Plaintiff Khaku that there were no available Delta flights until Friday July 26, 2024, which Plaintiff Khaku did not accept as it was four days away.  Delta was, however, able to rebook Plaintiff and his family for a flight with United Airlines on July 24, 2024 – two days after their originally scheduled flight.

59.    Delta refused to cover hotel and meal costs for the significant delays and/or cancellation after Plaintiff Khaku inquired regarding reimbursement.  Delta cited the CrowdStrike outage as the reason for the significant delays and/or

cancellation and claimed no responsibility.  Plaintiff Khaku, with his wife and two children, then rented a car and drove for three hours to Allentown, Pennsylvania, where his parents live, to stay with them for two days while they waited for their rebooked flight on United.  The cost of the rental car and gas was an out-of-pocket expense that Plaintiff incurred as a result of the significant delay and the timing of Delta's rebooking.

60.    Additionally, Delta lost Plaintiff Khaku's and his family's baggage. To this day, Plaintiff and his family have not received their baggage.  Plaintiff and his family were then forced to purchase basic necessities and lost all their personal items, including those they had bought on their trip.  The cost of the replacement items was an out-of-pocket expense that Plaintiff incurred as a result of the significant delay and loss of Plaintiff's baggage.

61.    Plaintiff Khaku reasonably relied upon Delta's representations that he would be automatically refunded for the cancelled flight.  When that did not happen, Plaintiff Khaku called and emailed Delta numerous times to request a refund.  In response, Delta gave Plaintiff 10,000 SkyMiles and reimbursed him $650 for the rental car and for the basic necessities Plaintiff Khaku needed to purchase for his family.

62.    At no time before, during, or after Plaintiff Khaku's flight cancellation by Delta did Delta disclose that it would not honor its contract with Plaintiff and

not provide a refund.

63.    To date, Delta has not provided Plaintiff Khaku with a refund or reimbursement for the original ticket price, nor has Delta compensated his family for their lost baggage.

64.    As a result of the significant delay of transportation of Plaintiff Khaku and his family and the loss of his baggage, Plaintiff was financially damaged.

65.    The significant delays of transportation of Plaintiff Khaku, his family, and his baggage caused damage to Plaintiff Khaku and violated the Montreal Convention and/or constituted breaches of the applicable terms of governing agreements as set forth below (International Contract of Carriage and/or International Contract of Carriage as Modified).

**Plaintiff David Kuk**

66.    Plaintiff David Kuk ("Plaintiff Kuk") is a citizen and resident of Ontario, Canada.

67.    Plaintiff Kuk purchased four roundtrip tickets from Toronto, Canada to Las Vegas, Nevada through Delta's website.  Plaintiff paid for the tickets with 70,000 SkyMiles and $400 using a credit card.

68.    On July 18, 2024, Plaintiff Kuk and his family arrived at the Toronto Pearson airport.  Delta delayed the flight several times before canceling it.  Delta did not provide Plaintiff Kuk with any meal or hotel vouchers.  Delta rebooked the

flight for the following day.

69.    The next day, Plaintiff Kuk and his family again arrived at the Toronto Pearson airport.  Once there, Delta informed Plaintiff Kuk that the rebooked flight had also been canceled.  Plaintiff Kuk requested that Delta cancel his tickets so that he could book an alternative flight with a different airline.

70.    Plaintiff Kuk incurred out-of-pocket expenses by booking a flight using a different airline.  He paid approximately $2,300 using a credit card.

71.    As a result of Delta's multiple cancelations, Plaintiff Kuk was forced to purchase a flight with a different airline, rent a vehicle, and pay for an Airbnb which he was unable to use, in the amount of approximately $700.

72.    Plaintiff Kuk requested a refund for the originally cancelled flight as well as for his out-of-pocket expenses as a result of Delta's significant delays and/or cancellation.  Delta did not provide a refund for the canceled flights nor did it reimburse Plaintiff Kuk's out-of-pocket expenses as a result of the significantly delayed and/or canceled flights.

73.    On July 26, 2024, Delta informed Plaintiff Kuk via email that – instead of providing an automatic refund for the canceled flights per its contract – Delta would only give a $100 electronic voucher to be used toward a future flight with Delta.

74.    Plaintiff Kuk's spouse used Delta's online chat function to get more

information about the electronic voucher.  Delta's customer service agent informed Plaintiff Kuk's spouse that the electronic voucher would expire in one year.

75.    To date, Delta has not provided Plaintiff Kuk with a refund or reimbursement for the original ticket price or any of his out-of-pocket expenses.

76.    As a result of the significant delay of transportation of Plaintiff Kuk and his family and/or the loss of his baggage, Plaintiff was financially damaged.

77.    The significant delays of transportation of Plaintiff Kuk, his family, and his baggage caused damage to Plaintiff Kuk and violated the Montreal Convention and/or constituted breaches of the applicable terms of governing agreements as set forth below (Canadian Contract of Carriage and/or Canadian Contract of Carriage as Modified).

**Plaintiff Carmen Moorman**

78.    Plaintiff Carmen Moorman is a citizen and resident of the state of Ohio.

79.    Plaintiff Moorman purchased five roundtrip international tickets with five pieces of baggage to Puerto Escondido, Mexico from Cincinnati, Ohio through Delta's website at a cost of more than $1,100.00 per ticket.

80.    Plaintiff Moorman's return flight from Puerto Escondido, Mexico was scheduled to depart on July 21, 2024.

81.    On July 21, 2024, Plaintiff Moorman and her family arrived at the

Puerto Escondido, Mexico airport and checked their baggage. The July 21, 2024 international flight was scheduled to take Plaintiff Moorman and her family home through the following route: Puerto Escondido, Mexico, to Mexico City, Mexico, to Minneapolis, Minnesota, to Cincinnati, Ohio.

82.    The first two legs of Plaintiff Moorman and her family's return flight departed as scheduled; however, the third leg of Plaintiff Moorman and her family's return flight (Minneapolis, Minnesota to Cincinnati, Ohio) was substantially delayed for more than four hours, before ultimately being canceled.

83.    In particular, after Plaintiff Moorman and her family landed in Minneapolis, Minnesota, Plaintiff Moorman and her family went to the gate for departure home, where it became apparent that her flight to Cincinnati, Ohio, which was supposed to take off on July 21, 2024 at 8:59 p.m., was delayed.

84.    The flight was delayed several more times until Delta finally canceled the flight at approximately 1:50 a.m. on July 22, 2024.

85.    Plaintiff Moorman attempted to speak with a Delta agent to rebook the flight; however, the line was five hours long as there was only one Delta Agent available to assist customers.

86.    Plaintiff Moorman and each of her family members searched for available hotel rooms online and called about the ones that appeared to be available. Although Plaintiff Moorman was looking to book two hotel rooms,

Plaintiff Moorman booked the first hotel that said there was availability of one room. Reserving the room with a credit card, Plaintiff Moorman and her family took a Lyft to the hotel only to learn on arrival that the hotel was overbooked and there were no rooms available.

87.     Because there were no other rooms available within 85 miles, Plaintiff Moorman and her family decided the best course of action would be to take a Lyft back to the airport.

88.     Plaintiff Moorman and her family were starving at this point, and were aware that the airport restaurants all closed at or around 9:00 p.m.

89.     Plaintiff Moorman and her family had the foresight to DoorDash a meal to the lobby of the hotel before returning to the airport.  The hotel was kind enough to let Plaintiff Moorman and her family use the hotel lobby to wait for and then eat their meal.  The cost of the DoorDash meal was in excess of $70.00.

90.     Plaintiff Moorman and her family returned to the airport via Lyft at approximately 3:00 a.m.

91.     The cost of the two Lyft rides totaled more than $50.00.

92.     As a result of Delta's cancelation, Plaintiff Moorman and her family were stranded in Minneapolis, Minnesota throughout the night and early morning.

93.     All Delta provided to the hundreds of people standing in line was water.

94.     During the delays, Plaintiff Moorman and her family made vending machine purchases at the airport totaling approximately $19.00.

95.     As a result of Delta's cancelation, at approximately 6:00 a.m., Plaintiff Moorman rented a rental car from SIXT to drive her and her family home to Cincinnati.

96.     The rental car, for a 12-hour one way rental from Minneapolis, Minnesota to Cincinnati, Ohio cost Plaintiff Moorman more than $1,600.00.

97.     Plaintiff Moorman paid for gasoline for the vehicle totaling approximately $100.00.

98.     Plaintiff Moorman was also assessed an assortment of toll-related fees in the amount of $27.39.

99.     Plaintiff Moorman also paid for additional food from Culver's and, upon information and belief, Fleet Farm Convenience Store in the amount of approximately $26.00.

100.   Plaintiff Moorman's and her family's baggage did not arrive back to the Cincinnati, Ohio airport until 2 to 3 days after it was scheduled to arrive.

101.   Once the baggage arrived at the Cincinnati, Ohio airport, Plaintiff Moorman arranged for her husband to drive back to the airport to retrieve it.  The distance between Plaintiff's home and the airport is approximately 23 miles.  Thus, an additional approximately 46 miles were unnecessarily put on Plaintiff

Moorman's vehicle. The standard rate of reimbursement for mileage in 2024 was 67 cents per mile.[10] Thus, Plaintiff Moorman was subjected to an additional expense of $30.00 to retrieve her baggage. To add insult to injury, while the baggage was being retrieved and the vehicle was parked outside of the baggage claim, Plaintiff Moorman's vehicle was issued a parking ticket.

102. As detailed above, as a direct and proximate result of Delta's substantial delay and ultimate cancelation of Plaintiff Moorman's and her family's international return flight, Plaintiff Moorman was forced to pay for alternative transportation, attempted accommodations requiring round trip ground transportation back to the airport, and meals. In total, Plaintiff Moorman incurred out-of-pocket expenses of approximately $2,000.00.

103. On or before July 29, 2024, Plaintiff Moorman submitted her documented expenses to Delta using Delta's reimbursement request form on its website; however, Delta only issued Plaintiff Moorman a check in the amount of $250.00 as detailed below.

104. Plaintiff Moorman is entitled, under the applicable contracts as set forth more fully below and/or the Montreal Convention, to full reimbursement for her damages.

---

[10] https://www.irs.gov/newsroom/irs-issues-standard-mileage-rates-for-2024-mileage-rate-increases-to-67-cents-a-mile-up-1-point-5-cents-from-2023 (last visited February 3, 2026).

105.   Although Plaintiff Moorman submitted a request for reimbursement of expenses incurred as a result of the significant delay and later cancellation on July 25, 2024, Defendant only agreed to reimburse Plaintiff Moorman for $250.00 – which is equal to about 12.5% of Plaintiff Moorman's total out-of-pocket expenses incurred.

106.   Although Plaintiff Moorman did not accept Delta's $250.00 offer, Delta issued a partial reimbursement check in the amount of $250.00 to her address.

107.   Plaintiff Moorman was shocked to see that Defendant's $250.00 partial reimbursement check issued on August 16, 2024 and received on or about August 25, 2024, included an attempted hidden release on the back of it.  *See* Moorman Check (Exhibit 4 hereto) (personal identifying information and/or private financial information redacted).

108.   In particular, the attempted hidden release on the back of the check stated:

ENDORSE HERE

The undersigned by endorsement below acknowledges receipt of this check as full settlement of and hereby releases Delta Airlines, Inc. from any and all claims the undersigned may have against Delta Airlines, Inc. to this date.

X_____

**DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE**
**RESERVED FOR FINANCIAL INSTITUTIONAL USE**

109.   When Plaintiff Moorman received the $250.00 check in the mail, she noticed that it included a release of liability.  Thus, by cashing the check, she would be required to release her claims against Delta.  *See* Exhibit 1.

110.   Because Plaintiff Moorman is entitled to more than $250.00 under the Montreal Convention, Plaintiff Moorman has not signed and Plaintiff Moorman has not deposited the $250.00 check.

111.   To date, Delta has not provided Plaintiff Moorman with a full contractual refund or full reimbursement for Plaintiff Moorman's out-of-pocket expenses and instead issued a partial reimbursement check with a release in the amount of $250.00.

112.   Because Plaintiff Moorman is entitled to a full reimbursement of Plaintiff Moorman's out-of-pocket expenses, Plaintiff Moorman has rejected the contingent $250.00 partial reimbursement and will not sign or deposit the check.

113.   As a result of the significant delay of transportation of Plaintiff Moorman and her family, Plaintiff was financially damaged.

114.   The significant delays of transportation of Plaintiff Moorman, her family, and her baggage caused damage to Plaintiff Moorman and violated the Montreal Convention and/or constituted breaches of the applicable terms of governing agreements as set forth below (International Contract of Carriage and/or

28

International Contract of Carriage as Modified).

**Plaintiff Vittorio Muzzi**

115.   Plaintiff Vittorio Muzzi ("Plaintiff Muzzi") is an Italian citizen and resident of Haarlem, The Netherlands.

116.   Plaintiff Muzzi purchased four roundtrip tickets from The Netherlands to Fort Lauderdale, Florida through KLM's website for both Delta and KLM flights.  Plaintiff Muzzi paid €3729.96 for the tickets using a debit card.

117.   On July 19, 2024, Plaintiff Muzzi arrived at the Schipol Airport in the Netherlands.  After waiting in the airport for six hours, Delta informed Plaintiff Muzzi that the flight AMS to Boston had been canceled.   Delta failed to automatically rebook Plaintiff Muzzi on a later flight or offer accommodation or meals vouchers, so Plaintiff Muzzi was forced to manually rebook his flight three days later to a different airport using a different airline.

118.   Despite cancelling Plaintiff Muzzi's flight, Delta retained Plaintiff Muzzi's baggage.

119.   Plaintiff Muzzi ultimately was able to book a flight for several days later, July 22, 2024, using a different airline and arrival airport (Orlando/MCO).

120.   Because Delta had retained Plaintiff Muzzi's baggage, the baggage became lost and was not returned to Plaintiff Muzzi.  Ultimately, Plaintiff Muzzi had to rent a car and travel to MCO airport to retrieve his baggage on August 3,

2024.

121.   As a result of Delta's cancellation, Plaintiff Muzzi was forced to book a flight with a different airline, pay hotel nights which he did not use because of Delta's cancellation, pay drop off charges for the rented car, cancellation fees, meals, Ubers, and minor clothing expenses since his baggage was lost.  Plaintiff Muzzi incurred out-of-pocket expenses and cancellation/no-show fees in the amount of approximately €5,000.

122.   Plaintiff Muzzi reasonably relied upon Delta's representations that he would be compensated for his out-of-pocket expenses.

123.   Plaintiff Muzzi followed Delta's instructions and, on August 4, 2024, Plaintiff Muzzi submitted a compensation request.  In response, Delta offered Plaintiff Muzzi €587.59.

124.   At no time before, during, or after Plaintiff Muzzi's flight cancellation by Delta did Delta disclose that it would not honor its contract with Plaintiff Muzzi and only provide a partial refund/reimbursement.

125.   To date, Delta has not provided Plaintiff Muzzi with a refund or reimbursement for the original ticket price or any of his out-of-pocket expenses.

126.   As a result of the significant delay of transportation of Plaintiff Muzzi and his family, Plaintiff was financially damaged.

127.   The significant delays of transportation of Plaintiff Muzzi and his

family caused damage to Plaintiff Muzzi and violated the Montreal Convention and/or constituted breaches of the applicable terms of governing agreements as set forth below (International Contract of Carriage; International Contract of Carriage as Modified).

**Defendant**

128.   Delta Air Lines, Inc. ("Delta") is a Delaware corporation with its principal place of business at 1030 Delta Boulevard, Atlanta, Georgia 30354.

129.   Delta is one of the top three biggest airline companies, serving more than 200 million travelers annually.  It boasts up to 4,000 daily departures to more than 1,000 destinations worldwide.[11]

## GENERAL FACTUAL ALLEGATIONS

**CrowdStrike Outage and its Impact on Airline Travel**

130.   At 12:09 a.m. EST on Friday, July 19, 2024, a faulty automatic update to a cybersecurity software program developed by CrowdStrike resulted in millions of computers running Microsoft Windows to crash.[12]

131.   The CrowdStrike outage impacted CrowdStrike customers who use Microsoft Windows products, including many airports and airlines.

132.   Airlines use Microsoft's Office365 for scheduling and transporting

---

[12]   https://www.crowdstrike.com/falcon-content-update-remediation-and-guidance-hub/ (last visited February 3, 2026).

crew, passengers, and cargos to the appropriate destination.

133.   Although CrowdStrike fixed the defective update by 1:27 a.m. EST on July 19, Windows users continued to experience system crashes and outages throughout the day.[13]

134.   When the CrowdStrike outage crashed these online systems, affected airlines, while normally reliant on cloud-based technology, were forced to resort to manual operations.  For example, many airlines had to check in their passengers on paper rather than through their online systems, a process that is significantly slower.

135.   As a result, the CrowdStrike outage resulted in massive delays and cancellations throughout the global airline industry.  According to flight tracking firm FlightAware, there were more than 4,000 flight cancellations and 35,500 flight delays worldwide by Friday afternoon.[14]

136.   Once systems were back online, the phenomenon of "delay propagation" prevented immediate recovery.  Delay propagation occurs when a delay at a flight stage causes a ripple effect in the subsequent stages of a flight.  Delays propagate into and out of an airport.  Arrival delays are tracked at the end

---

[13] *Id.*

[14] https://www.wired.com/story/crowdstrike-windows-outage-airport-travel-delays/ (last visited February 3, 2026).

of each flight leg traveled by the same aircraft identified by a tail number.[15]

137.  As a result, most airlines continued to cancel and delay flights throughout the weekend.  Delta canceled more than 4,500 flights between Friday, July 19 and Sunday, July 21, 2024.[16]

**Delta's Failures to Recover from the Outage and/or Delta's Failures to Take All Measures That Could Reasonably Be Required to Avoid the Passengers' Damage Were Entirely Within Delta's Control**

138.  The United States Department of Transportation (DOT) deemed any flight delays and/or cancellations resulting from the July 19 incident to be a "controllable" event – meaning an event caused by the airline.[17]

139.  By the end of the weekend, nearly every airline had managed to recover and resume normal operations.  Delta, however, continued to cancel and delay a staggering number of flights – far more than any other airline.  In fact, CrowdStrike has represented that "in contrast to other major airlines that resumed near-normal levels of operations by the following day, July 20, Delta struggled to resume near-normal levels of operations for days."[18]

---

[15]  https://aspm.faa.gov/aspmhelp/index/Delay_Propagation.html  (last  visited February 3, 2026).

[16]  https://www.cnn.com/2024/07/23/business/delta-flight-cancellations/index.html (last visited February 3, 2026).

[17]  *See* Airline Cancellation and Delay Dashboard, U.S. Dep't of Transp., https://www.transportation.gov/airconsumer/airline-cancellation-delay-dashboard.

[18]  https://cdn.arstechnica.net/wp-content/uploads/2024/10/CrowdStrike-v-Delta-Complaint-10-25-24.pdf (last visited February 3, 2026).

140.   Upon information and belief, "it was Delta's own response and IT infrastructure that caused delays in Delta's ability to resume normal operation, resulting in a longer recovery period than other major airlines."[19]

141.   Upon information and belief:

Delta's delayed recovery from the July 19 incident was the result of non-compliance with, among other things, the TSA's March 7, 2023 cybersecurity amendment.   Delta's response to the outage and CrowdStrike's efforts to help remediate the issues revealed technological shortcomings and failures to follow security best practices, including outdated IT systems, issues in Delta's active directory environment, and thousands of compromised passwords. CrowdStrike engineers also detected a custom script running daily on thousands of Delta machines, further indicating that Delta had previously recognized a lack of proper hygiene in its systems. CrowdStrike did not identify this issue on other customers' systems, indicating it was unique to Delta.[20]

142.   On Monday, July 22, Delta canceled more than 1,250 flights, about a third of its schedule.[21]  These cancellations accounted for nearly 70% of all flights within, to, or from the United States that had been canceled on Monday.[22]  No other US airline had canceled one-tenth as many flights.[23]

143.   On Tuesday, July 23, Delta continued to cancel and delay flights at staggering numbers.  By 2 p.m. that day, more than 450 flights had been cancelled

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

and more than 1,000 flights had been delayed.[24]

144.  On Thursday, July 25, Delta announced that its "operational reliability" had returned to "normal."[25]  Yet, passengers continued to report that Delta canceled their flights through July 31, 2024.

145.  Delta reportedly canceled more flights in five days (between Friday and Tuesday) than it did in the entire years of 2018 and 2019 *combined*.[26]  There were 5,470 flight cancellations for the airline between Friday and Tuesday, per FlightAware.[27]  By contrast, a total of 5,370 flights were canceled by Delta across years 2018 and 2019.[28]

146.  As stated in the letter, Delta asserts that the update released on July 19 caused a shutdown of Delta's systems "which, in turn, caused a crippling disruption to Delta's operations for several days, forcing flight cancellations and

---

[24]  https://www.nytimes.com/2024/07/23/us/pete-buttigieg-delta-outage.html  (last visited February 3, 2026).

[25]  https://news.delta.com/update/july-2024-operation/delta-starts-thursdays-operation-zero-cancellations (last visited February 3, 2026).

[26]  https://www.businessinsider.com/delta-canceled-more-flights-in-5-days-than-2-years-2024-7#:~:text=Delta%20canceled%20more%20flights%20in%205%20days%20after%20the%20CrowdStrike,in%202018%20and%202019%20combined&text=Delta%20canceled%20more%20flights%20in%20less%20than%20a%20week%20due,it%20canceled%20a%20combined%205%2C370 (last visited February 3, 2026).

[27]  *Id.*

[28]  *Id.*

delays, and adversely affecting more than a million Delta customers."[29]

147. On Monday, July 22, Delta released the following statement, attributing its failures to its reliance on Windows software and to its inability to fix problems with its crew tracking system:[30]

> Upward of half of Delta's IT systems worldwide are Windows based. The CrowdStrike error required Delta's IT teams to manually repair and reboot each of the affected systems, with additional time then needed for applications to synchronize and start communicating with each other.

> Delta's crews are fully staffed and ready to serve our customers, but one of Delta's most critical systems – which ensures all flights have a full crew in the right place at the right time – is deeply complex and is requiring the most time and manual support to synchronize.

148. Delta cited particular troubles with its critical crew-scheduling system, which helps the airline get crews to the right place at the right time.[31]

149. "It's critical because you have to get the aircraft, the cabin crew, the flight crew, all at the right place at the right time in order for you to operate your schedule," explained Michael McCormick, a longtime Federal Aviation

---

[29] July 29, 2024 letter from D. Boies to C. Anderson available at Ex. 1 at https://cdn.arstechnica.net/wp-content/uploads/2024/10/CrowdStrike-v-Delta-Complaint-10-25-24.pdf.
[30] https://news.delta.com/update/july-2024-operation/delta-people-working-247-restore-operation-support-customers-get-crews (last visited February 3, 2026).
[31] https://thepointsguy.com/news/dot-investigates-delta-meltdown/ (last visited February 3, 2026).

Administration veteran.[32] "When the system goes down . . . you have to resort to manually trying to plan it," he explained. "That's requiring emails, texts, phone calls, all around the system in order to try to do that."[33]

150.    In the eyes of McCormick, who now serves on the faculty at Embry-Riddle Aeronautical University, this recent outage – and the subsequent meltdown it triggered – should serve as a wakeup call for airlines:

> "I think this highlights the need to have better firewalls, so, that's cybersecurity, but in addition to that, redundancy and backup systems," McCormick said. "[Airlines] have grown extraordinarily dependent upon automation, and as we saw — and continue to see — they cannot operate their flight schedules without that automation."[34]

151.    Software that helps airlines schedule and track their pilots and flight attendants can become an Achilles' heel for companies trying to recover from major disruptions to their operations.[35]

152.    In the days following the CrowdStrike outage, Delta sought to shift the blame to CrowdStrike and Microsoft by retaining a law firm to pursue potential damages against CrowdStrike and Microsoft.[36]

153.    However, CrowdStrike has refuted Delta's allegations, stating that the

---

[32] https://thepointsguy.com/news/dot-investigates-delta-meltdown/
[33] *Id.*
[34] *Id.*
[35]    https://www.nytimes.com/2024/07/22/business/delta-global-tech-outage-pete-buttigieg.html (last visited February 3, 2026).
[36]    https://www.law360.com/articles/1863550/delta-hires-boies-schiller-to-recoup-outage-related-damages (last visited February 3, 2026).

threat of litigation "has contributed to a misleading narrative that CrowdStrike is responsible for Delta's IT decisions and response to the outage."[37]

154.   According to CrowdStrike, CrowdStrike reached out to Delta to offer assistance "within hours of the incident," but Delta rejected repeated offers to help restore Delta's impacted systems.[38] Indeed, CrowdStrike stated that its CEO "personally reached out to Delta's CEO to offer onsite assistance, but received no response."[39]

155.   Moreover, CrowdStrike avers that it further offered free on-site services and resources to Delta within hours of the outage, but Delta refused the assistance and resources.[40]

156.   Similarly, Microsoft on Tuesday, August 6, 2024, blamed Delta Air Lines for its weeklong bout of cancelations, claiming its aging technology caused the airline to recover far slower from the global tech outage than its rivals.

157.   Plaintiffs and class members' damages were caused or contributed to being caused by Delta's outdated software.  Furthermore, Delta did not have backup scheduling programs or backup plans in the event of scheduling software problems, as well as other actions that Delta could have taken to prevent the delays

---

[37] https://apple.news/AWlK7OnFxRnGwB7FARQAMGg (last February 3, 2026).
[38] *Id.*
[39] *Id.*
[40] *Id.*

and/or cancellations.  Such is evidenced by the fact that Delta was the slowest to recover in comparison to other airlines.  Furthermore, as detailed more fully below, Delta rejected assistance from CrowdStrike and Microsoft.  It is for these reasons that other airlines like United and American bounced back more quickly from the CrowdStrike update.

158.  "Our preliminary review suggests that Delta, unlike its competitors, apparently has not modernized its IT infrastructure," Mark Cheffo, an attorney representing Microsoft, wrote in an August 6, 2024 letter to Delta.

159.  In a letter to Delta, Microsoft made the following statements:

(a)  Even though Microsoft's software had not caused the CrowdStrike incident, Microsoft immediately jumped in and offered to assist Delta at no charge following the July 19 outage.  Microsoft employees asked Delta if they needed assistance every day from July 19 to 23, the letter said.[41]

(b)  Each day that followed from July 19 through July 23, Microsoft employees repeated their offers to help Delta.  Each time, Delta turned down Microsoft's offers to help, even though Microsoft

---

[41]    https://onemileatatime.com/news/microsoft-discredits-delta-blistering-letter/ (last visited February 3, 2026).

would not have charged Delta for this assistance.[42]

(c)  On the morning of July 22, a Microsoft employee, aware that Delta was having more difficulty recovering than any other airline, messaged a Delta employee to say, "just checking in and no pressure to reply, but if you can think of anything your Microsoft team can be helping with today, just say the word." The Delta employee replied, saying "all good. Cool will let you know and thank you."[43]

(d)  Despite this assessment that things were "all good," public reports indicate that Delta canceled more than 1,100 flights on July 22 and more than 500 flights on July 23.[44]

(e)  More senior Microsoft executives also repeatedly reached out to help their counterparts at Delta, again with similar results. Among others, on Wednesday, July 24, Microsoft CEO Satya Nadella emailed Delta CEO Ed Bastian, who has never replied.[45]

(f)  In fact, it is rapidly becoming apparent that Delta likely refused

---

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

Microsoft's help because the IT system it was most having trouble restoring – its crew-tracking and scheduling system – was being serviced by other technology providers, such as IBM, because it runs on those providers' systems, and not Microsoft Windows or Azure.[46]

(g) Microsoft continues to investigate the circumstances surrounding the CrowdStrike incident to understand why other airlines were able to fully restore business operations so much faster than Delta, including American Airlines and United Airlines. Our preliminary review suggests that Delta, unlike its competitors, apparently has not modernized its IT infrastructure, either for the benefit of its customers or for its pilots and flight attendants.[47]

Given all this, my client was surprised to see your letter. This is particularly so given that CrowdStrike has acknowledged responsibility for the content update that caused the July 19 incident.[48]

160.    But, meanwhile, the computer problems at Delta knocked its crucial

---

[46] *Id.*

[47] *Id.*

[48] *Id.*

crew tracking system offline for the better part of a week, making it impossible for the company to find the pilots and flight attendants it needed to fly its aircraft.[49] While other airlines were quick to resume normal operations after the CrowdStrike outage, Delta was forced to cancel about 30% of its schedule over those five days, leaving an estimated half-million passengers stranded.[50]  It took many days after that to re-book affected passengers on other flights and return their checked bags.[51]

161.  It is reported that American Airline had largely recovered its operation by the evening of July 19th and had only 51 mainline flight cancellations the following day.   Delta, meanwhile, captured unwanted national headlines as network restoration dragged on over five miserable days in which the carrier canceled approximately 7,000 mainline and regional flights.[52]  It said those cancellations disrupted the travel of 1.3 million customers and cost the carrier approximately $500 million.[53]

162.  American Airlines CEO Robert Isom said during an earnings call: "One of the things we've learned is that, in terms of any disruption, you've got to keep track of your aircraft, certainly, but also your crews, in terms of where they

---

[49]     https://edition.cnn.com/2024/08/06/business/microsoft-crowdstrike-outage-delta/index.html (last visited February 3, 2026).
[50] *Id.*
[51] *Id.*
[52]     https://www.travelweekly.com/Travel-News/Airline-News/Why-CrowdStrike-crash-hit-Delta-harder (last visited February 3, 2026).
[53] *Id.*

are.  And you probably ought to take action as quickly as possible to make sure you don't lose the ability for the purpose of recovery" […] "We've built technology, and we've done the right thing to make sure that we take early caution, early steps."[54]

163.  Those comments teased at what Delta has said was its biggest sticking point over its protracted recovery from the outage.[55]  The airline said 60% of its mission-critical applications, including redundant backup systems, rely on Windows, and that during its recovery it had to physically reset 40,000 servers – a bigger lift than any other airline.[56]

164.  During its long recovery process, CEO Ed Bastian also explained that what slowed Delta the most was the loss of a key crew-tracking tool, which left the airline without visibility on the whereabouts of its flight crews.[57]  Absent that knowledge, Delta was unable to reset its operation.[58]

165.  As discussed above, while the initial outage on July 19, 2024 impacted millions of customers and computers using Microsoft's Office365, all other airlines except for Delta recovered quickly.  In other words, Delta is the only

---

[54]   https://www.phocuswire.com/why-the-crowdstrike-crash-hit-delta-harder  (last visited February 3, 2026).
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*

airline that failed to resume normal operations for several weeks following the outage.

166.  Delta's operations protocol, technology, software, and policies and procedures related to operations is entirely within Delta's control.

167.  The reasons for Delta's failures to resume normal operations are apparent: (1) the design and operational resiliency capabilities of Delta's IT infrastructure are weaker than those of other airlines; (2) the decisions Delta made with respect to system upgrades contributed to its inability to quickly recover from the outage; (3) Delta refused free, onsite and virtual assistance offered by Microsoft to help restore Delta's operations; and (4) Delta's CEO ignored repeated offers by CrowdStrike to assist in Delta's recovery from the outage.

168.  Delta's actions and inactions directly and proximately caused its own operational fiasco, lasting weeks following the outage.

**Traveler Experiences and Traveler Damages**

169.  The impact from the substantial flight delays and/or cancellations on Delta passengers was disastrous.  Delta's failure to recover from the CrowdStrike outage left passengers stranded in airports across the country and the world for days at a time, in many cases thousands of miles from home.  To add insult to injury, Delta failed to provide timely alternative flight and/or transportation reimbursement to those impacted by the substantial delays and/or cancellations.

170.   As a result, affected passengers were forced to spend thousands of dollars in unexpected expenses, including flights from other airlines, hotels, rental cars, ground transportation, and/or food.

171.   To add insult to injury, Delta provided some customer with e-credits to use towards future flights as compensation, but made no effort to provide consumers cash refunds as required by federal law.[59]

172.   Upon information and belief, Delta's misrepresentations resulted in thousands of passengers forgoing their right to a refund by accepting the offered e-credits or partial refunds instead.

173.   Even when affected passengers did exercise their rights to request prompt refunds for their cancelled or delayed flights, Delta refused or ignored their requests, or failed to provide real-time assistance from customer service agents.

174.   For those passengers who did receive a response from Delta, Delta offered pennies on the dollar of the total incurred expenses and added a release on the backside of the check.

175.   In addition, Delta refused to provide all affected passengers with meal, hotel, and ground transportation vouchers, despite its previous commitments.

176.   Further, Delta separated thousands of passengers from their baggage,

---

[59]    https://www.washingtonpost.com/transportation/2024/07/26/delta-canceled-flights-investigation-crowdstrike/# (last visited February 3, 2026).

leaving many without clothes, necessary medication, and other belongings.

177.   As a result, affected passengers were forced to spend hundreds of dollars purchasing replacements.   Furthermore, many affected passengers had to pay out-of-pocket expenses to retrieve their delayed baggage that would not have been incurred but for the delay.

178.   When affected passengers attempted to seek reimbursement for these expenses, Delta refused to issue full reimbursement of the incurred expenses or ignored their requests, despite Delta's previous commitments to provide said reimbursements.

**Delta Violates Its Contracts and Policies Related to Flight Disruptions**

179.   Delta has contracts with consumers, titled Contract of Carriage.   There is a U.S. contract for U.S. customers, a Canada contract for Canadian customers, and an International contract for international customers. All three contracts are nearly identical and as such will be referred to herein as the "Contract."

180.   Consumers who purchased international flights, including Plaintiffs Bajra, Kuk, Moorman, and Muzzi, have additional claims pursuant to the International Contract of Carriage, the Canadian Contract of Carriage, and/or the Montreal Convention.   Specifically, Plaintiffs Kuk, Bajra, Muzzi, and Moorman's claims are governed by the Convention for the Unification of Certain Rules for International Carriage by Air done at Montreal on May 28, 1999 (referred to above

and hereafter as "the Montreal Convention"), a treaty ratified by the United States of America and which became effective in November 2003, because they purchased flights to/from a Member State to the Montreal Convention. According to the U.S. Department of Transportation's Airline Customer Service Dashboard, Delta has made the following commitments to passengers affected by a cancellation within the airline's control:[60]

- Meal or meal cash/voucher when cancellation results in passenger waiting for 3 hours or more for new flight

- Complimentary hotel accommodations for any passenger affected by an overnight cancellation

- Complimentary ground transportation to and from hotel for any passenger affected by an overnight cancellation

181. In addition, Delta has made the following commitments to passengers affected by a significant delay within the airline's control:[61]

- Meal or meal cash/voucher when flight delay results in passenger waiting for 3 hours or more for new flight

- Complimentary hotel accommodations for any passenger affected by an overnight delay

- Complimentary ground transportation to and from hotel for any

---

[60] https://www.transportation.gov/airconsumer/airline-customer-service-dashboard (last visited October 10, 2024). *See also*, htttps://www.delta.com/us/en/legal/customer-commitment (version in effect on October 21, 2024).

[61] https://www.transportation.gov/airconsumer/airline-customer-service-dashboard (last visited October 10, 2024). *See also*, htttps://www.delta.com/us/en/legal/customer-commitment (version in effect on October 21, 2024).

passenger affected by an overnight delay

## TERMS OF DELTA'S TERMS OF MODIFIED CONTRACTS OF CARRIAGE

182.   On July 22, 2024, Delta notified its customers whose travel had been disrupted due to a significantly delayed flight or canceled flight of a "Temporary Reimbursement Waiver" available to those impacted by the CrowdStrike outage, making the following available to customers:[62]

**Extending a travel waiver**. Delta extended a travel waiver for all customers with travel booked from July 19-23. The waiver offers customers the ability to make a one-time change to their itinerary. The fare difference for customers will be waived when rebooked travel occurs on or before July 28, in the same cabin of service as originally booked. Customers are encouraged to manage changes to their travel via delta.com or the Fly Delta app.

**Right to a Refund Upon Request**. Customers whose travel has been disrupted due to a canceled or significantly delayed flight may choose to cancel their travel and receive an eCredit for the unflown portion of the trip, or may instead request a refund for the unflown portion of the trip at delta.com/refund.

**Issuing SkyMiles Program miles or a travel voucher** in an amount based on the customer's affected travels.

**Covering eligible expenses** resulting from this flight disruption, including providing meal vouchers, hotel accommodations where available and ground transportation.

**Reimbursement of eligible expenses**. Customers who have incurred hotel, meal or ground transportation expenses while in transit during this operational disruption may submit eligible expenses for reimbursement.

---

[62]    https://news.delta.com/update/july-2024-operation/delta-people-working-247-restore-operation-support-customers-get-crews (last visited February 3, 2026).

**Reaching out to customers about cancellations and rebooking options.** Delta is notifying customers about delays and cancellations in their itinerary via the Fly Delta app and text message, and offering rebooking options that can be managed online.

While customers can monitor and manage their itineraries on Delta.com or on the Fly Delta app, these online tools have been inundated with traffic, causing intermittent performance challenges. Delta teams are working to stabilize those tools. Also note that our ability to respond to service messages on social media platforms such as *X* are limited.

*\*Delta does not reimburse prepaid expenses, including but not limited to hotel reservations at the customer's destination, vacation experiences, lost wages, concerts or other tickets.*

183.    On July 26, 2024, Delta represented that it was "continuing to offer several customer-focused options to ease the travel experience . . ."[63]:

What Delta is doing to make things right for customers impacted by CrowdStrike disruption

Following the CrowdStrike outage and resulting operational disruption, Delta is continuing to offer several customer-focused options to ease the travel experience and make things right.

Following the CrowdStrike outage and resulting operational disruption, Delta is continuing to offer several customer-focused options to ease the travel experience and make things right.

**Flight Cancellation/Extended Delay Refunds & Trip Cancellation Option**

Customers whose travel was disrupted due to a canceled or significantly delayed flight may choose to cancel their travel via

---

[63] https://news.delta.com/what-delta-doing-make-things-right-customers-impacted-crowdstrike-disruption (last visited February 3, 2026).

Delta.com or the Fly Delta app and receive an automatic refund for the unflown portion of the trip. Since July 19, of the refunds processed, 70% were completed via Delta.com or the app.

**No Questions Asked Trip Cancellation**

Delta is also permitting customers with travel booked from July 19-28 who chose not to travel to cancel and request a refund of the unflown portion of their trip – regardless of whether their flight was canceled or significantly delayed. Enhanced refund flexibility applies to tickets with Delta-operated flights, purchased on or before July 23.

**Out-of-Pocket Expense Reimbursement**

We know many customers who experienced a significant delay or flight cancellation incurred unplanned, out-of-pocket expenses during the disruption period, between July 19 and July 28. Delta has expanded the list of eligible expenses that may be covered for this disruption, including flight tickets purchased on other airlines in the same cabin of service or lower, train and bus tickets, rental cars and ride shares.

As part of our Delta Customer Commitment, we will continue to cover reasonable costs for additional categories of expenses.

**How to submit your expenses**

Delta's reimbursement platform on Delta.com provides customers with a seamless way to submit expenses for fast processing.

- Visit Delta's dedicated **Temporary Reimbursement Waiver** page on Delta.com and click on the **Reimbursement Form** link to begin the submission process.
- Provide your contact and flight information and upload images of your applicable receipts.
- Once the form has been submitted, check the status of your submission via the **Check Reimbursement Case Status** page. Delta has brought in additional Customer Care employees and implemented automated processes to provide customer reimbursements quickly.

50

Delta's Customer Care team has implemented several automated processing methods to speed up the reimbursement process and is committed to processing expense reimbursement requests within 30 days, likely sooner.

**Automatic Refunds for Bag and Seat Fees**

As an added gesture, Delta is automatically refunding all paid checked bag fees for customers who were charged for checking a bag since July 19 (when the disruption started). Delta is continuing to waive bag fees for up to three checked bags for customers traveling through 11:59 p.m. local time July 28.

Additionally, Delta is automatically refunding seat purchases including paid upgrade and preferred seats for customers who were not able to take advantage of those purchases. For example, if a customer paid for a Delta Comfort+ upgrade post purchase and did not travel in that upgraded seat, Delta is automatically refunding the fee.

No action is needed to receive either the baggage or upgrade fee refund; they are being processed automatically over the coming days.

For all ticket or fee refunds, customers will receive the refund back to their original form of payment. Customers may see multiple refund transactions in their credit card or bank statement as fee refunds are processed separately from flight refunds. Customers eligible for out-of-pocket expense reimbursement will receive an email with instructions on how to receive the reimbursement.

**Customer Apology Gesture**

Customers impacted by a cancellation or significant delay during the disruption period also received an email offering SkyMiles or an electronic Transportation Credit Voucher (ETCV).

**Extending a travel waiver**

Delta extended a travel waiver  for all customers with travel booked

51

from July 19-28. The waiver offers customers the ability to make a one-time change to their itinerary. The fare difference for customers will be waived when rebooked travel occurs on or before Aug. 4, in the same cabin of service as originally booked. Customers are encouraged to manage changes to their travel via delta.com or the Fly Delta app.

*Delta does not reimburse prepaid expenses, including but not limited to hotel reservations at the customer's destination, vacation experiences, lost wages, concerts or other tickets.*

184. Delta further implemented a "Temporary Reimbursement Waiver" which Delta touted as offering expanded coverage of reimbursable expenses:[64]

# Temporary Reimbursement Waiver

To help customers manage trips that have been disrupted by a global IT outage on July 19, 2024, we will temporarily expand coverage of reimbursable expenses. Review the impacted travel dates, eligibility and expanded reimbursement options below.

| AFFECTED CITIES (TO / FROM / THROUGH) | IMPACTED TRAVEL DATE(S) | REIMBURSEMENT ELIGIBILITY |
|---|---|---|
| All Delta-operated flights | July 19-28, 2024 | Expanded reimbursement applicable |

---

[64]https://web.archive.org/web/20240725234104/https://www.delta.com/us/en/advisories/other-alerts/temporary-reimbursement-waiver (last visited February 3, 2026).

For travel between July 19-28, 2024, customers experiencing a flight cancellation or significant delay (>3 hours) may request reimbursement for the following expenses incurred due to their trip disruption, above and beyond our **standard policy**:

- The fare paid to purchase another airline ticket in the same class of service, after subtracting the value of the unused Delta ticket

- Alternative transportation methods such as rental cars, rideshares, trains or buses that a customer used to reach their destination, after subtracting the value of the unused Delta ticket

- Go to our **reimbursement form** to submit your receipts

Please note, there is no change in policy for prepaid expenses. These continue to be excluded from eligible reimbursement expenses. As a reminder, our **standard reimbursement policy** will apply to all travel occurring before July 19 or after July 28, 2024.

185. To obtain reimbursement under the Temporary Reimbursement Waiver, Delta instructed consumers to complete a reimbursement request form.[65]

186. In addition, on July 25, U.S. Secretary of Transportation Pete Buttigieg made clear in a statement on his X (formerly Twitter) account: "If you've racked up out-of-pocket expenses on hotels, meals, alternative flights, etc. Delta is required to reimburse passengers."[66]

---

[65] https://www.delta.com/reimbursement/ (version in effect on October 16, 2024).

[66] https://x.com/SecretaryPete/status/1816550304533369165 (last visited February 3, 2026).

## DELTA FORCES CONSUMERS TO ACCEPT PARTIAL REIMBURSEMENTS IN EXCHANGE FOR A WAIVER OF LEGAL CLAIMS

187.   Nowhere on Delta's websites, or on the reimbursement request form, does it state that Delta will provide partial reimbursements.  Further, nowhere on these sites does Delta disclose that accepting a partial reimbursement requires consumers to release their legal claims against Delta.

188.   To add insult to injury, when consumers receive email notifications about a partial reimbursement offered by Delta, those email notifications do not contain the legal waiver.

189.   Only after consumers click on the button to accept the partial reimbursement does Delta disclose – for the first time – that acceptance of the partial reimbursement releases consumers' legal claims against Delta.

190.   Delta's waiver is reproduced in full below:

By accepting payment, you acknowledge this payment as full settlement of and hereby releases Delta Air Lines, Inc. from any and all claims the undersigned may have against Delta Air Lines, Inc. to this date.

191.   Delta's waiver is unconscionable and unenforceable because it fails to inform consumers of their legal rights, namely their "right to a refund if that is the case before making an offer for alternative transportation, travel credits, vouchers,

or other compensation in lieu of refunds."[67]

192.   Additionally, Delta's partial reimbursement amounts are only a fraction of what passengers are entitled to.

193.   Plaintiffs filed a class action lawsuit against Delta on August 6, 2024. Since then, Delta has continued to communicate with putative class members, but fails to disclose the existence of this class action lawsuit against Delta.

194.   Delta continues to conceal the fact that it is subject to a class action lawsuit and instead continues to send partial reimbursement checks containing a release without informing consumers of the legal claims that are the subject of this lawsuit.

**Delta's Failures Prompt Federal Scrutiny**

195.   On July 23, Secretary Buttigieg released a statement that the Department of Transportation had opened an investigation into Delta "to ensure the airline is following the law and taking care of its passengers during continued widespread disruptions."[68] By that time, the Department of Transportation had received more than 3,000 complaints against Delta.[69]

---

[67] https://www.govinfo.gov/content/pkg/FR-2024-04-26/pdf/2024-07177.pdf (last visited February 3, 2026).

[68] https://www.npr.org/2024/07/23/nx-s1-5049792/deltas-airlines-delays-and-cancelations-prompt-dot-investigation (last visited February 3, 2026).

[69] https://www.washingtonpost.com/transportation/2024/07/26/delta-canceled-flights-investigation-crowdstrike/# (last visited February 3, 2026).

196.   In a news conference later that day, Secretary Buttigieg stated:

There's a lot of things I'm very concerned about, including people being on hold for hours and hours, trying to get a new flight, people having to sleep on airport floors, even accounts of unaccompanied minors being stranded in airports, unable to get on a flight.

197.   On July 24, Secretary Buttigieg posted to his X (formerly Twitter) account the following: "On hold for hours, sleeping on airport floors, unaccompanied minors stranded—these are the stories we are hearing from Delta passengers."[70]

198.   According to The Washington Post, the Department of Transportation's investigation was examining text messages sent by Delta to passengers "that regulators say did not spell out their rights to a refund."[71]

199.   In addition to the Department of Transportation's investigation, on July 23, U.S. Senator Maria Cantwell (D-Wash.), Chair of the Senate Committee on Commerce, Science and Transportation, sent a letter to Delta Air Lines CEO Ed Bastian regarding the airline's operational and customer communications problems in the wake of the CrowdStrike outage.[72]

200.   In the letter, Senator Cantwell expressed concern "that Delta is failing

---

[70] https://x.com/SecretaryPete/status/1816147652288913674 (last visited February 3, 2026).

[71] https://www.washingtonpost.com/transportation/2024/07/26/delta-canceled-flights-investigation-crowdstrike/# (last visited February 3, 2026).

[72] https://www.commerce.senate.gov/services/files/374240F2-C0B2-4B38-8B64-37678CDF9D28 (last visited February 3, 2026).

to meet the moment and adequately protect the needs of passengers."[73]

201.   In particular, Senator Cantwell expressed concern that Delta was violating Section 503 the Federal Aviation Administration Reauthorization Act of 2024, which codified the right to a refund for airline passengers whose flights are canceled, significantly delayed, or significantly changed.[74]

202.   Senator Cantwell stated that "Delta's public website does not accurately and transparently reflect a passenger's legal right to a refund."[75]

203.   Similarly, Section 505 of the FAA law provides that "customers should be able to access real-time assistance from customer service agents of air carriers without an excessive wait time, particularly during times of mass disruptions."[76]   In her letter, Senator Cantwell noted reports of Delta's failure to connect passengers with its customer service representatives.[77]

204.   Senator Cantwell demanded Delta to "make clear to all its customers subjected to cancellations and significant delays and changes, including as a result of the technology outage, that they are entitled to refunds as a matter of law" and that Delta "should invest significant resources into its customer service operations

---

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id*.

[77] *Id.*

to ensure that customers are made whole in short order."[78]

## CLASS ACTION ALLEGATIONS

205.   Plaintiffs bring this action, individually, and on behalf of a nationwide

class, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3),

defined as follows:

> All persons in the United States who purchased airline tickets through
> Delta, or for flights on Delta, to, from or within the States, and
> incurred a significant delay and/or sought to cancel their flights or had
> their flights cancelled, between July 19, 2024 and July 31, 2024.[79]

206.   Plaintiffs also bring this class action on behalf of the following

Subclasses:

### **Montreal Convention Class**

All persons who purchased airline tickets through Delta, or for flights
on Delta, to or from a Member State[80] of the Montreal Convention
and incurred a significant delay and/or sought to cancel their flights or
had their flights cancelled, between July 19, 2024 and July 31, 2024.

### **The International Class**

All persons who purchased airline tickets through Delta, or for flights
on Delta, to or from the United States and another Country and
incurred a significant delay and/or sought to cancel their flights or had
their flights cancelled, between July 19, 2024 and July 31, 2024.

### **The Canadian Class**

---

[78] *Id.*

[79] Plaintiffs reserve the right to amend or add to the timeframe included in the
definition of the Class after conducting discovery.

[80] *See* fn. 83 for a list of Member States of the Montreal Convention.

All persons who purchased airline tickets through Delta, or for flights on Delta, to or from Canada and the United States and incurred a significant delay and/or sought to cancel their flights or had their flights cancelled, between July 19, 2024 and July 31, 2024.

**The Domestic Class**

All persons who purchased airline tickets through Delta, or for flights on Delta, wholly within the United States and incurred a significant delay and/or sought to cancel their flights or had their flights cancelled, between July 19, 2024 and July 31, 2024.

207. Excluded from the Class(es) are: (a) Defendant; (b) Defendant's affiliates, agents, employees, officers, and directors; and (c) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

208. **Numerosity:** Upon information and belief, the Classes are so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Classes are unknown at this time, such information being in the sole possession of Delta and obtainable by Plaintiffs only through the discovery process, upon information and belief, the Classes consist of more than a million Delta customers. The number of Class members can be determined based on Delta's records.

209. **Commonality:** Common questions of law and fact exist as to all members of each Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but

are not limited to:

    a.    Whether Delta violated the Montreal Convention;

    b.    Whether Delta breached its International Contract of Carriage;

    c.    Whether Delta breached its Canadian Contract of Carriage;

    d.    Whether Delta breached its Domestic Contract of Carriage;

    e.    Whether Delta breached its International Contract of Carriage as modified by its Temporary Reimbursement Waiver;

    f.    Whether Delta breached its Canadian Contract of Carriage as modified by its Temporary Reimbursement Waiver; and/or

    g.    Whether Delta breached its Domestic Contract of Carriage as modified by its Temporary Reimbursement Waiver.

210. **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members.  Plaintiffs' and Class members' claims all arise out Delta's uniform Contracts of Carriage, uniform modifications of Contracts of Carriage, uniform breaches of Contracts, and/or uniform causes of substantial delays and/or cancellations of rebookings or the option to rebook; and/or uniform application and violation of the Montreal Convention.

211. **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Classes and are committed to pursuing this action vigorously.  Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation.  Accordingly, Plaintiffs and their counsel will fairly and

adequately protect the interests of the Classes.

212. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Classes. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Delta's conduct. It would be virtually impossible for members of the Classes individually to effectively redress the wrongs done to them. Even if the members of the Classes could afford such individual litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly-situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

213. Delta has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Classes as a whole.

## COUNT I

### VIOLATION OF THE MONTREAL CONVENTION
### (DELAY IN CARRIAGE OF PASSENGERS AND BAGGAGE)

### (On behalf of Plaintiffs Kuk, Moorman, Bajra, Muzzi, Khaku, and the Montreal Convention Class)

214.   Plaintiffs Kuk, Moorman, Bajra, Muzzi, and Khaku restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

215.   The Montreal Convention applies to all "international carriage" of persons, baggage, or cargo performed by aircraft for reward.  It applies equally to gratuitous carriage by aircraft performed by an air transport undertaking.

216.   For the purposes of the Montreal Convention, the expression "international carriage" means any carriage in which, according to the agreement between the parties, the place of departure and the place of destination, whether or not there be a break in the carriage or a transshipment, are situated either within the territories of two State Parties, or within the territory of a single State Party if there is an agreed stopping place within the territory of another State, even if that State is not a State Party.  Carriage between two points within the territory of a State Party without an agreed stopping place within the territory of another State is not international carriage for the purposes of this Convention.

217.   Article 19 of the Montreal Convention sets forth the private cause of

action for money damages caused by delay or cancellation of international airfare transportation against airlines: "The carrier is liable for damage occasioned by delay in the carriage by air of passengers, baggage or cargo."

218. The United States is a signatory to the Montreal Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999 (entered into force on Nov. 4, 2003) reprinted in S. Treaty Doc. No. 106-45, since 05-28-1999.

219. The United States of America and Mexico, the Netherlands, and Canada, as well as 135 other member countries,[81] are signatories to the Montreal

---

[81] *E.g.*, Albania; Fiji; North Macedonia; Argentina; Finland; Norway; Armenia; France; Oman; Australia; Gabon; Pakistan; Austria; Gambia; Panama; Azerbaijan; Georgia; Paraguay; Bahamas; Germany; Peru; Bahrain; Ghana; Philippines; Bangladesh; Greece; Poland; Barbados; Guatemala; Portugal; Belgium; Guyana; Qatar; Belize; Honduras; Republic of Korea; Benin; Hungary; Republic of Moldova; Bolivia; Iceland; Romania; Bosnia and Herzegovina; India; Russian Federation; Botswana; Indonesia; Rwanda; Brazil; Ireland; Saint Vincent and the Grenadines; Brunei Darussalam; Israel; Saudi Arabia; Bulgaria; Italy; Senegal; Burkina; Faso; Jamaica; Serbia; Cabo Verde; Japan; Seychelles; Cambodia; Jordan; Sierra Leone; Cameroon; Kazakhstan; Singapore; Canada; Kenya; Slovakia; Central African Republic; Kuwait; Slovenia; Chad; Latvia; South Africa; Chile; Lebanon; Spain; China; Lithuania; Sri Lanka; Colombia; Luxembourg; Sudan; Congo; Madagascar; Sweden; Cook Islands; Malaysia; Switzerland; Costa Rica; Maldives; Syrian; Arab Republic; Côte d'Ivoire; Mali; Thailand; Croatia; Malta; Togo; Cuba; Mauritius; Tonga; Cyprus; Tunisia; Czech Republic; Monaco; Turkey; Democratic Republic of the Congo; Mongolia; Uganda; Denmark; Montenegro; Ukraine; Dominican Republic; Morocco; United Arab Emirates; Ecuador; Mozambique; United Kingdom; Egypt; Namibia; United Republic of Tanzania; El Salvador; Nepal; Equatorial Guinea; Netherlands; Uruguay; Estonia; New Zealand; Vanuatu; Eswatini; Niger; Viet Nam; Ethiopia; Nigeria; Zambia.

Convention of 1999.

220.   Article 33(1) of the Montreal Convention provides that: "An action for damages must be brought, at the option of the plaintiff, in the territory of one of the States Parties, either before the court of the domicile of the carrier or of its principal place of business, or where it has a place of business through which the contract has been made or before the court at the place of destination."

221.   Plaintiffs Kuk, Moorman, Bajra, Muzzi, Khaku, and the Montreal Convention Class entered into binding legal agreements for international airfare transportation (a) from a specific airport in the United States of America to a specific airport in a Member Country; and/or (b) from a specific airport in a Member Country[82] to a specific airport in the United States of America.   For example, Plaintiff Moorman entered into a binding legal agreement for four (a) international airfare transportation tickets from an airport in Cincinnati, Ohio to an airport in Puerto Escondido, Mexico; and four (b) international airfare transportation tickets from Puerto Escondido, Mexico to a specific airport in the United States of America, namely an airport in Cincinnati, Ohio.

222.   Similarly, Plaintiff Kuk entered into a binding legal agreement for roundtrip international airfare transportation from an airport in Ontario, Canada to Las Vegas, Nevada; Plaintiff Bajra entered into a binding legal agreement for

---

[82] *See id.* (listing the Montreal Convention Member Countries).

roundtrip international airfare tickets from an airport in Denver, Colorado to The Netherlands; Plaintiff Muzzi entered into a binding legal agreement for international airfare transportation from an airport in The Netherlands to Fort Lauderdale, Florida; and Plaintiff Khaku entered into a binding legal agreement for international airfare transportation from an airport in Orlando, Florida to Dubai, United Arab Emirates.

223. Any and all terms, conditions, covenants, and liabilities arising from said contract are governed by the Montreal Convention.

224. On Plaintiff Moorman and her family's return flight from Puerto Escondido, Mexico to Cincinnati, Ohio, Plaintiff's connecting flight was significantly delayed and was subsequently canceled by Delta. Similarly, one or more of the flights of Plaintiffs Kuk, Bajra, Muzzi, and Khaku were significantly delayed and subsequently canceled by Delta.

225. The flight delays and/or cancellations were not caused by "extraordinary circumstances" within the meaning of the Montreal Convention, which could not have been avoided in due exercise of due diligence or another pertinent legal standard of care by the Delta.

226. As discussed, Delta's outdated tech systems are fully within Delta's control, and Delta's unwillingness to accept assistance from Microsoft and CrowdStrike caused the delays in Delta's operations to return to a state of

normalcy.

227.   Delta did not pursue all meaningful actions required to avoid or mitigate impact of extraordinary circumstances.[83]

228.   "Extraordinary circumstances" is limited and applies only in certain circumstances where the airline can prove the cancellation or delay was caused "by ***political instability, meteorological conditions incompatible with the operation of the flight concerned, security risks, unexpected flight safety shortcomings and strikes*** that affect the operation of an operating aircraft." (emphasis added). Moreover, even the listed events do not "themselves constitute extraordinary circumstances, but only . . . may produce such circumstances." *Wallentin-Hermann v. Alitalia*, European Court of Justice, Case No C-549/07, Judgment of December 22, 2008, ¶ 22.

229.   That "extraordinary circumstances" do not include technical or mechanical problems except in the rare instances where the airline can prove those problems are due to hidden, inherent manufacturing defects or aircraft damage caused by sabotage. *Id.* at ¶ 26 (mechanical problems may constitute extraordinary

---

[83]   *Cf. Ronald Huzar v. Jet2.com Ltd.*, [2014] EWCA Civ. 791, Case No: B2/2013/3277/CCRTF (Royal Courts of Justice, London, England, 11 June 2014) (holding that technical problems, which may be unforeseeable, but are ultimately caused by an event inherent in the running of an aircraft, and cannot therefore be considered to be an extraordinary circumstance). *See* https://www.bottomline.co.uk /wp-content/uploads/2013/10/179933236-Jet2-appeal.pdf (last visited October 16, 2024).

circumstances only when "it was revealed by the manufacturer of the aircraft compromising the fleet of the air carrier concerned, or by competent authority, that those aircraft, although already in service, are affected by a hidden manufacturing defect which impinges on the flight safety" or where there was "damage to aircraft caused by acts of sabotage"); *see also Sturgeon v. Condor Flugdienst GmbH*, European Court of Justice, Case No. C-402/7, Judgment of November 19, 2009 (reiterating that technical problems are not extraordinary circumstances in context of "technical faults on the plane and illness among the crew").

230.   In accordance with Article 19 of the Montreal Convention, Defendant is liable for damages caused by delay and/or cancellation of international carriage of passengers.

231.   As a direct and proximate cause of delay and/or cancellation of the above identified international airfare, Plaintiff Moorman, Kuk, Moorman, Bajra, Muzzi, Khaku, and the members of the Montreal Convention Class were damaged. Plaintiff Moorman incurred out-of-pocket expenses in the amount of approximately $2,000.  Plaintiff Kuk incurred out-of-pocket expenses in excess of $3,000.00.   Plaintiff Bajra incurred out-of-pocket expenses in the amount of $1,975.  Plaintiff Muzzi incurred out-of-pocket expenses in the amount of €5,000. Additionally, Plaintiff Khaku incurred out-of-pocket expenses in the amount of $650.

232.  At all times material hereto, Defendant refused to compensate Plaintiff Moorman, Kuk, Bajra, Muzzi, Khaku, and other members of purported Class, or conditioned compensation on Plaintiff Moorman, Kuk, Bajra, Muzzi, Khaku, and those similarly situated on a waiver of their legal rights.

233.  As a direct and proximate cause of Defendant's significant delay and ultimate cancellation of the international flight and/or failure to mitigate Plaintiffs' damages by providing alternative air transportation, ground transportation, hotel accommodations, and/or meals, Plaintiff Moorman, Kuk, Bajra, Muzzi, Khaku, and other members of the Montreal Convention Class incurred out-of-pocket expenses as set forth above.

234.  As described more fully above, Plaintiff Moorman's baggage was delayed by 2 – 3 days.  Plaintiff Moorman made additional trips to the Cincinatti, Ohio airport she otherwise would not have made but for Delta's delay, which resulted in incurring additional expenses to Plaintiff Moorman as described above. Similarly, Plaintiff Kuk was forced to purchase a flight with a different airline and a rental vehicle he would not have otherwise incurred, as described more fully above.  Further, Plaintiff Bajra was forced to purchase a flight with a different airline that he would not have otherwise incurred, as described more fully above. Further, Plaintiff Muzzi's baggage was delayed by 15 days, which resulted in incurring additional expenses Plaintiff Muzzi would not have otherwise incurred,

as described more fully above. Additionally, Plaintiff Khaku's baggage was lost and to date has not been returned to Plaintiff Khaku, nor has Delta reimbursed Plaintiff Khaku for the lost baggage.

235. Plaintiff Moorman submitted an online claim for reimbursement of out-of-pocket expenses on or about July 25, 2024. Plaintiff Kuk submitted an online claim for reimbursement of out-of-pocket expenses on or about July 26, 2024. Plaintiff Bajra submitted an online claim for reimbursement of out-of-pocket expenses on or about July 31, 2024. Plaintiff Muzzi submitted an online claim for reimbursement of out-of-pocket expenses on or about August 4, 2024.

236. Pursuant to Article 19 of Montreal Convention Defendant is statutorily obligated to compensate Plaintiffs Moorman, Kuk, Bajra, Muzzi, Khaku, and the members of the Montreal Convention Class for their damages caused by the significant delay and/or cancellation of the flights between July 19, 2024 and July 28, 2024.

## COUNT II

### BREACH OF INTERNATIONAL CONTRACT OF CARRIAGE AND CANADIAN CONTRACT OF CARRIAGE AS MODIFIED BY THE TEMPORARY REIMBURSEMENT WAIVER

**(On behalf of Plaintiffs Kuk, Moorman, Bajra, Muzzi, Khaku, and the International Class, the Canadian Class, and the Montreal Convention Class)**

237. Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

238.  Delta's International Contract of Carriage provides as follows:

**A. Contract of Carriage**

When you buy a ticket for travel on Delta, you enter into a contract with us, and you agree to be bound by its terms. The terms of your contract (the "Contract of Carriage") are set forth in:
• your Ticket;
• these Conditions of Carriage; and
• our published fare rules and regulations, which may govern the calculation of the fare and other charges that apply to your itinerary ("Fare Rules").

This document is Delta's International Conditions of Carriage. It applies to travel on any itinerary for International Carriage and states the terms upon which Delta offers to transport passengers.

239.  Delta's Canadian Contract of Carriage provides as follows:

**A. Contract of Carriage**

When you buy a ticket for travel on Delta, you enter into a contract of carriage with us. The terms of your contract are set forth in:
• your Ticket
• these Conditions of Carriage
• our published fare rules and regulations, which may govern the calculation of the fare and other charges that apply to your itinerary. If your ticket is priced by delta.com, a Delta agent, or a computer reservation system, these fare rules and regulations will be included in the calculation of the ticket price that we quote to you.

240.  This Count arises out of Delta's International Contract of Carriage (Plaintiffs Moorman, Bajra, Muzzi, and Khaku) and/or the Canadian Contract of Carriage (Plaintiff Kuk).

241.  Plaintiffs, along with all putative class members, entered into a

Contract of Carriage with Defendant for provision of air travel in exchange for payment.

242.   The International Contract of Carriage and/or the Canadian Contract of Carriage were each drafted by Defendant.

243.   Plaintiffs, and all putative class members, performed under the International Contract of Carriage and/or Canadian Contract of Carriage, specifically, by tendering payment for the airline tickets to Defendant and complied with all conditions precedent under the respective Contract.

244.   Delta's International Canadian Contract of Carriage defines "Carrier" as "any air carrier shown as a participant in this tariff."  Delta is a participant in this tariff.  The Delta Canadian Contract of Carriage defines "Carrier" as "any airline shown as a participant in this tariff."  Delta is a "Carrier" under both Contracts of Carriage as it is a carrier and an airline shown as a participant in the respective tariff.

245.   Although Delta's Canadian Contract of Carriage limits Delta's "Liability in the Event of Schedule Changes, Delays and Flight Cancellations" in RULE 240(B) (regarding Refunds) and Delta's "Liability for Additional Amenities in the Event of Schedule Changes, Delays and Flight Cancellations" in RULE 240(C) (regarding what Delta refers to as Additional Amenities), Delta's Canadian Contract of Carriage also contains contractual terms that contradict such terms as it

relates to passengers subject to the Montreal Convention and/or Warsaw Convention. *See* Rule 191 to Delta's Canadian Contract of Carriage.

246.   In particular, Rule 191 of the Canadian Contract of Carriage provides, in pertinent part:

**RULE 191: LIABILITY OF CARRIERS**

For the purpose of International Carriage governed by the Montreal Convention, the Liability rules set out in the Montreal Convention are fully incorporated herein and shall supersede and prevail over any provisions of this tariff which may be inconsistent with those rules. To the extent that they are not inconsistent with the foregoing, the following provisions shall apply:
[…]
3) The Carrier shall be liable for damage occasioned by delay in the carriage of passengers by air, as provided in the following paragraphs:
[…]
c) Damages occasioned by delay are subject to the terms, limitations and defenses set forth in the Warsaw Convention and the Montreal Convention, whichever may apply. They include foreseeable compensatory damages sustained by a passenger and do not include mental injury damages.
d) The Carrier reserves all defenses and limitations available under the Warsaw Convention or the Montreal Convention, whichever may apply, to claims for damage occasioned by delay, including, but not limited to, the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention. Under the Montreal Convention, the liability of the Carrier for damage caused by delay is limited to 5,346 Special Drawing Rights per passenger. The limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22(5) of the Montreal Convention, whichever may apply.

4) The Carrier is liable for damages sustained in the case of destruction or loss of, damage to, or delay of checked and unchecked baggage, as provided in the following paragraphs:

a) Except as provided below, the liability of the Carrier is limited to 1,288 Special Drawing Rights for each passenger in the case of destruction, loss, damage, or delay of baggage, whether checked or unchecked, under the Warsaw Convention or the Montreal Convention, whichever may apply. […]

[…]

e) The Carrier reserves all defenses and limitations available under the Warsaw Convention and the Montreal Convention, whichever may apply to such claims including, but not limited to, the defense of Article 20 of the Warsaw Convention and Article 19 of the Montreal Convention, and the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention, except that the Carrier shall not invoke Article 22(2) and (3) of the Warsaw Convention in a manner inconsistent with paragraph 4(a) hereof. The limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22(5) of the Montreal Convention, whichever may apply.

247.    Additionally, Delta's Canadian Contract of Carriage provides:

Except as stated in this rule **and as provided in Rule 191**, Delta will have no liability for making connections, failing to operate any flight according to schedule, changing the schedule for any flight, changing seat assignments or aircraft types, or revising the routings by which Delta carries the passenger from the ticketed origin to destination.

*See also* ¶¶ 15-18 *infra.  See also* Rule 240(A).

248.    Similarly, although Delta's International Contract of Carriage provides terms regarding Delta's "Liability in the Event of Schedule Changes, Delays and Flight Cancellations" in RULE 20(A) (regarding Refunds) and Delta's "Liability for Additional Amenities in the Event of Schedule Changes, Delays and Flight Cancellations" in RULE 20(B) (regarding what Delta refers to as Additional

Amenities), Delta's International Contract of Carriage also contains contractual terms that contradict such terms as it relates to passengers subject to the Montreal Convention and/or Warsaw Convention.

249. Similar to the Canadian Contract of Carriage, Delta's International Contract of Carriage provides that "Damages occasioned by delay are subject to the terms, limitations and defenses set forth in the Warsaw Convention and the Montreal Convention, whichever may apply. They include foreseeable compensatory damages sustained by a passenger and do not include mental injury damages," as set forth, in pertinent part, as follows:

**RULE 18: LIABILITY OF CARRIERS; CODESHARE RULES**

[…]

B) LAWS AND PROVISIONS APPLICABLE

[...]

3) The Carrier shall be liable for damage occasioned by delay in the carriage of passengers by air, as provided in the following paragraphs: [...]

    a) The Carrier shall not be liable if it proves that it and its servants and agents took all measures that could reasonably be required to avoid the damage, or that it was impossible for it or them to take such measures.

    b) Airport, air traffic control, security, and other facilities or personnel, whether public or private, not under the control and direction of the Carrier are not servants or agents of the Carrier, and the Carrier is not liable to the extent the delay is caused by these kinds of facilities or personnel.

c) Damages occasioned by delay are subject to the terms, limitations and defenses set forth in the Warsaw Convention and the Montreal Convention, whichever may apply. They include foreseeable compensatory damages sustained by a passenger and do not include mental injury damages.

d) The Carrier reserves all defenses and limitations available under the Warsaw Convention or the Montreal Convention, whichever may apply, to claims for damage occasioned by delay, including, but not limited to, the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention. Under the Montreal Convention, the liability of the Carrier for damage caused by delay is limited to 5,346 Special Drawing Rights per passenger. The limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22(5) of the Montreal Convention, whichever may apply.

4) The Carrier is liable for damages sustained in the case of destruction or loss of, damage to, or delay of checked and unchecked baggage, as provided in the following paragraphs:

a) Except as provided below, the liability of the Carrier is limited to 1,288 Special Drawing Rights for each passenger in the case of destruction, loss, damage, or delay of baggage, whether checked or unchecked, under the Warsaw Convention or the Montreal Convention, whichever may apply. Unless the passenger proves otherwise:

1) all baggage checked by a passenger shall be considered to be the property of that passenger;

2) a particular piece of baggage, checked or unchecked, shall not be considered to be the property of more than one passenger; and

3) unchecked baggage, including personal items, shall be considered to be the property of the passenger in possession of the baggage at the time of embarkation.

b) Normal carrier limit of liability will be waived for substantiated claims involving loss, damage, or delay in delivery to mobility aids such as wheelchairs, walkers, crutches, scooters and other mobility aid, when such items have been accepted into the care of the carrier as checked baggage or otherwise. The liability of carrier for substantiated claims involving the loss of, damage to, or delay in delivery of mobility aids, when such items have been accepted as checked baggage or otherwise, is based on the cost of the repair or replacement value of the mobility aid. For damaged or delayed wheelchairs, walkers, crutches, scooters and other mobility aids if a damaged aid can be repaired, Carrier will arrange, at its expense, for the prompt and adequate repair of the aid and for its return to the passenger as soon as reasonably possible. Carrier will use reasonable efforts to obtain a temporary aid without undue delay while the passenger's mobility aid is being repaired or returned.

c) In the case of unchecked baggage, the Carrier is liable only to the extent the damage resulted from its fault, or that of its servants or agents.

d) The Carrier is not liable for destruction, loss, damage, or delay of baggage not in the charge of the Carrier, including baggage undergoing security inspections or measures not under the control and direction of the Carrier.

e) The Carrier reserves all defenses and limitations available under the Warsaw Convention, and the Montreal Convention, whichever may apply to such claims including, but not limited to, the defense of Article 20 of the Warsaw Convention and Article 19 of the Montreal Convention, and the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention, except that the Carrier shall not invoke Article 22(2) and (3) of the Warsaw Convention in a manner inconsistent with paragraph 4(a) hereof. The limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22(5) of the Montreal Convention, whichever may apply.

f) Under the Warsaw Convention and the Montreal Convention, whichever may apply, an action for damages must be brought within two years, and a complaint must be made to the Carrier within seven

calendar days in the case of damage to baggage, and 21 calendar days in the case of delay to baggage.

*See* International General Rules Tariff at 17-19 of 36.

250.   Concerning Baggage, Delta's International Contract of Carriage provides:

**RULE 17: BAGGAGE**

[…]

**B. Baggage Liability**
**1. General Limitation of Liability for Loss of, Damage to, or Delay in Delivery of Baggage**

Delta's liability for loss, damage, or delay in the delivery of a passenger's checked baggage, carry-on baggage, or other personal property tendered to Delta in connection with air transportation on Delta shall be limited to proven damage or loss and shall be governed by Rule 18 of these Conditions of Carriage (Liability of Carriers).

*See id.* at 17 of 36.

251.   Delta's International General Rules Tariff further provides as follows:

**RULE 25: LIMITATION OF LIABILITY**

INTERNATIONAL TRAVEL ON DELTA IS SUBJECT TO THE RULES RELATING TO LIMITATIONS OF LIABILITY AND ALL OTHER PROVISIONS OF THE WARSAW CONVENTION AND MONTREAL CONVENTION, AS AMENDED. FOR INFORMATION ON DELTA'S LIABILITY UNDER THE WARSAW CONVENTION AND MONTREAL CONVENTION, SEE RULE 18 OF THESE CONDITIONS OF CARRIAGE.

252.   Article 25 of the Montreal Convention provides as follows:

**Article 25 — Stipulation on Limits**

A carrier may stipulate that the contract of carriage shall be subject to higher limits of liability than those provided for in this Convention or to no limits of liability whatsoever.

253.  Article 26 of the Montreal Convention provides as follows:

**Article 26 — Invalidity of Contractual Provisions**
Any provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid down in this Convention shall be null and void, but the nullity of any such provision does not involve the nullity of the whole contract, which shall remain subject to the provisions of this Convention.

254.  Article 27 of the Montreal Convention provides:

**Article 27 — Freedom to Contract**
Nothing contained in this Convention shall prevent the carrier from refusing to enter into any contract of carriage, from waiving any defences available under the Convention, or from laying down conditions which do not conflict with the provisions of this Convention.

255.  Article 29 of the Montreal Convention provides:

**Article 29 — Basis of Claims**
In the carriage of passengers, baggage and cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights. In any such action, punitive, exemplary or any other non-compensatory damages shall not be recoverable.

256.  Due to Defendant's significant delays and/or cancellation of their flights, Plaintiffs and all members of the Classes did not get the benefit of their bargain with Defendant.

257.   Despite the substantial delays and/or cancellations, Delta failed to transport Plaintiffs within a reasonable period of time on a Delta flight or otherwise and/or failed to mitigate Plaintiffs' damages for out-of-pocket expenses incurred as a result of the substantial delay and/or cancellation.

258.   As a result of the foregoing, Plaintiffs were damaged.

259.   To the extent that the International Contract of Carriage attempts to relieve the carrier of liability or fix a lower limit than which is laid down in the Montreal Convention, the provision is null and void under Article 26 of the International Contract of Carriage:

### Article 26 — Invalidity of Contractual Provisions

Any provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid down in this Convention shall be null and void, but the nullity of any such provision does not involve the nullity of the whole contract, which shall remain subject to the provisions of this Convention.

260.   Additionally, during the CrowdStrike outage Delta modified the terms of the International Contract of Carriage without prior notice, which was within its right under the terms of the International Contract of Carriage as described below:

### RULE 1: General Provisions

### […]

### B. Amendments to Conditions of Carriage

Delta may amend these Conditions of Carriage *at any time*, except as provided by law. Your travel is governed by the rules that were in

effect on the date you purchased your ticket; provided, however, that *Delta reserves the right to apply rules currently in effect on the date of your travel where reasonably necessary for operational reasons and where the change in rule does not have a material negative impact upon you*. No Delta employee or ticketing agent has the authority to modify any provision of the Conditions of Carriage unless authorized in writing by a Delta corporate officer.

(emphasis added).

261. Thus, Delta preserved the right to modify the terms of International Contract of Carriage after the date of purchase without additional consideration as set forth above in Rule No. 1. The consideration that Delta received for the right to make such modifications was the price that Plaintiffs paid for their ticket or other valuable consideration.

262. Similarly, during the CrowdStrike outage Delta modified the terms of the Canadian Contract of Carriage without prior notice, which was within its right under the terms of the Canadian Contract of Carriage as described below:

**RULE 1: General Provisions**

**[…]**

**D.  Amendments to Conditions of Carriage**

**1.  Amendment by Delta**

Delta may amend these Conditions of Carriage *at any time*, except as provided by law. *Your travel will be governed by the rules that were in effect on the date you purchased your ticket; provided, however, that Delta reserves the right to apply rules currently in effect on the date of your travel where reasonably necessary for operational reasons and where the change in rule does not have a material*

*negative impact upon you.*

## 2. Authority of Delta Employees & Ticketing Agents

No Delta employee or ticketing agent has the authority to modify any provision of the Conditions of Carriage unless authorized by a Delta corporate officer. Delta appointed agents and representatives are only authorized to sell tickets for air transportation pursuant to the approved fares, rules and regulations of Delta. This rule supersedes any conflicting provision in the contract of carriage.

(emphasis added).

263.   Thus, Delta preserved the right to modify the terms of its Canadian Contract of Carriage after the date of purchase without additional consideration as set forth above in Rule No. 1.  The consideration that Delta received for the right to make such modifications was the price that Plaintiffs paid for their ticket or other valuable consideration.

264.   Indeed, during the period of the CrowdStrike outage, Delta modified the International Contract of Carriage and the Canadian Contract of Carriage by adding a Temporary Reimbursement Waiver and a Temporary Travel Waiver to its International Contract of Carriage and Canadian Contract of Carriage, which modified the Contracts in a way which expanded the out-of-pocket expenses available for reimbursement under the International Contract of Carriage and the Canadian Contract of Carriage as described above in the event of a significant delay and/or cancellation from July 19, 2024 to July 28, 2024.

265.   The expansion of out-of-pocket expenses modification was reasonably

necessary for operational reasons because a passenger who found alternative transportation was a passenger who no longer needed a ride on a Delta flight. This reduced the backlog of passengers who needed transportation and put less stress on Delta's IT systems and opened up more airplane seats on available Delta flights. Expanding the reimbursement for hotel and meal expenses beyond what was provided for in the original contract of carriage was also reasonably necessary for operational reasons because passengers who are in a hotel room are not in the limiting seating area at the airport – giving more space and reducing the chaos one passenger at a time. Furthermore, a well-fed passenger and non-sleep deprived passenger is a less angry passenger – which helps the agents dealing with stranded passengers.

266.   The expansion of out-of-pocket expenses provision modification of the International Contracts of Carriage and the Canadian Contract of Carriage was also a change in a rule that did not have a material negative impact on passengers. In fact, it had a material positive impact on passengers as passengers who incurred out-of-pocket expenses that exceeded those available under the International Contract of Carriage now should be able to recover under the modified International Contract of Carriage for these now-covered out-of-pocket expenses.

267.   As a result of Defendant's breaches of the International Contract of Carriage and the Canadian Contract of Carriage as modified by the Temporary

Reimbursement Waiver and Temporary Travel Waivers, Plaintiffs and the putative members of the Classes have incurred contractual damages in an amount to be proven at trial, including the cost of replacement tickets on other airlines, ground transportation, hotels, meals, and other out-of-pocket expenses and, as a result, are not any specific monetary cap on liability.

268.    As a result of Delta's breach of the International Contract of Carriage and the Canadian Contract of Carriage as modified, and failure to reasonably reimburse compensatory damages and out-of-pocket expenses under its contractual terms, Plaintiffs and the Classes have been damaged.

## <u>COUNT III</u>

### BREACH OF INTERNATIONAL CONTRACT OF CARRIAGE AND/OR CANADIAN CONTRACT OF CARRIAGE FOR REFUND AND/OR REIMBURSEMENT OF OUT-OF-POCKET EXPENSES

**(On behalf of Plaintiffs Kuk, Moorman, Bajra, Muzzi, Khaku, and the International Class, the Canadian Class, and the Montreal Convention Class)**

269.    Plaintiffs incorporate all prior paragraphs as if fully set forth herein except for the allegations set forth in Paragraphs 238-268.

270.    This Count arises out of Delta's International Contract of Carriage (Plaintiffs Moorman, Bajra, Muzzi, and Khaku) and/or the Canadian Contract of Carriage (Plaintiff Kuk).

271.    Plaintiffs, along with all putative class members, entered into a Contract of Carriage with Defendant for provision of air travel in exchange for

payment, which includes terms governing delays, cancellations, refunds, and baggage.

272.   The International Contract of Carriage and/or the Canadian Contract of Carriage were each drafted by Defendant.

273.   Delta's Canadian Contract of Carriage expressly incorporates the Montreal Convention and limits liability consistent with Articles 19, 22, 25, and 29 of the Convention.

274.   Rule 18(B)(3)(a)-(d) of the International Contract of Carriage governs liability for "damage occasioned by delay in the carriage of passengers by air." Rule 18(B)(4)(a)-(f) governs Delta's liability for "damages sustained in the case of destruction or loss of, damage to, or delay of checked and unchecked baggage." *See also* Rule 17(B)(1).

275.   Delta's rules also state that passengers are entitled to compensation for delay and baggage issues as allowed by the Montreal Convention, up to specified monetary limits (e.g., 5,346 Special Drawing Rights (SDRs, a defined term), which equates to thousands of dollars, for delays; 1,288 SDRs for baggage).

276.   Despite this, Delta failed to mitigate the impact of significant flight delays and cancellations or to reimburse Plaintiffs for out-of-pocket expenses including alternate travel, lodging, meals, and lost/delayed baggage.

277.   Plaintiffs performed under the contract and satisfied all conditions

precedent.

278.  Delta breached its obligations under the International Contract of Carriage and/or Canadian Contract of Carriage by failing to: (a) provide timely transportation; (b) reasonably assist Plaintiffs and Class Members during delays and cancellations; and (c) reimburse or compensate passengers for expenses and losses covered by the International Contract of Carriage and/or Canadian Contract of Carriage and the Montreal Convention incorporated therein to the extent applicable.

279.  As a direct and proximate result of Delta's breach, Plaintiffs and Class Members suffered economic damages as a result of the substantial delays and/or cancellations, including but not limited to expenses for alternative airline tickets, meals, lodging, ground transportation, and/or expenses associated with lost or delayed baggage.

280.  Plaintiffs and Class Members seek compensatory damages in an amount to be proven at trial.

## COUNT IV

**BREACH OF CONTRACT[84]**
**FAILURE TO REFUND FARE**

**(On Behalf of All Plaintiffs and Class Members)**

281.   Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

282.   Defendant made offers to Plaintiffs and the Class Members to enter into a contract for Defendant to provide transportation services to Plaintiffs and the Class Members through passenger tickets for air travel between specific locations, on specific flight numbers, on specific dates and times, at specific prices.

283.   Defendant's offer to provide transportation services to Plaintiffs and the Class Members also included Defendant's offer that it would refund Plaintiffs and the Class Members for all cancellations and/or significantly changed flights.

284.   At all times relevant, such offers and terms were specifically identified in Defendant's Conditions of Carriage entered into between Plaintiffs and the Class Members on one hand, and Defendant on the other, at the time of ticket purchases.

285.   The Conditions of Carriage reflect Defendant's self-imposed

---

[84] References to Delta's "Contract" or "Conditions of Carriage" refer to Delta's U.S. Contract of Carriage, its Canadian Contract, and its International Contract. Quotes from the Contract in this Count refer to language in the U.S. Contract.

undertakings and obligations voluntarily undertaken by Defendant.

286.    Moreover, Plaintiffs and the Class Members did not draft the terms of the Conditions of Carriage, rather, on information and belief, Defendant (and/or Defendant's agents at Defendant's direction) drafted all terms therein.

287.    Defendant made such offers in writing through the Delta's direct channels (such as Delta's direct-to-consumer sales website, www.delta.com, and the company's mobile applications) and through traditional travel agencies and online travel agencies.

288.    Numerous sections of the Conditions of Carriage applicable at the time Plaintiffs and the Class Members purchased their tickets confirm passengers' contractual rights to refunds where a flight has been cancelled and/or significantly changed, regardless of the reason for a cancellation or delay.

289.    For example, Rule 19 Delta's Conditions of Carriage provides as follows:

RULE 19: FLIGHT DELAYS/CANCELLATIONS

A. Delta's Liability in the Event of Schedule Changes, Delays and Flight Cancellations

If there is a flight cancellation, diversion, delay of greater than 120 minutes, or that will cause a passenger to miss connections, Delta will (at passenger's request) cancel the remaining ticket and refund the unused portion of the ticket and unused ancillary fees in the original form of payment in accordance with Rule 22.

290.  Rule 22 of Delta's Conditions of Carriage provides as follows:

RULE 22: REFUNDS

A. Involuntary Refunds

If a refund is required because of Delta's failure to operate on schedule or refusal to transport (except as a result of passenger's failure to comply with the contract of carriage), the following refund will be made directly to you:

1) If no portion of the ticket has been used, the refund will be an amount equal to the fare paid.

2) If a portion of the ticket has been used and termination (interruption) occurs:

a) At A Fare Breakpoint - The refund will be an amount equal to the fare paid for the unused transportation from the point of termination (interruption) to the destination or next Stopover point named on the ticket, or to a point at which transportation is to be resumed. No refund will apply when alternate transportation is provided by Delta and accepted by the passenger.

b) Within A Fare Component - The refund will be an amount equal to the percentage of unflown mileage to fare component total mileage by prorating the fare paid for the fare component, from the point of termination/interruption to the destination, or next Stopover point named on the ticket, or to the point at which transportation is to be resumed. No refund will apply when alternate transportation is provided by Delta and accepted by the passenger.

291.   The terms of Defendant's offer to provide transportation services contained a definite promise by Defendant and gave Plaintiffs and the Class Members the power to agree to the terms of Defendant's offer to provide transportation services, including but not limited to, through the act of purchasing a ticket or accepting transportation on Defendant's aircraft.

292.   Plaintiffs and the Class Members accepted Defendant's offer to provide transportation services, agreeing to the material terms contained in Defendant's offer.

293.   Plaintiffs and the Class Members communicated their acceptance of Defendant's offer to Defendant by purchasing one or more tickets, booking transportation services with Defendant.

294.   The agreement between Plaintiffs, the Class Members, and Defendant included an exchange of promises or value, i.e., consideration.  Here, Plaintiffs and the Class Members provided Defendant with consideration in the form of amounts equal to the monetary value of the fare and all charges and taxes paid.

295.   Plaintiffs and the Class Members performed all obligations and conditions required and expected of them and/or had a valid excuse for not performing any such obligations.

296.    Defendant cancelled and/or significantly changed Plaintiffs' and the Class Members' flights.

297.   Defendant has failed to provide and/or has outright refused to provide refunds to Plaintiffs and the Class Members for such cancelled and/or significantly changed flights.

298.   Defendant did so even though Defendant was contractually obligated to provide refunds to Plaintiffs and the Class Members in such circumstances.

299.  As a result, Defendant has materially breached its contracts with Plaintiffs and the Class Members.

300.  Because of Defendant's failure to perform under the Contract, Plaintiffs and the Class Members have been damaged and/or did not receive the refunds, benefits, payment, and/or performance to which they were entitled.

301.  As a result, Plaintiffs and the Class Members are entitled to fair compensation in the form of complete refunds for all fares, charges, and taxes paid.

## COUNT V

### BREACH OF DOMESTIC CONTRACT OF CARRIAGE AND/OR INTERNATIONAL CONTRACT OF CARRIAGE AND/OR CANADIAN CONTRACT OF CARRIAGE AS MODIFIED BY THE TEMPORARY REIMBURSEMENT WAIVER

### (On Behalf of Plaintiff Brennan and the Non-Montreal Convention Class Members)

302.  Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.  This claim arises from Defendant's breach of its Domestic Contract of Carriage and/or its International Contract of Carriage and/or Canadian Contract of Carriage. (Each is referred to as the "Contract").

303.  Plaintiffs and the putative Classes entered into the Contract with Defendant in exchange for payment for air travel.

304.  The Contract was drafted solely by Defendant.

305.   Plaintiffs and members of the Classes performed under the Contract by purchasing tickets and complying with all conditions precedent.

306.   Due to Delta's extensive delays and/or cancellations, Plaintiffs did not receive the benefit of their bargain.

307.   On July 22, 2024, Delta modified the Contract to include a Temporary Reimbursement Waiver and a Temporary Travel Waiver applicable from July 19 to July 28, 2024.

308.   Under Rule 1 of the Contract, Delta may modify the terms after purchase where operationally necessary and not materially adverse to the passenger. The price of the ticket constituted consideration for this contractual right.

309.   The temporary waivers expanded reimbursement for out-of-pocket expenses due to delay or cancellation, including lodging, meals, and alternate transportation.

310.   These changes were operationally necessary to reduce passenger backlogs and system strain, and to ease congestion in airport seating areas by encouraging self-accommodation.

311.   The modifications benefitted passengers and did not impose a material negative impact.  They allowed reimbursement for expenses otherwise not covered under the original Contract.

91

312.    Delta breached both the original and modified Contracts by failing to provide timely transport or reimburse passengers per the expanded waiver terms.

313. As a result, Plaintiffs and the members of the Classes suffered damages, including costs for alternative flights, ground transportation, hotels, meals, and other expenses, in amounts to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment in their favor and against Defendant Delta Air Lines, Inc., and grant the following relief as set in detail below:

*A. As to the Montreal Convention Claims (Count I):*

(1)    Compensatory, economic, consequential, and/or pecuniary damages for damages occasioned by delay in the carriage of passengers, including but not limited to: (a) meals; (b) lodging; (c) ground transportation (train tickets, rental cars, ride shares, bus tickets, taxis, etc.); (d) alternative airfare and/or replacement flights; (e) alternative ground transportation; (f) replacement necessities; (e) missed cruises or prepaid excursions; (f) telephone expenses; (g) inconvenience; (h) lost wages or profits; and/or (i) otherwise (e.g., including but not limited to reimbursement of non-cancellable reservations), subject to applicable treaty limits where not waived or inapplicable.

(2)     Compensatory, economic, consequential, and/or pecuniary damages for damages occasioned by destruction, loss, damages, or delay in the carriage of baggage, subject to applicable treaty limits where not waived or inapplicable;

(3)     Other restitutionary measures;

(4)     Declaratory relief declaring Defendant's liability under the Montreal Convention for the complained-of delays of carriage of passengers and/or complained-of baggage destruction, loss, damage, or delay;

(5)     Declaratory relief that Defendant's modifications (if any) that reduced passenger rights under the Montreal Convention are deemed invalid, null, void, and unenforceable pursuant to Article 26 of the Montreal Convention;

(6)     Declaratory relief that Defendant's modifications (if any) that expanded passenger rights under the Montreal Convention are enforceable pursuant to Article 25 of the Montreal Convention; and/or

(7)     Pre-judgment and post-judgment interest as permitted by law;

B.     *As to Breach of International Contract of Carriage and Canadian Contract of Carriage as Modified by the Temporary Reimbursement Waiver (Count II):*

(1)     Compensatory, economic, consequential, and/or pecuniary damages for damages occasioned by delay in the carriage of passengers, including but not limited to: (a) meals; (b) lodging; (c) ground transportation (train tickets, rental

cars, ride shares, bus tickets, taxis, etc.); (d) alternative airfare and/or replacement flights; (e) alternative ground transportation; (f) replacement necessities; (e) missed cruises or prepaid excursions; (f) telephone expenses; (g) inconvenience; (h) lost wages or profits; and/or (i) otherwise (e.g., including but not limited to reimbursement of non-cancellable reservations) under the Montreal Convention provisions and associated case law;

(2)    Compensatory, economic, consequential, and/or pecuniary damages for damages occasioned by destruction, loss, damages, or delay in the carriage of baggage under the Montreal Convention provisions and associated case law;

(3)    Refund of the unflown portion of their ticket as modified by the Temporary Reimbursement Waiver for significant delay or flight cancelation. *See* Temporary Reimbursement Waiver;

(4)    Reimbursement of Out-of-Pocket expenses incurred during the disruption period as indicated in the applicable Contract of Carriage as modified by the Temporary Reimbursement Waiver for significant delay or flight cancelation, including: (a) hotel, transportation, and/or meal expenses; (b) fare paid to purchase another airline ticket in the same class of service, after subtracting the value of the unused Delta ticket; and/or (c) alternative transportation methods such as rental cars, rideshares, trains, or buses that a customer used to reach their destination, after subtracting the value of the unused Delta ticket;

(5)    Restitution and disgorgement of monies wrongfully retained by Defendant in violation of its contractual obligations and/or equitable relief requiring Defendant to honor its refund and/or reimbursement commitments uniformly and without conditioning payment on unlawful releases;

(6)    Declaratory relief that Defendant's modifications (if any) that reduced passenger rights are void and unenforceable consistent with Delta's Contract of Carriage. *See* ICOC at Rule 1(B); CCOC at Rule 1(D)(1);

(7)    Declaratory relief that Defendant's modifications of the Contracts of Carriage that expanded passenger rights are enforceable consistent with Delta's Contract of Carriage. *See* ICOC at Rule 1(B); CCOC at Rule 1(D)(1).

*C. As to Breach of International Contract of Carriage and Canadian Contract of Carriage for Refunds and/or Reimbursements of Out-of-Pocket Expenses (Count III):*

To the extent the Montreal Convention does apply:

(1)    Compensatory, economic, consequential, and/or pecuniary damages for damages occasioned by delay in the carriage of passengers, including but not limited to: (a) meals; (b) lodging; (c) ground transportation (train tickets, rental cars, ride shares, bus tickets, taxis, etc.); (d) alternative airfare and/or replacement flights; (e) alternative ground transportation; (f) replacement necessities; (e) missed cruises or prepaid excursions; (f) telephone expenses; (g) inconvenience; (h) lost

wages or profits; and/or (i) otherwise (e.g., including but not limited to reimbursement of non-cancellable reservations). *See, e.g.*, ICOC at Section 18(3)(c) (as to compensatory damages occasioned by delay in the carriage of passengers by air); CCOC at Section 191; 191(B)(3)(c) (same);

(2)     Compensatory, economic, consequential, and/or pecuniary damages for damages occasioned by destruction, loss, damages, or delay in the carriage of baggage. *See, e.g.*, ICOC at Section 18(4) (as to compensatory damages occasioned by delay, destruction, or loss of baggage.); CCOC at Section 191; 191(B)(4) (same);

(3)     Restitution and disgorgement of monies wrongfully retained by Defendant in violation of its contractual obligations and/or equitable relief requiring Defendant to honor its refund and/or reimbursement commitments uniformly and without conditioning payment on unlawful releases;

(4)     Declaratory relief that Defendant's modifications (if any) that reduced passenger rights are void and unenforceable consistent with Delta's Contract of Carriage. *See* ICOC at Rule 1(B); CCOC at Rule 1(D)(1);

(5)     Declaratory relief that Defendant's modifications of the Contracts of Carriage that expanded passenger rights are enforceable consistent with Delta's Contract of Carriage. *See* ICOC at Rule 1(B); CCOC at Rule 1(D)(1).

To the extent that the Montreal Convention does *not* apply:

(1)    As a result of significant delay or flight cancellation, refund of airfare in an amount equal to:

(a)    If no portion of the ticket has been used: the fare paid (including taxes and government-imposed fees or charges).

(b) If a portion of the ticket has been used and termination (interruption) occurs: (i) At a Fare Breakpoint: the fare paid (including taxes and government-imposed fees or charges) for the unused transportation from the point of termination (interruption) to the destination or next stopover point named on the ticket, or to a point at which transportation is to be resumed; (ii) Within a Fare Component: the percentage of unflown mileage to fare component total mileage by prorating the fare paid (including taxes and government-imposed fees or charges) for the fare component, from the point of termination/interruption to the destination, or next Stopover point named on the ticket, or to the point at which transportation is to be resumed;

(2)    As a result of significant delay or flight cancellation, provision of additional contractual amenities due to delays and/or flight cancellations: (a) Hotel stay or travel voucher and/or (b) Ground Transportation as outlined in the contract;

(3)    Compensatory and/or economic damages occasioned by delay in the carriage of passengers and/or failure to provide the aforementioned amenities, including but not limited to: (a) meals; (b) lodging; (c) ground transportation (train

tickets, rental cars, ride shares, bus tickets, taxis, etc.); (d) alternative airfare and/or replacement flights; (e) alternative ground transportation; (f) replacement necessities; (e) missed cruises or prepaid excursions; (f) telephone expenses; (g) inconvenience; (h) lost wages or profits; and/or (i) otherwise (e.g., including but not limited to reimbursement of non-cancellable reservations);

(4)     Restitution and disgorgement of monies wrongfully retained by Defendant in violation of its contractual obligations and/or equitable relief requiring Defendant to honor its refund and/or reimbursement commitments uniformly and without conditioning payment on unlawful releases;

(5)     Declaratory relief that Defendant's modifications (if any) that reduced passenger rights are void and unenforceable consistent with Delta's Contract of Carriage.  *See* ICOC at Rule 1(B); CCOC at Rule 1(D)(1);

(6)     Declaratory relief that Defendant's modifications of the Contracts of Carriage that expanded passenger rights are enforceable consistent with Delta's Contract of Carriage.  *See* ICOC at Rule 1(B); CCOC at Rule 1(D)(1).

*D. As to Breach of Contract for Failure to Refund Fares (Count IV):*

(1)     Refund of airfare in an amount equal to:

(a) If no portion of the ticket has been used: the fare paid (including taxes and government-imposed fees or charges);

(b) If a portion of the ticket has been used:

(i)     At a Fare Breakpoint: the fare paid (including taxes and government-imposed fees or charges) for the unused transportation from the point of termination (interruption) to the destination or next Stopover point named on the ticket, or to a point at which transportation is to be resumed;

(ii)     Within a Fare Component: the percentage of unflown mileage to fare component total mileage by prorating the fare paid (including taxes and government-imposed fees or charges) for the fare component, from the point of termination/interruption to the destination, or next Stopover point named on the ticket, or to the point at which transportation is to be resumed. *See* DCOC Rules 19(A) and 22(A); CCOC Rule 240(B) and 260;

(2)     Restitution and disgorgement of monies wrongfully retained by Defendant in violation of its contractual obligations and/or equitable relief requiring Defendant to honor its refund and/or reimbursement commitments uniformly and without conditioning payment on unlawful releases;

(3)     Declaratory relief that Defendant's modifications (if any) that reduced passenger rights are void and unenforceable consistent with Delta's Contract of Carriage. *See* DCOC Rule 1(B); ICOC at Rule 1(B); CCOC at Rule 1(D)(1);

(4)     Declaratory relief that Defendant's modifications of the Contracts of Carriage that expanded passenger rights are enforceable consistent with Delta's Contract of Carriage. *See* DCOC Rule 1(B); ICOC at Rule 1(B); CCOC at Rule

1(D)(1).

(5)     Compensatory and/or economic damages for damages occasioned by breach of contractual terms.

E.     *As to Breach of Domestic, International, and/or Canadian Contract of Carriage as Modified by the Temporary Reimbursement Waiver (Count V):*

As to Class Members subject to the Domestic Contract of Carriage and the International Contract of Carriage and Canadian Contract of Carriage Not Subject the Montreal Convention:

(1)     Refund of the unflown portion of their ticket as modified by the Temporary Reimbursement Waiver for significant delay or flight cancelation.  *See* Temporary Reimbursement Waiver;

(2)     Reimbursement of out-of-pocket expenses incurred during the disruption period as indicated in the applicable Contract of Carriage as modified by the Temporary Reimbursement Waiver for significant delay or flight cancelation, including: (a) hotel, transportation, and/or meal expenses; (b) fare paid to purchase another airline ticket in the same class of service, after subtracting the value of the unused Delta ticket; and/or (c) alternative transportation methods such as rental cars, rideshares, trains, or buses that a customer used to reach their destination, after subtracting the value of the unused Delta ticket;

(3)     Restitution and disgorgement of monies wrongfully retained by

Defendant in violation of its contractual obligations and/or equitable relief requiring Defendant to honor its refund and/or reimbursement commitments uniformly and without conditioning payment on unlawful releases;

(4)    Declaratory relief that Defendant's modifications (if any) that reduced passenger rights are void and unenforceable consistent with Delta's Contract of Carriage. *See* ICOC at Rule 1(B); CCOC at Rule 1(D)(1);

(5)    Declaratory relief that Defendant's modifications of the Contracts of Carriage that expanded passenger rights are enforceable consistent with Delta's Contract of Carriage. *See* ICOC at Rule 1(B); CCOC at Rule 1(D)(1).

F.    *Injunctive and Equitable Relief Applicable to All Counts*

(1) Injunctive relief prohibiting Defendant from:

(a)    Conditioning partial reimbursements on undisclosed or hidden releases;

(b)    Misrepresenting passengers' rights to refunds and reimbursement;

(c)    Failing to provide required notices and/or other disclosures during mass disruptions;

(d)    Equitable relief requiring Defendant to implement compliant refund and reimbursement practices consistent with its Contracts of Carriage, the Montreal Convention, and applicable law;

(e)    Injunctive relief requiring an accounting of the value of unflown

tickets under Delta's standard irregular operation refund policy and the value of unflown tickets under Delta's temporary waiver program.

G.    *General Relief on Behalf of the Classes:*

(1)    Certification of the proposed Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(2)    Appointment of Plaintiffs as Class Representatives of the Classes;

(3)    Designation of Plaintiffs' counsel as Class Counsel;

(4)    Grant of all appropriate relief including declaratory and injunctive relief on behalf of Plaintiff and the Classes;

(5)    Award of Pre-judgment and post-judgment interest to the fullest extent permitted by law;

(6)    Award of reasonable attorneys' fees, costs, and/or expenses; and/or

(7)    Grant of all such other relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs, individually and on behalf of the putative Classes, demand a trial by jury on all issues so triable.

Respectfully submitted,

Dated: <u>February 4, 2026</u>    By:    <u>*/s/ E. Adam Webb*</u>
E. Adam Webb
G. Franklin Lemond, Jr.
**WEBB, KLASE & LEMOND, LLC**
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
Tel: (770) 444-9325
Adam@WebbLLC.com
Franklin@WebbLLC.com

Joseph G. Sauder
Joseph B. Kenney
**SAUDER SCHELKOPF**
1109 Lancaster Avenue
Berwyn, PA 19312
Tel: (888) 711-9975
jgs@sstriallawyers.com
jbk@sstriallawyers.com

Francis J. "Casey" Flynn, Jr.
**Law Office of Francis J. Flynn, Jr.**
6057 Metropolitan Plaza
Los Angeles, CA 90036
Tel: (314) 662-2836
casey@lawofficeflynn.com

Tiffany Marko Yiatras
**Consumer Protection Legal, LLC**
308 Hutchinson Road
Ellisville, Missouri 63011-2029
Tel: (314) 541-0317
tiffany@consumerprotectionlegal.com

David A. Bain
**Law Offices of David A. Bain, LLC**
Suite 1050
1230 Peachtree St., N.E.
Atlanta, GA 30309
Tel: (404) 724-9990
dbain@bain-law.com

Paul Doolittle
Thomas William Sizemore
Georgia Bar No. 823195
**Poulin Willey Anastopoulo, LLC**
32 Ann Street
Charleston, SC 29403
Tel: (803) 222-2222
paul.doolittle@poulinwilley.com
teamsizemore@poulinwilley.com

**ATTORNEYS FOR PLAINTIFFS AND THE CLASS MEMBERS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 4, 2026, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which automatically sends email notification of such filing to all attorneys of record.

*/s/ G. Franklin Lemond, Jr.*
G. Franklin Lemond, Jr.
